# In the United States Court of Federal Claims

Nos. 20-44; 20-47; 20-55 (consolidated)
(Filed: 23 December 2021)

```
*****************************************
ROBERT L. CAMPO, et al.,           *
                                   *    Motion to Dismiss; RCFC 12(b)(6);
            Plaintiffs,            *    Fifth Amendment; Takings; Oysters;
                                   *    Compensable Property Right; Surreply;
v.                                 *    28 U.S.C. § 1497; Louisiana
                                   *
THE UNITED STATES,                 *
                                   *
            Defendant.             *
                                   *
*****************************************
```

*Camilo K. Salas III*, Salas & Co., L.C., with whom were *Michael G. Stag*, *Ashley M. Liuzza*, and *Mathew D. Rogenes*, all of Stag Liuzza, L.L.C., New Orleans, LA, for plaintiffs.

*William J. Shapiro*, Senior Trial Attorney, Environment and Natural Resources Division, Department of Justice, of Sacramento, CA, for the government.

## OPINION AND ORDER

In his 1690 Second Treatise of Government, John Locke famously noted "the labour of his body, and the work of his hands, we may say, are properly his. Whatsoever then he removes out of the state that nature hath provided, and left it in, he hath mixed his labour with, and joined to it something that is his own, and thereby makes it his property." Over 300 years later, this case raises the unique legal issue of whether Louisiana oyster growers may claim property rights in the fruits of their labor—oysters.

Plaintiff oyster farmers allege the United States deprived them of use, occupancy and enjoyment of their personal oyster stock and real property (oyster beds and reefs). The farmers allege the government actions resulted in a permanent taking of their property for a public use without payment of just compensation in violation of the Takings Clause of the United States Constitution. The government admits when plaintiffs sell oysters they are "paid for the fruits of [their] effort," and plaintiffs may assert rights to exclude, destroy, use, possess, recover for larceny, alienate, sue third parties for damages, and enjoy the fruits of selling oysters. Despite acknowledging those rights, the government moves to dismiss the portion of plaintiffs' claim alleging a taking of the oysters; the government argues plaintiff farmers lack a compensable property right in the oysters. For myriad reasons detailed *infra*, under Louisiana precedent, federal common law, and Lockean labor theory, plaintiffs undoubtedly have compensable property rights in their oysters. Accordingly, the Court **DENIES** the government's motion to dismiss in part pursuant to Rule 12(b)(6) of the Court of Federal Claims.

## I. Background[1]

### A. Oyster Industry in Louisiana

Oysters are "bivalves," which have two hard outer shells "composed primarily of calcium carbonate (CaCO$_3$)," and which encase "a soft inner [invertebrate] body." Class Action Compl. ("Compl.") at 10, ECF No. 1. Oysters "have been cultivated, grown, farmed, and harvested commercially in Louisiana since the mid[-]1800s" and, today, "Louisiana is the top harvester of oysters in the U.S. Gulf of Mexico ("Gulf") and has led the United States in oyster landings every year since 2000." Compl. at 9–10.

"Louisiana leads the nation in oyster production largely due to the state's successful public-private oyster cultivation partnership developed in the late 1800s and early 1900s." Compl. at 17. "In 1899, the U.S. Bureau of Fisheries (precursor to the U.S. Fish and Wildlife Service) investigated Louisiana's coastal area for possible expansion of oyster culture and made several recommendations for oyster fishery management, including encouraging the state to promote private investment in oyster cultivation." Compl. at 17–18. Parish governments subsequently ceded control of water bottom leases to Louisiana's state government. Compl. at 18. "Over the following decades, Louisiana passed numerous laws to assist and protect oyster leaseholders," and now, "Louisiana's oyster cultivation is governed by both legislative statutes (Louisiana Revised Statutes, Title 56) and rules promulgated by the [Louisiana Department of] Wildlife and Fisheries Commission [("LDWF")] (Louisiana Administrative Code, Title 76)." *Id.* State law specifies LDWF "[s]hall assist in protecting all lessees of private oyster bedding grounds in the enjoyment of their rights." *Id.* (citing La. Stat. Ann. § 56:6(16) (2014)).

"[B]y law all [but a few of] the water bottoms in the [S]tate of Louisiana are owned by the [S]tate of Louisiana." Mot. to Dismiss Oral Arg. Tr. ("Tr.") at 20:7–9, 20:23–21:5, ECF No. 26. "Oyster growers apply to lease the state-owned water bottoms through LDWF's Oyster Lease Survey Section," and where water bottoms are privately owned, "oyster farmers . . . obtain private leases from private owners of water bottoms." Compl. at 18. The state-owned water bottom leases are issued "for a typical term of 15 years, currently at a rate of $3.00 per acre (as of January 1, 2016)." *Id.* Notably, for this price "state law provides the lessee with exclusive use of the water bottoms." *Id.* at 18–19. Oyster farmers generally "harvest oysters from private leases from May through September when public oyster areas are closed to harvesting oysters for market purposes." *Id.* "Oyster farmers often transplant seed oysters from public oyster[] areas to their private leases to 'bed' them whenever the public oyster areas are open, most frequently during September, October, March, and April." *Id.* Louisiana also regulates the oyster industry by requiring "licenses to commercially harvest or possess oysters in Louisiana waters, . . . gear licenses for scrapers and tongs[, and] . . . [t]he captain of the harvest vessel must also have an

---

[1] The Court draws the following facts from plaintiffs' filings, "accept[ing] all well-pleaded factual allegations as true and draw[ing] all reasonable inferences in [the nonmovants'] favor." *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000); *see also Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)) ("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.").

Oyster Harvesting License." *Id.* at 19–20.  Separate licenses are also required to sell oysters directly to consumers or non-consumers.  Compl. at 20.

To survive and thrive, oysters must attach to the water bottoms.  *Id.* at 12.  Soft-bodied, hard-shelled oysters "cannot attach themselves to the mud[dy] . . . water bottoms," Tr. at 8:18–24, rather oysters require "hard, clean substrate, including existing oyster reef as well as non-native substrates such as limestone rock, concrete, dock pilings, and bulkheads," Compl. at 10.  Thus, after securing an oyster lease, an oyster grower must fix the "generally muddy" water bottoms, Tr. at 9:18–20, by ensuring the oysters have a hard substrate "to attach themselves to."  Tr. at 9:2; Compl. at 32.  The government "note[s] that the hard surface on which the oysters may attach . . . is sometimes called cultch."  Tr. at 12:8–11.  Leaseholders "get rock material, small rocks, and they will go and lay . . . rocks at the bottom, so that they will create a hard surface on which the oysters can grow."  Tr. at 9:6–10.  Also, "the shells that are . . . left over after the oysters have been removed . . . can be thrown back on the beds . . . to create the beds."  Tr. at 9:11–15.

After "fixing" the beds, the oyster grower must obtain "tiny oysters," or "seed," from "public seeding areas" and "bring [the seed] down to [their] water bottoms."  Tr. at 10:6–22.  "[T]ypically the time period between . . . bringing the tiny little oysters and the time where they can be actually harvested is approximately four years or five years."  Tr. at 10:22–11:2.  The government states laying cultch, seeding, and harvesting "takes a lot of labor effort," "it's pretty difficult work," Tr. at 15:13–16, and "[i]f you have to put the cultch down, that can be quite expensive," Tr. at 13:19–20.  *See also Avenal v. State*, 886 So. 2d 1085, 1110 (La. 2004) (Weimer, J., concurring) (footnote omitted) ("Oyster farming has historically been arduous, backbreaking work requiring a special dedication. . . .  Louisiana has historically leased water bottoms for a nominal value because this property had little intrinsic value.  Through hard work and dedication, many oyster fishermen built reefs with materials referred to as cultch over the muddy water bottoms, turning unproductive lands into an area producing bountiful crops of oysters.").

## B.  The Bonnet Carré Spillway

"[I]n response to the Great Mississippi flood of 1927," Compl. at 23, "the [United States Army Corps of Engineers ('Corps')] authorized the construction of the Bonnet Carré Spillway in 1928," Tr. at 30:5–8.  In 1931, the spillway was completed as "a flood control structure in the Lower Mississippi Valley."  Compl. at 20.  "Located in St. Charles Parish, Louisiana about 32.8 miles west of New Orleans, [the spillway] allows floodwaters from the Mississippi River to flow into Lake Pontchartrain and thence into the Lake Pontchartrain Basin, including Lake Pontchartrain, Lake Borgne, the Biloxi Marshes, Chandeleur Sound, Breton Sound, the Mississippi Sound and ultimately the Gulf of Mexico."  *Id.*  The spillway "has a design capacity of 250,000 cu ft/s (7,100 m$^3$/s)."  *Id.* at 21.

"The decision to operate or 'open' the Bonnet Carré Spillway is the responsibility of the Mississippi River Commission ('MRC') president."  *Id.* at 22.  "The MRC president relies heavily on the recommendations of the Corps' New Orleans District Engineer, who is responsible for the actual operation of the control structure and the floodway of the Bonnet Carré

Spillway." *Id.* The MRC predates the Bonnet Carré Spillway, having been established by "an Act of Congress on June 28, 1879." *Id.* "The decision to operate the Bonnet Carré Spillway is made when existing conditions, combined with predicted river stages and discharges, indicate that the mainline levees in New Orleans and other downstream communities will be subjected to unacceptable stress from high water." Compl. at 22. The Bonnet Carré Spillway was "first opened during the flood of 1937, and twelve times thereafter through February 2019, to lower river stages at New Orleans." *Id.* at 23–24.

### C. Environmental Factors Affecting Oyster Mortality in Louisiana

Eastern Oysters are a variety of oysters home to the "East Coast of North America from the Gulf of St. Lawrence in Canada to the Yucatan Peninsula in the Gulf," including the entire Gulf Coast of Louisiana. *Id.* at 10 (citation omitted). Eastern Oysters "prefer moderate salinities of between 5 to 15 parts per thousand ('ppt'), which minimize predator or disease threats without inhibiting physiological processes." *Id.* at 10. This water is colloquially known as "brackish" as it is "kind of a mixture of salt and fresh." Tr. at 30:1–2. Assuming sufficient food supply, "temperature and salinity are the most important natural environmental factors affecting oyster growth." Compl. at 12.

Tests show oysters along the Gulf Coast can tolerate temperatures ranging from 28°F to 120°F and salinities ranging from 0 to 42.5 ppt. *Id.* at 13. A recent study in Breton Sound, Louisiana found that adult oyster mortality increases with temperature but also with salinities under 9 ppt or over 13 ppt. *Id.* (citation omitted). Water salinity and temperature also affect developing larvae mortality and whether larvae can successfully settle and attach themselves to hard substrate on the water bottom. *Id.* (citation omitted). "A critical component of salinity and temperature induced oyster mortality is the duration of exposure to extreme conditions" such as "higher or lower salinity." *Id.* at 14. "It is generally accepted that oysters are more tolerant of extreme salinities at lower temperatures due to decreased metabolic activity," whereas oysters are less tolerant to extreme salinity in waters at a higher temperature. *Id.* In other words, during cold weather, oysters can often withstand prolonged exposure to fresh water but in warmer weather, prolonged exposure to fresh water can increase oyster mortality. Compl. at 14 (citation omitted).

"In a study entitled 'Salinity Changes in Pontchartrain Basin Estuary Resulting From Bonnet Carré Freshwater Diversion,' Technical Report CHL-97-2 prepared by the Corps' Waterways Experiment Station in February 1997, the Corps concluded that: '[t]he estuary responds very slowly to changes in freshwater inflow to Lake Pontchartrain. For example, in the Biloxi Marshes salinity effects are noticeable within 30 days of a change in flow, but the peak effect occurs around 60 days and a noticeable residual effect remains at 120 days.'" *Id.* at 16. The Corps also found a discharge capacity of about 30,000 cu ft/s ("cfs") would reduce salinities to about 6 ppt in the Biloxi Marshes, "which would become even lower two months later due to the slow response of the natural system." *Id.* at 16–17.

### D.  The Government's Opening the Spillway in 2019

In 2019, the Corps opened the Bonnet Carré Spillway for a total of 123 days, first from 27 February until 11 April and then from 10 May until 27 July.  *Id.* at 2, 24–25.  During the first 2019 opening, the peak flow rate was "213,000 cfs on March 19, 2019" and during the second 2019 opening, the peak flow rate was "161,000 cfs on May 21, 2019."  *Id.* at 24–25.  "[2019] marked the first time in the spillway's history that it was opened twice in one year."  *Id.* at 25.  These two openings released "nearly ten trillion gallons of freshwater from the Mississippi River into [oyster estuaries] . . . lowering the natural and essential salinity levels of the waters and marshes where plaintiffs . . . oyster leases are located . . . ."  Compl. at 32–33.

On 13 June 2019, the Governor of Louisiana, "John Bell Edwards, sent a letter to the United State Secretary of Commerce" admitting "[t]he extreme influx of freshwater [from the Bonnet Carré Spillway opening] has greatly reduced salinity levels in our coastal waters and disrupted estuarine productivity."  *Id.* at 29 (quoting Governor's Letter).  The Governor further stated:  "The most recent sampling of oyster reefs indicated a mortality range of 14% up to 100%.  Private oyster leaseholders in nearby areas have indicated to LDWF they have suffered between 50% and 100% mortality on their oyster reefs, with additional mortalities still ongoing in multiple areas."  *Id.* (quoting the Governor's Letter).  On 3 July 2019, "the Louisiana Department of Health announced the closing of several oyster-harvesting areas due to the low salinity levels caused by the influx of fresh water from the Mississippi River resulting from the opening of the Bonnet Carré Spillway."  *Id.*

## II.  Procedural History

On 14 January 2020, plaintiffs, Robert L. Campo, Michael Campo, Lepetich Aquaculture, L.L.C., and M.J. Lepetich Oysters, L.L.C., along with several consolidated plaintiffs (collectively, "plaintiffs"), filed a complaint alleging "[a]s a direct, natural or probable consequence of the opening of the Bonnet Carré Spillway during the year 2019, plaintiffs and the putative Class members have been deprived of the use, occupancy and enjoyment of their personal (oyster stock) and real (oyster beds and reefs) property, resulting in a permanent taking of their property for a public use, without payment of just compensation."  *See* Compl. at 33.  The Court granted the parties' motion to consolidate Case Nos. 20-47 & 20-55 with this case on 1 May 2020.  *See* Order, ECF No. 10.  The government then moved to dismiss in part plaintiffs' complaint pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") arguing plaintiffs lack a compensable property right in the oysters themselves.  *See* United States' Mot. to Dismiss in Part ("Def.'s MTD"), ECF No. 11.  Plaintiffs responded to the government's motion to dismiss by stating the Takings Clause applies to all forms of property rights and not only ownership. Pls.' Resp./Opp'n to the United States' Mot. to Dismiss in Part ("Pls.' Resp.") at 7, ECF No. 14.  On 27 July 2020, the government filed a reply averring none of plaintiffs' arguments contradict its argument the State of Louisiana owns the oysters, not plaintiffs.  United States' Reply in Supp. of Mot. to Dismiss in Part ("Def.'s Reply") at 2–3, ECF No. 15.

On 1 February 2021, plaintiffs filed a motion for leave to file a surreply in opposition to the government's motion to dismiss in part.  *See* Mot. for Leave to File Pls.' Surreply in Opp'n

to the United States' Mot. to Dismiss in Part ("Pls.' Surreply Mot."), ECF No. 21.  In their surreply, plaintiffs present two arguments:  (1) Louisiana's statutory scheme for leasing water bottoms gives plaintiffs the right to possess the oysters they grow and plaintiffs own these oysters through possession; and (2) this Court has jurisdiction over their action pursuant to 28 U.S.C. § 1497 (2018).  *See* Pls.' Surreply in Opp'n to the United States' Mot. to Dismiss in Part ("Pls.' Surreply Suppl."), ECF No. 21-1.  In response, the government argues plaintiffs fail to justify their filing of a surreply and if the Court grants plaintiffs' motion, it should conclude neither argument has merit.  *See* United States' Resp. to Pls.' Mot. for Leave to File Surreply ("Def.'s Surreply Resp."), ECF No. 22.

On 9 July 2021, the Court held oral argument on the government's motion to dismiss in New Orleans, Louisiana.  *See* Order, ECF No. 23.  After oral argument, the Court ordered the parties to file supplemental briefing to address the appropriate application of Louisiana Supreme Court decisions.  *See* Order, ECF No. 24.  On 30 July 2021, the government filed its supplemental brief wherein the government argues Louisiana Supreme Court's precedent, *Avenal v. State*, 886 So. 2d 1085 (La. 2004), squarely resolves the question presented in the government's motion and is binding authority.  *See* United States' Suppl. Br. ("Def.'s Suppl. Br."), ECF No. 27.  Plaintiffs filed their supplemental brief on 5 August 2021, arguing *Avenal v. State* does not address the key issues presented in this case and thus this Court is not bound by it.  *See* Pls.' Resp. to the United States' Suppl. Br. ("Pls.' Suppl. Br."), ECF No. 28.

## III. Parties' Arguments Regarding the Government's Motion to Dismiss Under RCFC 12(b)(6)

The government moves to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(6) arguing, "[t]he Court should dismiss the portion of Plaintiffs' claim alleging a taking of the oysters themselves because, pursuant to Louisiana state law, Plaintiffs lack a compensable property right in the oysters."  Def.'s MTD at 1.  In its supplemental brief, the government argues, "[t]he Louisiana Supreme Court's interpretation of state law in *Avenal v. State*, 886 So. 2d 1085 (La. 2004), squarely resolved the question presented in the United States' Motion to Dismiss in Part . . . and is binding authority."  Def.'s Suppl. Br. at 1.  The government continues, "[i]n rejecting the *Avenal v. State* plaintiffs' claims, the Louisiana Supreme Court confirmed that '[t]he state owns the waters.  [La. Stat. Ann. § 9:1101].  The state owns the oysters.  La. Stat. Ann. § 56:3.  Thus, the [s]tate could not take its own property.'"  Def.'s MTD at 6 (citing *Avenal*, 886 So. 2d at 1106).  The government also asserts, "the Federal Circuit's decision in *Avenal v. United States* does not support plaintiffs' position" because "the Federal Circuit did not address who owns the *oysters* themselves."  Def.'s Reply at 2–3.  The government adds, plaintiffs are incorrect in contending "they have some property right in the oysters, despite state law to the contrary."  *Id.* at 2.

In response to plaintiffs' motion to file a surreply, the government argues, "the United States' discussion of dispositive state legal authority in its [r]eply does not justify the filing of a surreply.  And, even if the Court grants Plaintiffs' motion, Plaintiffs' Surreply offers no grounds to circumvent controlling state precedent."  Def.'s Surreply Resp. at 1.  The government also urges the Court to reject plaintiffs' arguments regarding 28 U.S.C. § 1497 (2018) because this claim is not properly raised in plaintiffs' complaint.  *Id.* at 8.  The government alternatively

argues plaintiffs' claim falls outside the scope of § 1497 as plaintiffs do not allege "the United States damaged oyster leases by dredging or some other activity related to dredging operations," nor do plaintiffs allege "the Corps' operation of the Bonnet Carré Spillway in 2019 was the 'use of other machinery and equipment in making river and harbor improvements authorized by Act of Congress.'"  *Id.* at 9 (quoting 28 U.S.C. § 1497).  The government adds, "Section 1497 does not apply retroactively to the Bonnet Carré Spillway," nor does § 1497 overcome the fact that "Plaintiffs do not own the oysters on State-owned waterbottoms."  *Id.* at 11–13.

Plaintiffs respond as follows to the government's motion to dismiss in part:  "The word 'property' in the Takings Clause includes every sort of interest a citizen may possess and is not limited ownership.  The government improperly construes the word 'property' as being synonymous with 'ownership.'"  Pls.' Resp. at 7.  Plaintiffs also contend, "oysters constitute 'property' within the meaning of Louisiana law" because "Louisiana's statutory scheme for the leasing of state-owned bottoms to private parties for the purpose of oyster farming gives the Plaintiffs the right to possess and sell the oysters they grow on the water bottoms leased from the State of Louisiana, and to enjoy the profits derived therefrom."  *Id.* at 11.  In their supplemental brief, plaintiffs argue, "this Court should reject the government's invitation to disregard the Federal Circuit's decision in the federal *Avenal* case and to follow instead the Louisiana Supreme Court's decision in the state *Avenal* case."  Pls.' Suppl. Br. at 4.

Plaintiffs argue in their surreply, "Louisiana's statutory scheme for the leasing of state-owned bottoms to private parties for the purpose of oyster farming gives the Plaintiffs the right to *possess* the oysters they grow on the water bottoms they lease from the State of Louisiana and through possession they own the oysters they grow on those leases."  Pls.' Surreply Suppl. at 3.  Plaintiffs also argue "[t]his Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1497."  *Id.* at 13.

## IV.  Applicable Law

### A.  Filing a Surreply

A party "may not raise new arguments in a reply brief."  *CliniComp Int'l, Inc. v. United States*, 135 Fed. Cl. 477, 482 (2017).  "The standard for granting a leave to file a surreply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001) (denying the petitioner's motion to file a surreply because it did not involve a new matter but rather an alleged mischaracterization).  The decision to grant or deny leave to file a surreply is committed to the sound discretion of the court, and the court considers whether the surreply is helpful to the adjudication of the motion and whether defendant will be unduly prejudiced if the court grants leave.  *Plunkett v. Dep't of Just.*, 249 F. Supp. 3d 73, 74 n.2 (D.D.C. 2017), *aff'd sub nom. Plunkett v. Doe*, No. 17-5087, 2018 WL 1388574 (D.C. Cir. Feb. 21, 2018) (citation and quotations omitted).

**B.  The Government's Motion to Dismiss Pursuant to RCFC 12(b)(6)**

The Court must dismiss a complaint that fails to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).  *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  To defeat a RCFC 12(b)(6) motion to dismiss, plaintiffs must show the complaint contains facts sufficient to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013).  This showing "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citation omitted).  When the factual allegations of a complaint, even if true, do not support a claim for relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the court and the parties.  *Id.* at 557–58; *see also Abbott Lab'ys. v. Brennan*, 952 F.2d 1346, 1354 (Fed. Cir. 1991) (stating dismissal "is appropriate if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." (citation and quotation marks omitted)).

When evaluating a RCFC 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint, and must indulge all reasonable inferences in favor of the non-movant."  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).  The Court should not, however, "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

**C.  The Fifth Amendment and the Application of State Law**

The Takings Clause of the Fifth Amendment provides "private property" may not "be taken for public use, without just compensation."  U.S. Const. amend. V.  Thus, to prevail on a takings claim, a plaintiff first must demonstrate that he has a protectable property interest.  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984).  "Generally speaking, state law defines property interests . . . ." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 707 (2010) (citation omitted).  This is because "[p]roperty interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

**D.  Property Interests Under Louisiana Law**

"Louisiana's oyster cultivation is governed by both legislative statutes (Louisiana Revised Statutes, Title 56) and rules promulgated by the Wildlife and Fisheries Commission (Louisiana Administrative Code, Title 76)."  Compl. at 18.

The Fifth Circuit explains, under Louisiana law, the essential features of the "bundle of rights" commonly characterized as "property" are as follows:

- 8 -

(1) *usus*—the right to use or possess, i.e., hold, occupy, and utilize the property; (2) *abusus*—the right to abuse or alienate, i.e., transfer, lease, and encumber the property, and (3) *fructus*—the right to the fruits, i.e., to receive and enjoy the earnings, profits, rents, and revenues produced by or derived from the property.

*Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 269 (5th Cir. 2012) (quoting *Rodrigue v. Rodrigue*, 218 F.3d 432, 436–37 (5th Cir. 2000)).

## V.  Whether Plaintiffs' Show Good Cause Sufficient to File a Surreply

Plaintiffs seek leave to file a surreply "in order to address various issues first raised in the United States' Reply."  Pls.' Surreply Mot. at 1.  Plaintiffs argue, "[i]n its Reply at p. 5, the government for the first time cites to an Opinion issued by the Louisiana State Attorney General," and "Plaintiffs must respond to the government's new arguments that use the word *possession*, because that word has special meaning under Louisiana law."  *Id.* at 2 (emphasis altered).  Plaintiffs also state they must respond to the government's argument regarding "Louisiana Civil Code art. 3413 and Revised Statute 14:67(A)" which plaintiffs assert the government cites for the first time in its reply brief.  *Id.*  The government responds, "Plaintiffs' Surreply . . . merely repeats the same argument Plaintiffs make in their Opposition" and thus the Court should deny plaintiff's motion for leave to file a surreply.  Def.'s Surreply Resp. at 2.

A party "may not raise new arguments in a reply brief."  *CliniComp Int'l, Inc.*, 135 Fed. Cl. at 482.  "The standard for granting a leave to file a surreply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001) (denying petitioner's motion to file a surreply because it did not involve a new matter but rather an alleged mischaracterization).  "The decision to grant or deny leave to file a surreply is committed to the sound discretion of the court, and in making its decision, the court may consider whether the surreply is helpful to the adjudication of the motion and whether defendant will be unduly prejudiced if the court grants leave."  *Plunkett*, 249 F. Supp. 3d at 74 n.2 (citation and quotations omitted).  Given the parties' surreply briefing provides useful clarifications to this complex case and the government does not aver it will be unduly prejudiced, the Court grants plaintiffs' motion for leave to file a surreply, which is deemed filed.  *See Ute Indian Tribe of Uintah & Ouray Indian Rsrv. v. United States*, 145 Fed. Cl. 609, 617 n.6 (2019) (granting the Tribe's motion to file a surreply because the surreply provided helpful clarifications).  Accordingly, the Court will consider the arguments in plaintiffs' surreply supplement as well as the government's arguments in response.

## VI.  Precedential Value of Louisiana Supreme Court Decisions and Other Sources of Law

Both parties agree Louisiana state law is "[e]xclusively controlling."  Tr. at 91:19–25; Def.'s Suppl. Br. at 1.  The parties, however, disagree as to whether Louisiana's civil law regime affects the precedential value of Louisiana Supreme Court decisions on this Court.  The government argues a single Louisiana Supreme Court decision binds this Court, whereas plaintiffs aver the following order of precedence:  (1) Louisiana Civil Code; then (2) Louisiana

Revised Statutes; then (3) Federal Circuit and other federal circuit court case law; and then (4) a "series of" Louisiana state court interpretations.  Tr. at 92:2–93:9.

In Louisiana, a civil code jurisdiction, "[t]he sources of law are legislation and custom." La. Civ. Code Ann. art. 1.  Louisiana courts *may* look to "persuasive or secondary sources of law such as jurisprudence, doctrine, conventional usages, and equity," La. Civ. Code Ann. art. 1 cmt. B; however, "[j]udicial decisions . . . are not intended to be an authoritative source of law in Louisiana . . . .  [O]ur civilian tradition does not recognize the doctrine of *stare decisis* in our state."  *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 79 So. 3d 246, 256 (La. 2011) (quoting *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 128 (La. 2000), *opinion corrected on reh'g*, 782 So. 2d 573 (La. 2001)).  Rather than applying *stare decisis*, Louisiana courts recognize *jurisprudence constante*, which "operates with 'considerable persuasive authority'" where "a series of decisions form a 'constant stream of uniform and homogeneous rulings having the same reasoning[.]'"  *Id.* (quoting *Doerr*, 774 So. 2d at 128).  The Court must therefore determine the precedential value, if any, of Louisiana Supreme Court interpretations of Louisiana law and how these interpretations rank against other sources of law such as state statutes and traditional property principles.

## A.  Whether Louisiana Supreme Court Decisions Bind Federal Courts

The government asserts "Louisiana's civil law regime does not affect this Court's reliance on Louisiana Supreme Court decisions."  Def.'s Suppl. Br. at 1.  The government states "Louisiana courts follow a 'hybrid Civil Law/common law approach' . . . [which] means the Louisiana Supreme Court *itself* may, on rare occasion, depart from its own controlling precedent . . . [but] other courts *are themselves bound* to the decisions of the Louisiana Supreme Court."  *Id.* at 2–3 (citations omitted).  For support, the government cites several cases where the Louisiana Supreme Court stated their decisions bind Louisiana lower courts.  *See id.* at 3.  The government similarly asserts, "[i]n Fifth Amendment cases, [the Court of Federal Claims] and other federal courts have evaluated Louisiana property law by deferring to the Louisiana Supreme Court's interpretation of state law."  *Id.* at 3–4 (citing *Nat'l Food & Beverage Co. v. United States*, 103 Fed. Cl. 63, 68 (2012); *United States v. 0.073 acres of land, more or less, situate in Pars. of Orleans & Jefferson, Louisiana*, 705 F.3d 540, 545 (5th Cir. 2013)).

The government continues, "[t]he Court's evaluation of Louisiana state law here is nearly identical to the exercise an Article III court undertakes when applying state law in a diversity case under [the *Erie* doctrine]."  *Id.* at 4.  "The Fifth Circuit has made such assessments of Louisiana state law on numerous occasions, and it consistently holds in such circumstances that the federal court's task is 'to determine as best [we] can [how] the Louisiana Supreme Court would decide it.'"  *Id.* (quoting *Jorge-Chavelas v. Louisiana Farm Bureau Cas. Ins. Co.*, 917 F.3d 847, 850 (5th Cir. 2019)).  The government cites *Keenan v. Donaldson, Lufkin & Jenrette, Inc.*, 529 F.3d 569, 573 (5th Cir. 2008), for the principle "[a] final decision of the Louisiana Supreme Court on the issues presented would be controlling."  The government contends, "[f]ederal courts make a so-called '*Erie* guess about Louisiana law' only when there exists an '*absence* of a controlling high court decision . . . .'"  Def.'s Suppl. Br. at 5 (quoting *Jorge-Chavelas*, 917 F.3d at 850–51).  The government adds Louisiana "allows the United States Supreme Court or Article III appellate courts to certify 'questions or propositions of law of this

- 10 -

state' where 'there are no clear controlling precedents in the decisions of the supreme court of this state' to the Louisiana Supreme Court for resolution." *Id.* at 4 n.3 (quoting La. Sup. Ct. R. XII).[2]  The government considers this rule "nonsensical if the decisions of the Louisiana Supreme Court did not create 'controlling precedents.'" *Id.*

The government also argues this Court should follow Louisiana Supreme Court decisions because Louisiana jurisprudence states "when a law has been interpreted by the Louisiana Supreme Court, and the legislature has not seen fit to change that law, it must be assumed that the legislature has adopted such interpretation." *Id.* at 6 (quoting *LaFourche Par. Water Dist. No. 1 v. Digco Util. Const., L.P.*, 275 So. 3d 20, 25 (La. App. 1 Cir. 2019), *writ denied*, 274 So. 3d 1257 (La. 2019)).  The government states, "'it must be assumed,' *LaFourche Par[.]*, 275 So. 3d at 25, that the Louisiana legislature has adopted the Louisiana Supreme Court's interpretation of state law" when "[t]he Louisiana legislature has not enacted new laws to change [a Louisiana Supreme Court] holding despite having ample opportunity over nearly two decades to do so." Def.'s Suppl. Br. at 7.  The government also asserts "Louisiana law provides that court decisions addressing a 'rule of property' must be followed unless the Louisiana legislature adopts a legislative change." *Id.*

To the government's contention that Louisiana state courts are bound by decisions of the Louisiana Supreme Court, plaintiffs respond, "that is debatable" and "that intermediate [Louisiana state] courts may follow decisions of the Louisiana Supreme Court does not mean that this federal Court is bound by those decisions." Pls.' Resp. Suppl. Br. at 6.  Plaintiffs also argue, "[t]he fact that other federal courts may rely on Louisiana court decisions as persuasive sources of law does not mean this Court is bound by any decision of the Louisiana Supreme Court." *Id.*  Plaintiffs also state, "a single decision by the Louisiana Supreme Court on the issue for which the government has cited it, is not binding on this Court." *Id.* at 7–8 (citing *Boyett v. Redland Ins. Co.*, 741 F.3d 604 (5th Cir. 2014); *Bergeron v. Richardson*, 320 So. 3d 1109 (La. 2021)).

Plaintiffs argue there is no judicially established "rule of property" in Louisiana law because Louisiana adopted a new constitution in 1974 stating judicial decisions are not sources of law but rather interpretations. *Id.* at 8.  *Jurisprudence constante* is summarized as "a series of decisions form[ing] a constant stream of uniform and homogeneous rulings having the same reasoning," *see Boyette*, 741 F.3d at 607 n.19, so plaintiffs aver "one single state [Supreme Court] case lacks the consistency required to become even considerable persuasive authority, much less an authoritative expression of law," Pls.' Resp. Suppl. Br. at 9.

---

[2] Federal courts generally certify complex questions of state law, such as whether plaintiffs have compensable rights in oysters against the United States under Louisiana law, to the state's highest court. *See, e.g.*, *Borcik v. Crosby Tugs, L.L.C.*, 222 So. 3d 672, 673 (La. 2017) (defining "'good faith' as used in R.S. 30:2027" upon certification by the Fifth Circuit).  The Louisiana Supreme Court, however, only allows "the Supreme Court of the United States, or . . . any circuit court of appeal of the United States" to certify questions involving Louisiana state law; there is no express allowance for a federal district court or an Article I trial court to certify a question.  La. Sup. Ct. R. XII. Although it would be beneficial to certify this question, this Court cannot certify a question to the Louisiana Supreme Court, therefore this Court must itself decide this tough issue of Louisiana state law. *Id.*  Notably, the Federal Circuit as a "circuit court of appeal of the United States" could certify this question to the Louisiana Supreme Court. *Id.*

A federal court "has a duty to determine state law as it believes the State's highest court would," *Hulin v. Fibreboard Corp.*, 178 F.3d 316, 328 (5th Cir. 1999), and "[a] final decision of the Louisiana Supreme Court on the issues presented would be controlling," *Keenan*, 529 F.3d at 573.[3]  If Louisiana Supreme Court precedent does not decide the issues presented because it is distinguishable from the case at hand, this Court "must determine, in our best judgment, how we believe [the Louisiana Supreme Court] would resolve the issue." *Boyett*, 741 F.3d at 607 (stating, "[a]s the Louisiana Supreme Court has not addressed [the two issues in this case], the district court had to make an '*Erie* guess' as to these two issues."); *see 0.073 Acres of Land*, 705 F.3d at 543 ("Neither [the Fifth Circuit] nor Louisiana courts have ruled whether the right to collect assessments, or real covenants generally, are compensable under the Takings Clause" so the Fifth Circuit considered the Louisiana Civil Code, statutes, jurisprudence, common law, and public policy to conclude the homeowners' association's right to collect assessments from townhome owners are not compensable property interests under the Takings Clause).

The government correctly offers *National Food* as an example where this court deferred to Louisiana Supreme Court precedent; however, Judge Lettow followed the Louisiana Supreme Court's constructions of mineral servitude reservations because "[n]o reason ar[ose] to give the term . . . a broader meaning than has been ascribed to similar phrases by the Louisiana Supreme Court." *Nat'l Food*, 103 Fed. Cl. at 68 (holding "[u]nder Louisiana law, National Food has a compensable property interest in the clay located on its land."). The court's language implies it might not have followed Louisiana Supreme Court precedent if a compelling reason arose to do otherwise. *Id.*

The government's "rule of property" argument also presumes the Louisiana Supreme Court has decided the specific issues presented in this case and the Louisiana legislature did not see fit to change the law. *LaFourche Par.*, 275 So. 3d at 25. If the Louisiana Supreme Court has not decided the issues presented in this case, then the legislature would not have reason to change the law and consequently the Louisiana Supreme Court's interpretation would not bind this Court as a "rule of property." *See id.* (following a Louisiana Supreme Court interpretation when "the Supreme Court has specifically instructed [the relevant statutory interpretation]."). The government's statement a court must follow a prior decision if the legislature has not modified it, is also incomplete—a more complete statement is as follows: "when the jurisprudence has consistently established a uniform interpretation of a statute that governs property rights, that jurisprudence constitutes a 'rule of property' which must be followed absent a legislative mandate to the contrary." *Garrett v. Pioneer Prod. Corp.*, 390 So. 2d 851, 856 (La.

---

[3] Note, however, if the Louisiana Supreme Court were considering whether plaintiffs have compensable rights in oysters against the United States under Louisiana law, it would not be bound by its own precedent. According to the Louisiana Supreme Court, "a single decision is not binding on our courts." *Eagle Pipe & Supply, Inc.*, 79 So. 3d 246, 256 (La. 2011); *Unwired Telecom Corp. v. Par. of Calcasieu*, 903 So. 2d 392, 405–06 (La. 2005); *Doerr*, 774 So. 2d at 128. "Indeed, '[s]tare decisis is foreign to the Civil Law, including Louisiana.'" *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003); *see also Bergeron*, 320 So. 3d at 1116 (stating, "*[j]urisprudence constante* does not preclude us from overruling [precedent] and applying the plain language of [the statute]."). While the Louisiana Supreme Court is not bound by its own prior rulings, Louisiana "[t]rial courts and courts of appeal are bound to follow the last expression of law of the Louisiana Supreme Court." *Lucky v. Fricks*, 511 So. 2d 1315, 1317 (La. App. 2 Cir. 1987), *writ denied,* 514 So. 2d 455 (La. 1987); *see Pelican State Assocs., Inc. v. Winder*, 219 So. 2d 500, 503 (La. 1969) ("[T]he appellate courts of this state are bound to follow decisions of this court . . . ."). Thus, if the Federal Circuit certified the state law issue of this case to the Louisiana Supreme Court, the court would not be bound by its own precedent.

1980) (citations omitted).  Accordingly, a rule of property requires a "consistently established," "uniform interpretation" by the Louisiana Supreme Court, thus *a single* Louisiana Supreme Court decision is insufficient to establish a "rule of property."  *See id.* at 856.

If Louisiana Supreme Court precedent decides "the issues presented," *Keenan*, 529 F.3d at 573, this Court must follow it, otherwise this Court must determine "state law as it believes the State's highest court would."  *Hulin*, 178 F.3d at 328; *see also Boyett*, 741 F.3d at 607; *Keenan*, 529 F.3d at 573; *Nat'l Food*, 103 Fed. Cl. at 68.  This Court therefore must understand how the Louisiana Supreme Court would interpret state law.  *See supra* note 2.

## B.  How the Louisiana Supreme Court Decides Issues of Louisiana Law

According to the government, "Louisiana law provides that '[t]he sources of law are legislation and custom' . . . [but] interpretation of the law belongs to the judiciary."  Def.'s Suppl. Br. at 2 (citations omitted).  Plaintiffs respond, "the government incorrectly states that the Louisiana constitution, the Civil Code and Louisiana statutes are the primary sources of law and court decisions are treated as secondary sources of law."  Pls.' Resp. Suppl. Br. at 5.  Plaintiffs state, "[u]nder the Louisiana Civil Code, legislation and custom are the only authoritative sources of law. . . .  Jurisprudence, doctrine, conventional usages, and equity are merely persuasive sources of law."  *Id.* at 5–6 (quoting *Hulin*, 178 F.3d at 320).

In Louisiana, a civil code jurisdiction, "[t]he sources of law are legislation and custom."  La. Civ. Code Ann. art. 1 (2021).  Legislation is defined as, "a solemn expression of legislative will."  La. Civ. Code Ann. art. 2 (2021).  "Custom results from practice repeated for a long time and generally accepted as having acquired the force of law" and although custom is a primary source of law, it "may not abrogate legislation."  La. Civ. Code Ann. art. 3 (2021).  Custom reflects two elements:  (1) "long practice (*longa consuetudo*)"; and (2) "the conviction that the practice has the force of law (*opinio necessitatis or opinio juris*)."  La. Civ. Code Ann. art. 3 cmt. (b).  "According to civilian doctrine, legislation and custom are authoritative or primary sources of law. . . .  [As] contrasted with persuasive or secondary sources of law, such as jurisprudence, doctrine, conventional usages, and equity, that may guide the court in reaching a decision in the absence of legislation and custom."  La. Civ. Code Ann. art. 1 cmt. (b) (citing Yiannopoulos, Louisiana Civil Law System Sections 31, 32 (1977)); *see also Bergeron*, 320 So. 3d at 1116 (citations omitted) (stating "jurisprudence, even when it arises to the level of *jurisprudence constante*, is a secondary law source.").  Since jurisprudence only serves as a secondary source in Louisiana, the Louisiana Supreme Court has declared "the decisions of a court of last resort are not the law, but only the evidence of what the court thinks is the law."  *Norton v. Crescent City Ice Mfg. Co.*, 150 So. 855, 858 (La. 1933); *accord Constr. Materials, Inc. v. Am. Fid. Fire Ins. Co.*, 388 So. 2d 365, 367 (La. 1980) ("Previous statements even by this Court cannot supersede what we now see is the plain letter and intent of the statute.").

Although the Louisiana Supreme Court is not bound by its previous decisions, this Court is bound by a Louisiana Supreme Court decision if it resolves the issues presented.  *Keenan*, 529 F.3d at 573.  Absent controlling precedent, the relevant question is how the Louisiana Supreme Court decides unresolved legal issues.  *Id.*  In *Keenan*, the Fifth Circuit wrote "Louisiana's

interpretive methodology on unresolved legal issues is to examine first the primary sources of law:  the constitution, codes, and statutes.  Jurisprudence is secondary, even where numerous lower court decisions are in accord on an issue."  *Id.* (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007)); *see also Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992) ("[T]he primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts." (quoting Albert Tate, Jr., *Techniques of Judicial Interpretation in Louisiana,* 22 La. L. Rev. 727 (1962))).  "Nevertheless, while state law generally defines what constitutes a property interest, 'unwritten common law' or 'policies and practices' also can rise to the level of creating 'property interests.'"  *Melancon*, 703 F.3d at 269 (citing *Perry v. Sindermann,* 408 U.S. 593, 602–03 (1972)).

This Court must first decide whether any Louisiana Supreme Court case resolves the issues presented, and if so, the Court must follow it.  *Keenan*, 529 F.3d at 573.  If no Louisiana Supreme Court case decides the issues presented, this Court "must determine, in [its] best judgment, how [it] believe[s the Louisiana Supreme Court] would resolve the issue . . . [by] employ[ing] Louisiana's civilian methodology in the same manner as would the Louisiana Supreme Court."  *Boyett*, 741 F.3d at 607.  Absent a controlling Louisiana Supreme Court decision, this Court must apply Louisiana's interpretive methodology by "examin[ing] first the primary sources of law:  the constitution, codes, . . . statutes[, and custom]."  *Keenan*, 529 F.3d at 573 (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206).  If the primary sources are inconclusive, the Court will consider secondary sources such as:  doctrine, conventional uses, and equity.  La. Civ. Code Ann. art. 1 cmt. (b).  In short, if the Louisiana Supreme Court has decided "the issues presented" this Court sits as a Louisiana lower court, whereas if Louisiana Supreme Court has not decided "the issues presented," this Court sits as would the Louisiana Supreme Court itself.  *Keenan*, 529 F.3d at 573.

## VII.  Whether Plaintiffs Have Compensable Property Interests in Oysters as Against the United States Under Louisiana State Law

Both parties in this case agree Louisiana state law is "[e]xclusively controlling."  Tr. at 91:19–25; Def.'s Suppl. Br. at 1.  The parties also recognize Louisiana's Oyster Statutes provide public water bottom oyster lessees with certain rights while reserving other rights for the government.  Def.'s MTD at 4–5; Pls.' Resp. at 11–12.  With an understanding of the precedential value of Louisiana Supreme Court decisions, this Court first must consider whether any Louisiana Supreme Court opinion decides the issue presented and absent a controlling decision, the Court must apply Louisiana's interpretive methodology by looking first to the authoritative sources of law in the State of Louisiana—legislation and custom.

### A.  Whether the Louisiana Supreme Court's *Avenal* Decision Holds Plaintiffs Lack Compensable Property Rights in Oysters as Against the United States

In *Avenal*, the Louisiana Supreme Court considered whether "oyster fishermen holding oyster leases in the Breton Sound area . . . suffered a compensable taking under [the Louisiana Constitution] as a result of the State of Louisiana's operation of the Caernarvon Freshwater Diversion Structure ('Caernarvon'), which altered salinity levels in the waters covering the

oyster fishermen's leases." *Avenal*, 886 So. 2d at 1088. "In anticipation of the operation of Caernarvon, in 1989, [the Louisiana Department of Wildlife and Fisheries] inserted a clause in its lease form, requiring that the State be indemnified and held harmless for any claims related to coastal restoration." *Id.* at 1090. The court held "the vast majority of the oyster fisherman are not entitled to compensation under [the Louisiana Constitution] because their leases contain clauses holding the State harmless from any loss or damage resulting from this coastal diversion project." *Id.* at 1088. The Louisiana Supreme Court also considered "whether plaintiffs' property was 'taken' for a public purpose, or whether it was 'damaged' for a public purpose" because "although the Louisiana Constitution provides that just compensation shall be paid when property is taken or damaged, [La. Stat. Ann. § 13:5111] provides a three-year prescriptive period for *takings* and [La. Stat. Ann. § 9:5624] provides a two-year prescriptive period for *damage*." *Id.* at 1104–05 (emphasis altered). The court stated, "[p]roperty is considered 'damaged' when the action of the public authority results in the diminution of the value of the property," *id.* at 1105 (citations omitted), and held "the claims of the oyster fishermen whose leases do not contain hold harmless clauses have prescribed under [La. Stat. Ann. § 9:5624]," *id.* at 1088.[4]

The government moves to dismiss plaintiffs' complaint under RCFC 12(b)(6) arguing, "[t]he Court should dismiss the portion of Plaintiffs' claim alleging a taking of the oysters themselves because, pursuant to Louisiana state law, Plaintiffs lack a compensable property right in the oysters." Def.'s MTD at 1. The government continues as follows: "In rejecting the *Avenal v. State* plaintiffs' claims, the Louisiana Supreme Court confirmed that '[t]he state owns the waters. [La. Stat. Ann. § 9:1101.] The state owns the oysters. La. Stat. Ann. § 56:3. Thus, the [s]tate could not take its own property.'" Def.'s MTD at 6 (citing *Avenal*, 886 So. 2d at 1106). Further, the government argues the Louisiana Supreme Court's interpretation of Louisiana state law in *Avenal* "squarely resolved the question presented in the United States' Motion to Dismiss in Part . . . and is binding authority." Def.'s Suppl. Br. at 1 (citing *Avenal*, 886 So. 2d 1085).

Plaintiffs respond, "[t]he state *Avenal* case did not address, much less resolve, the central issue presented in the government's Motion to Dismiss." Pls.' Suppl. Br. at 4. Plaintiffs argue *Avenal* is irrelevant because it "did not involve a takings claim based on a violation of the *United States* Constitution[,]" rather it involved "takings claims based on violations of the *Louisiana* Constitution." *Id.* Plaintiffs further aver *Avenal* "is not applicable and certainly not controlling in this case," *id.* at 5, as the decision was ultimately made "by the Louisiana Supreme Court on the basis of the applicable statute of limitations," *id.* at 3, and the *Avenal* plaintiffs "did not claim damage to the oysters" but instead to "their oyster *leases*," *id.* at 5.

A federal court "has a duty to determine state law as it believes the State's highest court would," *Hulin*, 178 F.3d at 328, and "[a] final decision of the Louisiana Supreme Court on the issues presented would be controlling," *Keenan*, 529 F.3d at 573. To the extent the Louisiana Supreme Court in *Avenal* held plaintiffs do not have compensable property rights in oysters, this

---

[4] The same *Avenal* plaintiffs also brought a claim in the Court of Federal Claims. *See Avenal v. United States*, 33 Fed. Cl. 778 (1995), *aff'd on other grounds*, 100 F.3d 933 (Fed. Cir. 1996). The parties in this case also cite the Federal Circuit decision, so to avoid confusion, this Court will refer to the Federal Circuit *Avenal* decision as "Federal Circuit *Avenal*" or "Federal *Avenal*." *See Avenal v. United States*, 100 F.3d 933 (Fed. Cir. 1996).

holding would likely be decisive if plaintiffs in this case were claiming just compensation under the Louisiana Constitution against the State of Louisiana; but here, plaintiffs are seeking just compensation under the United States Constitution against the United States.  In other words, plaintiffs versus the United States is different than plaintiffs versus Louisiana—the Louisiana Supreme Court may hold differently if the United States were defendant instead of the State of Louisiana.  The Louisiana Supreme Court alluded to this distinction in *Avenal* by stating "the rights granted in [La. Stat. Ann. § 56:423(B)] have never been recognized by this Court as anything other than rights granted against third parties to the leases, such as oil companies, not against the State."  *Avenal*, 886 So. 2d at 1100.  The court thus distinguished between "the State [of Louisiana]" and "third parties to the leases."  *Id.*  In *Avenal*, the Louisiana Supreme Court continually referred to property rights "against the state" which might indicate the Louisiana Supreme Court intended its holding to be limited to claims against the State of Louisiana.  *See id.* at 1085.  Contrary to the government's arguments, plaintiffs must have some property rights in oysters because, throughout the *Avenal* opinion, the Louisiana Supreme Court applied property principles to oyster beds and profits.  *See, e.g.*, *id.* at 1107 ("[Caernarvon] may have damaged [plaintiffs'] property rights in their oyster beds and the profits generated by the oysters that grow upon them.").

To support its holding, the *Avenal* court also cited a law review article by "one commentator" who discussed the policy implications of the Louisiana appellate court's *Avenal* decision and argued it should be reversed on appeal.  *Id.* at 1106 (quoting Robert L. Rogers, III, *Turning River Water into Gold:  Why Oyster Harvesters should not be Permitted to Cash In On Changes in Salinity Caused by the Caernarvon Water Diversion Project*, 22 Va. Envtr. L.J. 53 (2003)); *see* Rogers, *supra*, at 72 ("[t]he State of Louisiana should not be forced to pay billions of dollars in damages for a project that is not only good for the environment, but is also needed to protect Louisiana's economy.").  In this article, the commentator refers to compensable rights against the State of Louisiana which reinforces the key distinction that *Avenal* involves claims against the State of Louisiana whereas this case involves claims against the United States.  *See, e.g.*, Rogers, *supra*, at 70 ("Louisiana law does not provide a right enforceable against the state for future profits provided by the cultivation of oysters on the leased beds.").  As the United States is defendant, not the State of Louisiana, the Louisiana Supreme Court may decide this case differently than *Avenal* absent *Avenal*'s key policy implications.  *See* Rogers, *supra*, at 55.

*Avenal* is also distinguishable as it involved takings claims based on the Louisiana Constitution, whereas this case involves a takings claim based on a violation of the United States Constitution. [5]  *Avenal*, 886 So. 2d at 1092.  Further, the *Avenal* plaintiffs did not claim damage

---

[5] In relevant part, the Louisiana Constitution reads, "[p]roperty shall not be taken or damaged by the state," La. Const. art. I, § 4, consequently Louisiana distinguishes between "damages" and "takings," *see Avenal*, 886 So. 2d at 1104 ("In this case, the relevant consideration is whether plaintiffs' property was 'taken' for a public purpose, or whether it was 'damaged' for a public purpose.").  "In sum, because the Louisiana Constitution provides for compensation for property 'taken' or 'damaged,' what is considered 'taken' is a narrower concept in Louisiana when contrasted with federal law."  *Avenal*, 886 So. 2d at 1113 (Weimer, J., concurring).  In *Avenal*, the Louisiana Supreme Court noted the distinction between these two categories was crucial "because of the existence of two relevant prescription statutes."  *Id.* at 1104.  "[A]lthough the Louisiana Constitution provides that just compensation shall be paid when property is taken or damaged, [La. Stat. Ann. § 13:5111] provides a three-year prescriptive period for *takings* and [La. Stat. Ann. § 9:5624] provides a two-year prescriptive period for *damage*."  *Id.* at 1105 (emphasis in original).

to the oysters, rather only to the oyster leases. *Id.* at 1091 ("asserting that their oyster leases were destroyed or damaged because of the intrusion of freshwater from the Mississippi River by the Caernarvon project").

Another distinction is *Avenal* was entirely related to a freshwater diversion stemming from the control and management of coastal wetlands, whereas this case is entirely related to preventing the Mississippi River from flooding the City of New Orleans given significant rain far north of New Orleans.[6]  *See id.* at 1090; *see also* Rogers, *supra*, at 73 ("[the Caernarvon project] provides tremendous public benefit by preserving Louisiana's coastal wetlands.").  "The Caernarvon project . . . was designed to abate saltwater intrusion and marine tidal invasion, while promoting coastal restoration and enhancing fisheries and wildlife in the basin."  *Avenal*, 886 So. 2d at 1090.  For the Caernarvon project, "[t]he [Louisiana Department of Natural Resources] and [Louisiana Department of Wildlife and Fisheries] set optimal target salinity zones in Breton Sound[.]"  *Id.*  "The optimal salinity regime targeting annual average isohalines in concentration between 5 ppt and 15 ppt allowed oyster propagation and cultivation to continue in an existing zone within Breton Sound, while at the same time fostered coastal restoration by freshening the upper Breton Basin and allowing vegetation to return in an area where little oyster production was occurring."  *Id.*  Plaintiffs explain the Caernarvon project's objective was to "restore[] the salinity to the levels that existed before all the saltwater came in through the [Mississippi River Gulf Outlet]."  Tr. at 24:15–19.  Plaintiffs continue, the *Avenal* plaintiffs, "knew or should have known" the Caernarvon project would restore salinity levels and thus they could not claim "they lost anything, because when they went into business, they already knew that this could happen later, meaning the changing back of the water salinity levels."  Tr. at 24:21–25:1.

In this case, the fundamental purpose of the Bonnet Carré Spillway is to "keep the [Mississippi] river from overtopping its levees, thus averting the flooding of the City of New Orleans."  Compl. at 2.  Unlike *Avenal*, when the government operates the Bonnet Carré Spillway, salinity changes may be a side-effect of the Spillway's primary purpose—preventing flooding.  *Id.* at 16 ("the vast input of fresh water into these brackish and saline lakes has an immediate, short-term adverse environmental effect." (quoting *Spillway Operational Effects*, U.S. Army Corps of Engineers, New Orleans District, https://www.mvn.usace.army.mil/ Missions/Mississippi-River-Flood-Control/Bonnet-Carre-Spillway-Overview/Spillway-Operation-Information/)).  In short, the Caernarvon project was built with the primary purpose of affecting salinity levels to benefit oyster growers, whereas the Spillway was built to prevent the City of New Orleans from flooding and salinity changes are an unintended adverse effect of the Spillway project—this could be sufficiently material for the Louisiana Supreme Court to decide this case differently.[7]  For these reasons, the Court finds *Avenal* distinguishable—the decision does not "decide the issues" in this case.[8]

---

[6] This distinction might be moot under the current version of section 56:423.  *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

[7] This distinction might be moot under the current version of section 56:423.  *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

[8] The government also argues, *Avenal* should be followed because it establishes a "rule of property."  A single decision is insufficient to establish "consistent rulings" to necessitate a "rule of property," thus the Court is not bound to follow *Avenal* under this argument.  *Garrett*, 390 So. 2d at 856; *see also infra* note 9.

As *Avenal* does not decide the issue presented—whether oyster lessees have compensable property rights in oysters as against the United States—this Court concludes it is not controlling. If Louisiana Supreme Court case law does not decide the issues presented, this Court "must determine, in [its] best judgment, how [it] believe[s the Louisiana Supreme Court] would resolve the issue . . . [by] employ[ing] Louisiana's civilian methodology in the same manner as would the Louisiana Supreme Court." *Boyett*, 741 F.3d at 607. Absent a controlling Louisiana Supreme Court decision, this Court must apply Louisiana's interpretive methodology by looking to the authoritative sources of law in the State of Louisiana—legislation and custom, La. Civ. Code Ann. art. 1. "Louisiana's interpretive methodology on unresolved legal issues is to examine first the primary sources of law: the constitution, codes, and statutes." *Keenan*, 529 F.3d at 573 (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206). The Court therefore turns next to an analysis of Louisiana codes and statutes.

### B. Whether Louisiana Oyster Statutes Establish Plaintiffs Lack Compensable Property Rights in Oysters as Against the United States

The government alternatively argues "even if the Court were to conclude that *Avenal v. State* is not binding authority, the Court should nevertheless reach the same result—Plaintiffs have no compensable right in the oysters themselves." Def.'s Suppl. Br. at 2, 8–10. The government states, "[t]he United States Constitution does not create or define the scope of property interests compensable under the Fifth Amendment." Def.'s MTD at 7 (citing *Bd. of Regents of State Colls.*, 408 U.S. at 577). Rather, the government asserts "existing rules and understanding and background principles derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Id.* (internal quotation marks omitted) (citing *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002)). The government states, "[t]he Court should dismiss the portion of Plaintiffs' claim alleging a taking of the oysters themselves because, pursuant to Louisiana state law, Plaintiffs lack a compensable property right in the oysters." *Id.* at 1.[9]

The government contends the Corps did not take the oysters because the State of Louisiana owns the oysters, not the farmers. *Id.* at 8. To support its argument that plaintiffs lack compensable property rights in the oysters, the government quotes Section 56:3(A) as follows:

> The ownership and title to all . . . beds and bottoms of rivers, streams, bayous, lagoons, lakes, bays, sounds, and inlets bordering on or connecting with the Gulf of Mexico within the territory or jurisdiction of the state, *including all oysters and other shellfish and parts thereof grown thereon, either naturally or cultivated, and all oysters in the shells after they are caught or taken therefrom*, are and remain the

---

[9] Federal courts typically certify complex questions of state law to the highest state court, however, as stated *supra* note 2, this Court may not certify a question to the Louisiana Supreme Court as the Federal Circuit can.

property of the state, and shall be under the exclusive control of the Wildlife and Fisheries Commission except as provided in R.S. 56:4.[10]

*Id.* at 4–5 (quoting § 56:3(A)). The government contends, section 56:3(A) affirms the state owns all oysters. *See* La. Stat. Ann. § 56:3(A) (1985) ("all oysters . . . are and remain the property of the state"). During oral argument, the government took section 56:3 to its logical extreme stating, "there could be a good argument that even after the [oyster growers] pull them up, they still don't have an actual ownership interest in those oysters, even at the moment of possession," Tr. at 131:16–19, although the government admits "I've not seen a case that says that explicitly," Tr. at 132:11–13. The government states, "I think an argument could be made that the oysters are still not the property of the oyster lessees, even after they've been harvested. And that's just as a result of [section] 56:3." Tr. at 134:16–19. To the Court's statement, "[s]o the necessary conclusion is . . . oysters are never property, period," the government responds, "[it] would feel confident in making that argument . . . and that position does seem consistent with 56:3." Tr. at 136:1–8. The Court asked if "oysters never become property, not even when the oyster grower sells them to the restaurant," to which the government responded, "[the government has] not seen a case that says that. An argument could be made [under the language of 56:3]." Tr. at 134:22–135:1. The government describes the oyster cultivation process as follows: the oyster growers extract the oysters from the water bottom, bag them, tag the bags, weigh the bags, the state evaluates the oysters "for health and safety purposes," Tr. at 132:19–23, but oysters are property of the State of Louisiana the entire time, Tr. at 131:16–19. The government argues, even when an oyster grower sells oysters, "he's not being paid because he's selling something he owns[; h]e is being paid for the fruits of his effort." Tr. at 132:25–133:2.

The government posits, for the policy purpose of protecting water bottoms and fostering oyster production, "Louisiana has enacted an extensive statutory scheme, which heavily regulates oyster leasing activities on state-owned waterbottoms." Def.'s MTD at 3 (citing La. Stat. Ann. § 41:1225(A) (1990)). The parties in this case agree Louisiana oysters are exclusively governed by this extensive statutory scheme. *See* Compl. at 31–32 (citations omitted); Def.'s MTD at 4–5 (citations omitted).

The government admits, "[a]n oyster lease provides its owner 'the exclusive use of the water bottoms leased and of all oysters and cultch grown or placed thereon.'" Def.'s MTD at 4 (quoting La. Stat. Ann. § 56:423(A)). The government states, "[o]yster lessees have a use right—the exclusive right to use the leased area and reduce to possession oysters located therein—but state law is clear that they do not own the oysters located on state-owned waterbottoms." Def.'s Resp. Surreply at 7 (citing La. Stat. Ann. § 56:3(A); *Avenal*, 886 So. 2d at 1106)). The government contends, even after the water bottoms are leased, the state retains ownership of all oysters within its jurisdiction. Def.'s MTD at 4–5 (citing La. Stat. Ann. § 56:3(A) (1985)). The government admits "an oyster lessee has a statutory right to sue a

---

[10] Despite plaintiff's contrary argument, the government correctly asserts section 56:4 "is irrelevant for present purposes" as it merely states the Louisiana Department of Wildlife and Fisheries exclusive control of oysters and water bottoms is excepted by the Department of Natural Resource's authority to grant natural resource leases. Def.'s MTD at 5 n.2; *see* La. Stat. Ann. §§ 56:3–4. The government states, "[section] 56:4 is irrelevant to this case, because this does not involve any lease that might have been issued by the Department of Natural Resources." Tr. at 56:11–13.

- 19 -

tortfeasor." Tr. at 112:17–24 (citing La. Stat. Ann. § 56:423(B)).  The government states an oyster lessee under section 56:423 (B)(1) "shall have the right to maintain an action for damages against any person, partnership, corporation, or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee." Def.'s Reply at 7 (citing La. Stat. Ann. § 56:423 (B)(1)).[11]  The government argues, however, section 423(B) "says nothing about ownership of the oysters . . . [; i]t's a right to sue under state law and nothing more."  Tr. at 116:8–11.  The government contends the property right described in section 423 is merely "a usufructuary, a use right," Tr. at 110:21–23, and this use right only permits oyster growers to sue for damages under state tort law pursuant to § 56:423, Tr. at 112:18–25.  The government argues, "the right to sue for a tort in state law is not the same as a compensable property right in oysters themselves." Tr. at 118:17–19.  The government also distinguishes oyster leases from "other types of leases" as oyster lessee "property rights are created, defined, and limited by state law.[12] Def.'s MTD at 7–8 (citing *Slavich v. State, Dep't of Wildlife & Fisheries*, 994 So. 2d 85, 94 (La. App. 1 Cir. 2008), *writ denied sub nom. Slavich v. State ex rel. Dep't of Wildlife & Fisheries*, 996 So. 2d 1111 (La. 2008)).

Plaintiffs concede section 56:3(A) provides "the State owns the oysters," Tr. at 54:8–9, but plaintiffs note section 56:3(B) states "title of the state to all [oysters] . . . always remains in the state *for the purpose of regulating and controlling the use and disposition thereof*." Pls.' Surreply Suppl. at 10 (quoting La. Stat. Ann. § 56:3(B) (emphasis altered)).  Plaintiffs also contend 56:3(A) alone is not decisive in this case, explaining, "[under] 56:423, a lessee shall enjoy the exclusive use of the water bottoms lease and of all oysters." Tr. at 54:11–13.  Plaintiffs aver, "[s]o that is a property right, the right—exclusive right to the oysters." Tr. at 54:13–14; *see also* Tr. at 78:19–20 ("[PLAINTIFFS]:  . . . by the way, the title of subsection [56:423] says,

---

[11] *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

[12] During oral argument, plaintiffs provided the Court an example lease which was executed between Robert L. Campo and the Land Manager for Louisiana's Department of Wildlife and Fisheries.  This lease includes a section titled "Allocation Of Risk and Liability, And Indemnification" which plaintiffs note "basically . . . says . . . the State has the right to conduct its activities related to the State's coastal wetlands conservation and restoration plan, and that therefore, if there is any damage caused by *those efforts*, there's no claim against the State." Tr. at 22:10–23:2 (emphasis added).  Plaintiffs confirm this provision provides "the oyster growers cannot sue the State or the United States with respect to a diversion of fresh water" with the caveat "the diversion of fresh water must be related to coastal restoration." Tr. at 25:2–8.  The government agrees this "hold harmless language" "was the basis for the Louisiana Supreme Court's rejection of part of the claims in [*Avenal*]." Tr. at 26:2–9.  Unlike *Avenal*, however, the event in this case was entirely related to preventing New Orleans from flooding, so the coastal restoration exception is not applicable as discussed *supra* Section VII.A.  As the Court noted at oral argument, however, that the lease excepts liability for freshwater diversion for purposes of coastal restoration "would assume that there is liability for perhaps something else." Tr. at 41:17–24; *see also* Tr. at 43:9–17 (noting from the government's perspective the lease language does not matter—the lease "says what it says.").  While this provision is not determinative as to oysters being property, the provision reflects a balance of property rights and incentives to cultivate oysters versus the State's power to conduct projects for "coastal restoration."

The example lease further states, "[t]his lease is issued and the water bottoms herein leased shall be held subject to the provisions of R.S. 56:421 through 452, both inclusive, and the rules and regulations of the Department as provided in said Act."  Although the lease was signed December 2016, and although this language suggests the lease operates under the current edition of sections 56:421 through 452, the lease language exempting the United States for activities related to "coastal conservation and restoration" does not seem to incorporate the July 2016 amendment of section 56:423, where "coastal protection, conservation, or restoration," was replaced with "integrated coastal protection as defined in R.S. 49:214.2." *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

'Property Rights.'").  Plaintiffs also state, "the statute clearly allows the Plaintiffs to 'aver ownership' when a public offense is committed against their oysters, as in the case of destruction of their oysters like the one committed by the government."  Pls.' Resp. at 12 (citing La. Stat. Ann. § 56:423).[13]  Plaintiffs emphasize:  "[i]f this privilege is disturbed by a third person, the Oyster Statute grants to the oyster lessee of public record the right to maintain an action for damages arising out of the wrongful injury to the lease."  Pls.' Resp. at 13 (citing *Pace v. Chevron, U.S.A., Inc.*, 579 So. 2d 494, 496 (La. App. 4 Cir. 1991)).

Since 1899, "Louisiana [has] passed numerous laws to assist and protect oyster leaseholders."  Compl. at 18.  Indeed, the relationship between the State of Louisiana, oysters, growers, and third parties is one of the most detailed regulatory regimes in the country.  In *Avenal*, the Louisiana Supreme Court aptly explains Louisiana's statutory scheme as follows:

> La. R.S. 41:1225 authorizes the [Department of Wildlife and Fisheries ("DWF")] to grant leases on state-owned water bottoms for oyster cultivation, bedding, and harvesting, and matters relating thereto, as provided in Subpart D of Part VII of Chapter 1 of Title 56 of the Louisiana Revised States [sic] of 1950.  La. R.S. 41:1225; La. R.S. 56:4.  All oyster leases issued on State water bottoms are governed exclusively by this statutory scheme.  La. R.S. 56:424. . . .  The Secretary's right to grant oyster leases is likewise contingent upon a determination that the State owns the water bottoms to be leased, and that the lessee agrees as a matter of contract that he will operate under Louisiana laws and pursuant to DWF's rules and regulations.  La. R.S. 56:425(A), (B).  All leases begin on the date the lease is signed and continue for a fifteen-year period.  La. R.S. 56:428(A).  La. R.S. 56:425(C) recognizes that the Secretary may "make such stipulations in the leases made by him as he deems necessary and proper to develop the [oyster] industry" provided that the clauses are consistent with the statutory provisions of Subpart D.

*Avenal*, 886 So. 2d at 1095.  In relevant part, section 56:423 provides the following:

**§ 423.  *Property rights*; larceny or other public offense concerning; leases heritable and transferable; adjudication of claims**

(A)  A lessee shall enjoy the exclusive use of the water bottoms leased and of all oysters and cultch grown or placed thereon, subject to the restrictions and regulations of this Subpart and Part II of Chapter 2 of Title 49 of the Louisiana Revised Statutes of 1950.

(B)(1)  A lessee of oyster beds or grounds who has obtained, recorded, and marked his lease in compliance with the law shall have the right to maintain an action for damages against any person, partnership, corporation, or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee.

---

[13] *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

La. Stat. Ann. § 56:423 (2016) (emphasis added).[14]

Section 56:3(A) does not indicate when, if ever, a party other than the State of Louisiana can own oysters.  If the government's argument regarding the statue's logical extreme is true—oysters can never be property—it would shock the common sense of oyster-eaters to know the oysters they buy are not their property, even when they shuck and gulp them.  *See* Tr. at 134:16–19 ("[THE GOVERNMENT]:  I think an argument could be made that the oysters are still not the property of the oyster lessees, even after they've been harvested.  And that's just as a result of 56:3.").  Although section 56:3(A) provides the State of Louisiana owns the oysters, section 56:423 grants oyster lessees some property rights in oysters under certain circumstances, at a minimum, under the title "Property rights" Louisiana Statute section 56:423 provides "[a] lessee shall enjoy the exclusive use of the water bottoms leased and of all oysters and cultch grown or placed thereon."  La. Stat. Ann. § 56:423(A) (2016).  Oyster lessees must thus have some property right in the exclusive use of the water bottoms and the "oysters and cultch grown or placed thereon."  *Id.*  Oyster lessees also "have the right to maintain an action for damages against any person, partnership, corporation, or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease[.]"  La. Stat. Ann. § 56:423(B).  Therefore, under the Louisiana code, and certain circumstances enumerated, oyster lessees have some property rights in oysters.  La. Stat. Ann. § 56:423 ("Property rights, larceny or other public offenses concerning; leases heritable and transferable; adjudication of claims.").

It could be that the State of Louisiana has superior property rights but property rights are diverse and lesser rights are still property rights.  *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979) ("And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation."); *see also Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1572 n.32 (Fed. Cir. 1994).[15]  The Court next considers whether Louisiana cases addressing oyster growers' rights against third parties and the United States limits plaintiffs' property rights in this case.

---

[14] *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

[15] In *Florida Rock Industries*, Judge Plager states property "interests are about as diverse as the human mind can conceive," and further:

> Property interests may be real and personal, tangible and intangible, possessory and nonpossessory.  They can be defined in terms of sequential rights to possession (present interests—life estates and various types of fees—and future interests), and in terms of shared interests (such as the various kinds of co-ownership).  There are specially structured property interests (such as those of a mortgagee, lessee, bailee, adverse possessor), and there are interests in special kinds of things (such as water, and commercial contracts).  And property interests play across the entire range of legal ideas: *see, e.g.*, *Tompkins v. Superior Court of San Francisco*, 59 Cal. 2d 65, 27 Cal. Rptr. 889, 378 P.2d 113 (1963) (did joint occupancy of an apartment give one occupant the kind of possessory property interest that carried with it the power to grant to police legal entry to search without a warrant for the other occupant's marijuana stash).

*Fla. Rock Indus., Inc.*, 18 F.3d at 1572 n.32.

### C.  Prior Louisiana and Federal Circuit Cases Addressing Oyster Growers' Rights Against Third Parties and the United States

The government argues "numerous other decisions from Louisiana state courts confirm the plain meaning of Louisiana Statute 56:3(A)—oyster lessees (like fishermen) do not have a compensable property interest in the oysters (or fish) themselves."  Def.'s Suppl. Br. at 9.  The government provides the following string cite as support:

> *See, e.g.*, *Slavich*, 994 So. 2d at 93 (holding oyster lessees lack any property right to "optimal salinity regime for oyster cultivation"); *Inabnet v. Exxon Corp.*, 642 So. 2d 1243, 1256 (La. 1994) (holding that oyster lessees have no "real and actual interest" in the water bottom itself and therefore could not recover cultch restoration costs); *State v. Thompson*, 204 So. 3d 1019 (La. Ct. App. 2016) (rejecting fisherman's right to recover fish (or the monetary equivalent of fish) seized pursuant to arrest because fisherman have no property right in the fish); *La. Seafood Mgmt. Council v. La. Wildlife & Fisheries Comm'n*, 715 So. 2d 387, 392 (La. 1988) (rejecting takings claim because fishermen lack a property interest in the fish they harvest); *Dempster v. Louis Eymard Towing Co., Inc.*, 503 So. 2d 99, 101 (La. Ct. App. 1987) (rejecting plaintiff's claims for lost value of fish because "plaintiff had no proprietary interest in the fish which were at large in the waters").

*Id.* at 9–10 (footnote omitted).  The government also contends the Federal Circuit's decision in *Avenal* does not support plaintiffs' assertion of a possessory property right in the yet-to-be-harvested oysters.

Plaintiffs argue oyster leases "have the attributes of other forms of real property[] and are entitled to protection" from damage.  Pls.' Resp. at 2 (quoting Federal *Avenal*, 100 F.3d at 936).  Plaintiffs observe, "[m]ore recently, in *Horne v. USDA*, [576 U.S. 350, 358] (2015), the Supreme Court held . . . the Fifth Amendment applies equally to personal property and real property."  Pls.' Resp. at 3.  "Accordingly, the government is required to pay just compensation when it takes real property (such as Plaintiffs' oyster beds and reefs) as when it takes personal property (such as Plaintiffs' oysters, oyster spat, cultch and limestone rock placed on the oyster beds to cultivate oysters)."  *Id.*  Plaintiffs' central argument is even if the statutory scheme and Louisiana case law foreclose takings lawsuits against the State of Louisiana, this case is different because the United States is defendant, not the State of Louisiana.  *See* Tr. at 126:10–22 ("THE COURT: . . . [In] *Slavich*, the Louisiana Court of Appeals states the exclusive rights conferred by oyster leases . . . 'have never been recognized as anything other than rights granted against third parties to the leases, not against the State.'  [PLAINTIFFS]:  Right.  The Federal Government is a third party.  THE COURT:  So the Plaintiffs' position is the Federal Government is different.  [PLAINTIFFS]:  Yeah.").

In *Inabnet*, the State of Louisiana granted Exxon a right-of-way "with the right 'to cut, dig, dredge, deposit spoil on banks, build, construct and maintain a canal' on the right-of-way."  *Inabnet*, 642 So. 2d at 1245.  Louisiana then "granted plaintiff an oyster lease," and "[p]laintiff planted approximately 5,000 sacks of seed oysters on about sixteen acres," expecting a harvest about two years later.  *Id.* at 1247.  Meanwhile, Exxon's contractor dredged the right-of-way and

plaintiff sued Exxon alleging its contractor's "dredging had dug up part of his oyster beds and deposited spoil on other parts, damaging the oysters and the beds." *Id.* The Louisiana Supreme Court considered whether the oyster lessee could "recover his damage for the loss of his seed oysters and the loss of reasonably anticipated income, as well as for the cost of restoring the water bottoms to the condition where they would support oyster beds." *Id.* The court affirmed the judgments of the lower courts "as to the award of damages for loss of seed oysters and for loss of anticipated income from oyster production." *Id.* at 1256. Notably, the Louisiana Supreme Court explained, "La. Rev. Stat. 56:423 B(1) [sic] recognizes an oyster lessee's right to recover his own damages for injury to his oyster beds. The awards for loss of seed oysters and loss of income from anticipated production were based on this right of recovery." *Id.* at 1255. In holding plaintiffs could not recover damages for restoration of the water bottoms but could recover damages for the oysters as against third parties, the court distinguished between the state's property, the water bottoms, and plaintiffs' right to recover damages for harm to the oysters.[16]

In *Doucet*, the Louisiana Supreme Court affirmed a judgment "for the value of oysters allegedly killed during the 1932–1933 season in beds leased by the plaintiff from the state as the result of the company's pollution of the waters." *Doucet v. Texas*, 17 So. 2d 340, 340 (1944). Operating under a now antiquated statutory regime, the court noted in the pre-1926 act, "ownership of the oysters [was] specifically declared to be in the lessee and although the word 'ownership' is omitted from a similar provision in the 1926 act, the import is the same." *Id.* at 341. In *Butler*, the Louisiana Supreme Court found some defendants liable in a "case involv[ing] a claim for damage to oysters and water bottoms as a result of the dredging of a canal for use in drilling an oil well." *Butler v. Baber*, 529 So. 2d 374, 375 (La. 1988). According to persuasive Louisiana Supreme Court precedent, oyster growers can be entitled to compensation for damage to their oysters by third parties under certain circumstances. *Inabnet*, 642 So. 2d 1243; *Butler*, 529 So. 2d at 375; *Doucet*, 17 So. 2d 340; *see also*, *Melerine v. Tom's Marine & Salvage, LLC*, 315 So. 3d 806, 823 (La. 2021) ("An oyster lessee has a valuable property right entitled to protection under the law." (citing *Avenal*, 886 So. 2d at 1100 n.20)).

In *Avenal*, the Louisiana Supreme Court confirms the following: (1) oyster lessees have valuable property rights in oyster beds; and (2) lessees may recover against "third parties" for damage to seed oysters and anticipated production. *See Avenal*, 886 So. 2d at 1100 n.20.[17] The

---

[16] Regarding the *Inabnet* plaintiffs' property rights in the water bottoms, the court notes, however, "[i]n some situations, as in a long-term lease in which the lessee has made significant improvements, the lessee may have a greater interest than the owner in restoring damaged property." *Inabnet*, 642 So. 2d at 1255 n.15. The *Inabnet* court applies a previous version of section 56:423, *see infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

[17] The full footnote from *Avenal* is as follows:

specific language chosen by the *Avenal* court implies parties other than the State of Louisiana are "third parties." *Id.* ("In [*Butler*, *Doucet*, and *Inabnet*], the tortfeasor was a third party to the lease; no court has ever recognized a right under [La. Stat. Ann. § 56:423(B)(1)] against the State."). Indeed, a key distinction between *Avenal* and *Melerine*, *Inabnet*, and *Butler*, is, unlike the State of Louisiana, the tugboat captain, oil company, and mineral lessees were not parties to the lease but rather they were third parties. Similarly, the United States is not party to plaintiffs' lease agreements—it is a third party to the lease. *See, e.g.*, *Melerine*, 315 So. 3d 806; *Avenal*, 886 So. 2d 1085; *Inabnet.*, 642 So. 2d 1243; *Butler*, 529 So. 2d 374.

In *Slavich*, the Louisiana First Circuit Court of Appeal considered whether lessees of oyster beds could maintain a breach of implied contractual warranties action for damages against the State of Louisiana. *Slavich*, 994 So. 2d 85. The court stated: "As *Avenal* clearly held, the oyster statutes do not guarantee oyster lessees with a vested right to an optimal salinity regime for oyster cultivation. Further, the rights granted in LSA–R.S. 56:423(B) have never been recognized as anything other than rights granted against third parties to the leases, such as oil companies, not against the state." *Slavich*, 994 So. 2d at 95 (citing *Avenal*, 886 So.2d at 1100). As in *Avenal*, the *Slavich* court draws the same distinction between the State of Louisiana and all other parties as "third parties to the leases," thus the government's citation to *Slavich* does not overcome this distinction. *Id.*

In the Federal *Avenal* case, the Federal Circuit considered whether lessees of water bottoms had a property interest protected by the Fifth Amendment and whether the Caernarvon project resulted in a constitutional taking.[18]  *See* Federal *Avenal*, 100 F.3d 933 (affirming the trial court's decision to grant the government's summary judgment motion). The Federal Circuit found the lessees had "valuable property rights created by the State and protected by the [United States] Constitution," as against the United States, albeit in the oyster leases not the oysters. *Id.* at 937–38. "Louisiana law has long recognized that the property rights created by such leases, authorized by state statute, *see* La. Rev. Stat. Ann. § 56:423 (West 1995), have the attributes of

---

This Court has recognized that an oyster lessee has a valuable property right in his oyster beds, for the loss of which he can recover against one whose fault the loss was incurred. *Butler v. Baber*, 529 So. 2d 374 (La. 1988); *Doucet v. Texas Co.*, 205 La. 312, 17 So. 2d 340, 341 (1944). Accordingly, courts have allowed oyster lessees to recover against third party oil companies under La. C.C. art. 667 for damage to their oyster beds caused by the oil companies' activities. *Inabnet v. Exxon Corp.* . . . (holding that Exxon's use of property injured neighboring oyster lessee's property and constituted fault under Civil Code Article 2315 by analogy to Articles 667–669 such that oyster lessee was entitled to damages under La. R.S. 56:423(B)[(1)] including loss of seed oysters and loss of income from anticipated production, but not restoration costs). However, the basis for the oyster lessee's recovery in these cases was the explicit statutory right of recovery granted in La. R.S. 56:423(B)[(1)] which gives the oyster lessee "the right to maintain an action for damages against any person, partnership, corporation or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee." In all those cases, the tortfeasor was a third party to the lease; no court has ever recognized a right under this statute against the State.

*Avenal*, 886 So. 2d at 1100 n.20.

[18] The Federal *Avenal* case was decided in 1996, before the Louisiana Supreme Court decided its 2004 *Avenal* case. This temporal note is immaterial as the Federal *Avenal* case considered property rights in oyster leases as against the United States, whereas the State *Avenal* case considered property rights as against the State of Louisiana as well as other relevant distinctions discussed *supra* Section VII.A.

other forms of real property, and are entitled to protection from injury by third parties."[19] *Id.* at 936. The Federal Circuit stated, "[t]he question, then, is not whether the plaintiffs had a constitutionally protected property interest, but whether that property interest was taken by the Government." *Id.* There was no taking, however, because "plaintiffs, in the words of *Penn Central*, cannot have had reasonable investment-backed expectations that their oyster leases would give them rights protected from the planned freshwater diversion projects of the state and federal governments." *Id.* at 937. The Federal Circuit explained, "[i]n light of the history of events in this case, plaintiffs as a matter of law must be assumed to have known that their rights to use the bottom-lands for oystering were subject to the inevitable changes that the anticipated government program would bring about." *Id.* at 938.

Despite holding there was no taking in *Avenal* because of the unique "history of events in this case," the Federal Circuit confirmed oyster farmers have "the right to damages when the acts of another harm the oyster beds, including harm caused by deleterious changes in the waters in which the beds lie, for example by unlawful pollution." *Id.* Notably, the Federal Circuit stated, "[w]e grant that the decrease in salinity in the water covering the plaintiffs' leased grounds has restrained a valuable use of the lease rights." Federal *Avenal*, 100 F.3d 937. As the Federal Circuit only reaffirmed plaintiffs' property right in the leases, the Federal *Avenal* case supports this Court's holding plaintiffs have a compensable property rights in oysters.[20]

The government contends the property right described in the Federal *Avenal* case is merely "a usufructuary, a use right," Tr. at 110:21–23, and this use right only permits oyster growers to sue for damages under state tort law pursuant to § 56:423, Tr. at 112:18–25. Without citation at oral argument, the government argues, "the right to sue for a tort in state law is not the same as a compensable property right in oysters themselves." Tr. at 118:17–19. The government states, "one of the ways [Fifth Amendment claims are] distinguished from tort claims" is a plaintiff claiming a Fifth Amendment taking must "prove up a compensable property right." Tr. at 44:6–10. To support this proposition, the government cites *Air Pegasus* which states when considering a takings claim, "the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1212 (Fed. Cir. 2005) (citations omitted). The Federal Circuit continues, "the Constitution does not itself create or define the scope of 'property' interests protected by the Fifth Amendment. 'Instead existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking.'" *Id.* (citations omitted). The government's assertion regarding *Air Pegasus* does not establish plaintiffs lack property rights in oysters, rather it begs the question to which this Court now turns—what rights plaintiffs have in their "bundle of rights."

---

[19] The Louisiana legislature has revised this statute since 1995. *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

[20] The Federal *Avenal* case was decided before *Horne* in which the United States Supreme Court states, "[the Fifth Amendment] protects 'private property' without any distinction between types," clarifying the Fifth Amendment protects personal property as well as real property. *Horne*, 576 U.S. at 358, 367 (finding raisins are private property and "[a]ny physical taking of them for public use must be accompanied by just compensation."). This temporal note might explain why, in *Avenal*, the Federal Circuit only considered plaintiffs' property rights in the leases and not in the oysters.

In certain circumstances, the Louisiana code grants oyster lessees property rights in oysters, and persuasive case law establishes oyster lessees can assert these rights against "third parties." La. Stat. Ann. § 56:423; *Avenal*, 886 So. 2d 1085; *Inabnet*, 642 So. 2d 1243; *Butler*, 529 So. 2d at 375; *Doucet*, 17 So. 2d 340; Federal *Avenal*, 100 F.3d at 937. The Court next considers whether a traditional property rights analysis confirms plaintiff oyster growers have property rights in oysters. *See Air Pegasus*, 424 F.3d at 1212; *Melancon*, 703 F.3d at 269.

## VIII. Comparison of Traditional Property Rights Cases to Plaintiffs' Property Rights in Oysters

The government argues "[o]yster leases are use rights . . . [and] Louisiana state law provides that oyster lessees do not, and cannot, obtain a compensable property right in the oysters cultivated on state-owned waterbottoms . . . ." Def.'s MTD at 7–8 (citations omitted). The government states, Section 56:423(A) is only a "right to use, a use of property right." Tr. at 81:20–21. The government also re-asserts the *Avenal* language citing section 56:3, that the State of Louisiana owns the oysters and concludes "[t]hat is the end of the road for Plaintiffs." Tr. at 87:7.

The government cites the 1935 Louisiana Supreme Court case, *State v. Crappel*, for the proposition "the word 'occupancy' means 'the taking, the holding, the actual seizing, the keeping as one's owns, such things as may be acquired by capture, and *does not relate to the occupancy or possession of the ground on which or from which wild things which have no owner may be captured*.'" Def.'s Surreply Resp. at 6 (citing *State v. Crappel*, 160 So. 309, 312 (La. 1935)). In asserting plaintiffs lack of property rights in oysters until they are captured, the government argues oysters are analogous to fish and other "wildlife," stating as follows:

> The concept that the state retains ownership over oysters and wildlife has been confirmed in several other state decisions. *See La. Seafood Mgmt. Council v. La. Wildlife & Fisheries Comm'n*, 715 So. 2d 387, 392 (La. 1998) ("The lack of any property interest in the fish in the waters is well-settled, statutorily and judicially." (citations omitted)); *State v. Thompson*, 204 So. 3d 1019 (La. Ct. App. 2016) (rejecting fisherman's right to recover fish, or the monetary equivalent of the fish, seized pursuant to arrest because fisherman had no property right in the seized fish pursuant to La. Stat. Ann. § 56:3); *Dempster v. Louis Eymard Towing Co., Inc.*, 503 So. 2d 99, 101 (La. Ct. App. 1987), *writ denied*, 505 So. 2d 1136 (La. 1987) (rejecting plaintiffs' claims for lost value of fish resulting from oil spill because "plaintiff had no proprietary interest in the fish which were at large in the waters").

Def.'s MTD at 6. *Melancon*, the Fifth Circuit case defining the "bundle of rights" associated with property in Louisiana, the government argues "is irrelevant because Louisiana state law provides the answer." Def.'s Reply at 5. The government avers *Melancon* does not apply to this case for three reasons: (1) "*Melancon* did not involve oysters"; (2) "oyster lessee has a right to the 'exclusive use' of 'the water bottoms leased and of all oysters and cultch grown or placed thereon,' but the oysters are the property of the State of Louisiana"; and (3) "[t]he Fifth Circuit's decision in *Melancon*, which says nothing about state law concerning oysters, does not, and

cannot, overturn the Louisiana Supreme Court's interpretation of state law." *Id.* at 4–5 (citations omitted).

Plaintiffs respond as follows:

> The idea that . . . the oyster growers, don't have possession of the oysters is really not backed up by the facts here.  If it were shrimp, yes, because shrimp are moving.  The fish are moving.  And we agree that until you catch a fish, catch a shrimp, you don't own it.  Nobody owns it until you get possession over the wild animal . . . .  But with oysters . . . [plaintiffs] are allowed to go to the breeding grounds, pick the oysters, bring them to the cultch, put them in the cultch, in the base that they have prepared.  This is within a perimeter that if you look at the statute, they are required to mark their lease so that other people cannot go in there to grab any of these oysters on their fear of being prosecuted for that.  So they take the little baby oysters.  They put them at the bottom [on their] rocks, and those little baby oysters grow and multiply, and the entire time, soon after they are placed on the rocks, they become attached to the rocks.

Tr. at 51:19–52:17.  Plaintiffs compare oysters to crops by stating "[oysters] become attached.  The oysters are not moving around."  Tr. at 52:17–18; *see also* Tr. at 137:4–10 ("Fact of the matter is that because [oyster farming] is agriculture, the oysters always belong to the lessee, even before those oysters have fully developed to the state where they can actually be removed from the beds and transported to shore.").  As oysters remain fixed in place within the boundaries of plaintiffs' exclusive leases, plaintiffs aver "[the oysters] are in the possession of the leaseholders the entire time."  Tr. at 52:23–24; *see also* Tr. at 137:11–24 (THE COURT:  So it's Plaintiffs' position that once the baby oysters are picked up from the farm and brought in the boat to the leased water bottoms, they are the property of the lessee.  [PLAINTIFFS]:  And also because they attach to the water bottom, Your Honor.  They attach to the beds.").

Plaintiffs argue, "[t]he government improperly construes the word 'property' as being synonymous with 'ownership.'"  Pls.' Resp. at 7.  Plaintiffs argue "the [Supreme] Court has consistently re-affirmed the rule that the Takings Clause applies to all forms of property rights and not only to ownership."  *Id.* at 4.  Plaintiffs contend, "[their] oysters must be characterized a[s] 'property' under Louisiana law" by citing *Melancon*, and stating the following:

> Louisiana law gives the Plaintiffs the right to "enjoy the exclusive use of . . . all oysters . . . grown or placed" on the leased water bottoms (*usus*).  The law also allows Plaintiffs to sell their oysters (*abusus*).  And the law gives them the right to receive payment for their oysters (even from the State if it elects to cancel a lease) and to enjoy their earnings and profits (*fructus*).

*Id.* at 14.  Plaintiffs continue as follows:

> [The] three [*Melanon*] elements are given by [section] 423 to the Plaintiffs related to the oysters, because the exclusive right to use all the oysters, subject to the restrictions, allow the Plaintiffs to, one, possess the oysters because they are

allowed to mark their plot of land of water bottom that they lease, and nobody else can go in there to remove those oysters. Number two, it allows them the right to transfer, because those oysters are removed with the authority of the State of Louisiana, and they are sold to the public, and [three] they are entitled to the fruits, the profits from that activity. So whether we call it a right of use, a lease, it is ownership under the law of Louisiana.

Tr. at 79:20–80:8. Plaintiffs note, "La. Rev. Stat. [§] 56:423 provides the lessees 'the exclusive use of the water bottoms leased and of all oysters and cultch grown or placed thereon' and the right to sue for damages to the oyster beds or the grounds under the leases."[21] Pls.' Resp. at 12. In addition, plaintiffs argue "the statute clearly allows the Plaintiffs to 'aver ownership' when a public offense is committed against their oysters, as in the case of destruction of their oysters like the one committed by the government." *Id.* Plaintiffs argue "exclusive use in and of itself is a property right . . . protected by the Fifth Amendment." Tr. at 55:2–4.

"The lack of any property interest in the fish in the waters is well-settled, statutorily and judicially." *Louisiana Seafood Management Council*, 715 So. 2d at 392 (first citing La. Civ. Code arts. 450, 452; and then citing La. Rev. Stat. § 56:3). The Louisiana Supreme Court in *Louisiana Seafood* explained, "fish which are at large in state waters are the property of the state." *Id.* (quoting *LaBauve v. Louisiana Wildlife & Fisheries Comm'n*, 444 F. Supp. 1370 (E.D. La. 1978)); *see also Crappel*, 160 So. at 311 ("Rats are wild animals, which enjoy their natural liberty and go where they please. While at large they belong to nobody."). The question then is whether oysters are similar enough to fish or rats for this principle to control. By contrast, "[g]rowing crops are property under Louisiana law." *United States v. 131.68 Acres of Land, More or Less, Situated in St. James Par., State of La.*, 695 F.2d 872, 875 (5th Cir. 1983) (awarding net profits and costs already incurred for subsequent years' crops to landowners and lessees for crops taken by the United States Government).

Oysters are not mobile like foxes, rats, and fish. Oysters lack legs, feet, fins, and flippers with their "soft inner [invertebrate] bod[ies]" entirely encased in an outer shell composed primarily of calcium carbonate. Compl. at 10. Oysters are not "at large"—they are generally immovably fixed or planted on the cultch until they reach maturity. Tr. at 12:8–11. The distinction that oysters are fixed in place is crucial because oyster growers lease a specific plot and are required to mark their plot, so, unlike commercial fishers, oyster growers may discern what oysters are within their exclusive lease. Tr. at 52:4–11. As shown by plaintiffs' description, for another person to unlawfully harvest a lessee's oysters, that person would simply have to enter plaintiffs' leased plot and harvest oysters there. Tr. at 52:9–11; *see also* La. Stat. Ann. §§ 56:423(B)–(C).[22] Plaintiffs' description also highlights another crucial distinction— oyster growers generally acquire seed oysters and place those seed oysters on the water bottoms for growth. Compl. at 19.

The process and terminology of oyster farming is exactly as the name suggests, "farming." First, oyster lessees are called "harvesters," "farmers," or "growers." Tr. at 12:22–13:12. Second, like farmers tending the soil, oyster lessees invest significant resources to

---

[21] *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.
[22] *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

cultivate the water bottoms by setting the cultch.  Tr. at 13:19–20; *see also Avenal*, 886 So. 2d at 1110 (Weimer, J., concurring) (footnote omitted) ("Oyster farming is fraught with all the difficulties and risks farmers on land face—such as variances in weather conditions and pests—as well as those peculiar to aquaculture.").  Third, like crop farmers, oyster growers sow the "seed" oysters, "cultivate" the oysters, and then a few years later the oyster growers "harvest" these oysters.  Meanwhile, the oysters, like crops rooted in the soil, are fixed to the cultch within the oyster growers' exclusive leases.

In an interesting note in *Horne*, the Supreme Court distinguished raisins from a Maryland oyster case stating, "oysters, unlike raisins, were 'ferae naturae' that belonged to the State under state law, and '[n]o individual ha[d] any property rights in [oysters] other than such as the state may permit him to acquire.'"  *Horne*, 576 U.S. at 366–67 (quoting *Leonard v. Earle*, 141 A. 714, 716 (Md. App. Ct. 1928)).  In *Leonard*, oyster packers sought to compel the Conservation Commissioner of Maryland to issue a license to carry on the business of packing oysters.  *Leonard*, 141 A. 714.  *Leonard* is distinguishable from this case as the *Leonard* court considered the State of Maryland's power to exact oyster shells—wild caught, not grown—as a condition of awarding a license to pack oysters, whereas this case involves the United States' decision to release trillions of gallons of freshwater at the expense of oyster growers.  *Leonard*, 141 A. at 715.  Importantly, *Leonard* involved the State of Maryland exacting property from oyster packers, not the United States taking property from oyster growers.  *Id.*  In *Horne*, the Supreme Court emphasized the distinction between oyster packers and oyster growers by describing "[r]aisins . . . are private property—the fruit of the growers' labor."  *Horne*, 576 U.S. at 367 (citing *Leonard*, 141 A. at 716).

The government in this case admits, the oyster growers devoted significant resources to cultivate the water bottoms, lay cultch, seed, and raise their oysters.  In that regard, oysters, like raisins in *Horne*, are "fruit of the growers' labor."  *Id.* at 367; *see also Avenal*, 886 So. 2d at 1110 (Weimer, J., concurring) (footnote omitted) ("Oyster farming has historically been arduous, backbreaking work requiring a special dedication. . . .  Louisiana has historically leased water bottoms for a nominal value because this property had little intrinsic value.  Through hard work and dedication, many oyster fishermen built reefs with materials referred to as cultch over the muddy water bottoms, turning unproductive lands into an area producing bountiful crops of oysters.").  Neither *Horne* nor case law applying the rule of capture to fish, foreclose oyster growers property rights in this case, so the Court now turns to an analysis of plaintiffs' "bundle of rights" in oysters.

In *Murr*, Chief Justice Roberts states, "step one" of a Takings Clause analysis is "identifying the property interest at stake" and "[t]he word 'property' in the Takings Clause means 'the group of rights inhering in [a] citizen's relation to [a] . . . thing, as the right to possess, use and dispose of it.'"  *Murr v. Wisconsin*, 137 S. Ct. 1933, 1951 (2017) (Roberts, J., dissenting) (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)).  To decide whether plaintiffs have compensable property rights, the Court must understand all plaintiffs' rights in the oysters and determine whether the "group of rights" is sufficient to create a compensable property interest.  *Gen. Motors*, 323 U.S. at 378.  "[W]hile state law generally defines what constitutes a property interest, 'unwritten common law' or 'policies and practices' also can rise to the level of creating 'property interests.'"  *Melancon*, 703 F.3d at 269 (citing

*Perry v. Sindermann,* 408 U.S. 593, 602–03 (1972)).  "In other words, the Fifth Amendment protects expectations arising not just from legislation or judicial precedent, but also those 'spring[ing] from custom and practice.'"  *Id.* (citing *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1581 (Fed. Cir. 1993)).  In *Melancon*, the Fifth Circuit explains the essential features of the "bundle of rights" commonly characterized as "property" under Louisiana law are:

> (1) *usus*—the right to use or possess, i.e., hold, occupy, and utilize the property; (2) *abusus*—the right to abuse or alienate, i.e., transfer, lease, and encumber the property, and (3) *fructus*—the right to the fruits, i.e., to receive and enjoy the earnings, profits, rents, and revenues produced by or derived from the property.

*Id.* (citing *Rodrigue*, 218 F.3d at 436–37).

"The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).  Under Louisiana's oyster statutes, "[a] lessee shall enjoy the exclusive use of . . . all oysters" grown on their leased water bottoms.  La. Stat. Ann. § 56:423(A) (2016).  The government admits oyster growers "have the right to exclude other people from the [leased] area until the oysters come to eating size . . . .  [I]f [the oyster growers] have collected those seed oysters."  Tr. at 48:21–25.  The government continues, "exclusive use is a use of property right, that [lessees] and no one else can come onto that particular designated area denoted in their lease and attempt to harvest and collect oysters. . . .  That is [the lessees'] exclusively.  That's what the lease gives them."  Tr. at 60:9–14.

The government concedes plaintiffs have the exclusive right to destroy oysters, including the right to do anything the oyster growers "want to do with respect to those oysters."  Tr. at 141:18–142:2 ("THE COURT:  So the Government assumes under 423(a) that the lessee should enjoy the right to destroy the oysters if they so choose.  [THE GOVERNMENT]:  It seems like there certainly could be an argument to that.  They have . . . the exclusive use of the water bottoms lease and of all the oysters and cultch grown or placed thereon, so I think that that use right would include doing what it wants to do with respect to those oysters."); *see also* Tr. at 111:13–14 ("[THE GOVERNMENT]:  [plaintiffs] have a use right in the area that's defined by their lease.").  The government admits oyster lessees "have the exclusive ability to attempt to harvest [oysters] within . . . the geographic confines of their lease."  Tr. at 37:22–24; *see also* Tr. at 58:9–11 ("[THE GOVERNMENT]:  . . . [Section 56:423 provides] a[n] oyster lessee has a right to use a designated area to cultivate and try to harvest oysters.").  Plaintiffs accordingly have rights "to use or possess, i.e., hold, occupy, and utilize" the oysters.  *Melancon*, 703 F.3d at 269 (citations omitted).

The government also states, "[plaintiffs] have a right to sue for damages in state law for tort."  Tr. at 111:15–16.  That plaintiffs may sue third parties who harm their oyster beds and oysters also affirms the right to destroy oysters is exclusively plaintiffs'.  *See* La. Stat. Ann. § 56:423(B).  Further, the government states, "[section 423(C)] allows for recovery under larceny."  Tr. at 115:19–20; Tr. at 58:19–22 ("[THE GOVERNMENT]:  I could not take my boat out and try to collect oysters that might be located within the boundary of [Mr. Campo's] lease, because he has that exclusive right to do that.").  As the government notes section 56:423(C)

does not afford lessees a right to prevent someone from traversing over a marked lease area, the statute does afford lessees a right to sue for wrongful takings of oysters.  La. Stat. Ann. § 56:423(C).  These statutes affirm plaintiffs' rights "to use or possess, i.e., hold, occupy, and utilize" the oysters and plaintiffs' may be entitled to damages if third parties injure, damage, or infringe these rights.  *Melancon*, 703 F.3d at 269 (citations omitted).

The sale of harvested oysters has long been one of the "exclusive uses" referenced in § 56:423.  *See Avenal*, 886 So.2d at 1093 n.9 (discussing "income earned from the sale of oysters on their leases"); *Captain Kevin Corp. v. Bay Drilling Corp.*, 380 So. 2d 639, 643 (La. App. 1 Cir. 1979) ("[D]amages [were] properly based on the sale price [plaintiff] was receiving per sack of oysters sold."); *Morano v. City of New Orleans*, 2 La. 217, 219 (1831) ("The Council thought it proper to confine the sale of oysters in the city to these stands.").  The government also admits plaintiffs have the right to sell the oysters.  Tr. at 132:17–24 ("THE COURT: . . . Mr. Campo, transacts with the local restaurant, what is it that [he is] selling? . . . [THE GOVERNMENT]: [H]e would presumably be paid for the fruits of his effort.").  Plaintiffs clearly have rights to "abuse or alienate" oysters, and plaintiffs have rights to "receive and enjoy the earnings, profits, rents, and revenues produced by or derived from" the oysters.  *Melancon*, 703 F.3d at 269 (citations omitted).

The government admits plaintiffs have several rights including rights to exclude, destroy, use, possess, sue third parties for damages, recover under larceny, alienate, and enjoy the fruits of selling the oysters.  The Court therefore finds plaintiffs have all three essential features of the "bundle of rights" commonly characterized as "property" under Louisiana law.  *Melancon*, 703 F.3d at 269.  Accordingly, a traditional property rights analysis confirms plaintiffs have compensable property rights in oysters as against third parties such as the United States under certain circumstances.[23]  *Horne*, 576 U.S. at 367; *Loretto*, 458 U.S. at 435; *Gen. Motors*, 323 U.S. at 378; *Melancon*, 703 F.3d at 269.

## A. Analysis of Fifth Amendment Lockean Foundation to Property Rights in Oysters

The government admits laying cultch, seeding, and harvesting oysters "takes a lot of labor effort," "it's pretty difficult work," Tr. at 15:13–16, and "[i]f you have to put the cultch down, that can be quite expensive," Tr. at 13:19–20.  *See also* Tr. at 62:18–21 ("[Oyster farmers] have to put in blood, sweat and toil in order to sometimes turn muddy water bottoms into an area that could be used for oyster cultivation."); *Avenal v. State*, 886 So. 2d 1085, 1110 (La. 2004) (Weimer, J., concurring) (footnote omitted) ("Oyster farming has historically been arduous, backbreaking work requiring a special dedication.").  The government also states, when an oyster lessee sells oysters, "presumably [he] would be paid for the fruits of his effort."  Tr. at 132:17–24.  In other words, plaintiffs' labor including "blood, sweat, and toil" to prepare the cultch, lay seed oysters, cultivate the oysters, and harvest the oysters create value and plaintiffs realize this value by selling the oysters in the marketplace.  Tr. at 62:18–21.  Despite these admissions, the government's argument concludes that when plaintiffs sell oysters, they do not sell their property rights in oysters but rather merely receive payment for "the fruits of [their] effort[s]."  Tr. at 132:24; Tr. at 132:25 – 133:2 ("[THE GOVERNMENT]: . . . [The oyster farmer's] not being

---

[23] *See infra* note 27 for a full discussion of the section 56:423(A) and (B) statutory language.

paid because he's selling something he owns. [The oyster farmer] is being paid for the fruits of his effort.").

In his Second Treatise of Government, John Locke explains every individual has a property right "in his own person" and in anything he "remove[s] from the common state [of] Nature" and "mixe[s] his labour with." *See Carpenter v. United States*, 138 S. Ct. 2206, 2239 (2018) (Thomas, J., dissenting) (citing *Second Treatise of Government* § 27 (1690)); *see also Nollan v. California Coastal Comm'n*, 483 U.S. 825, 860 n.10 (1987) (Brennan, J., dissenting) ("By any traditional labor theory of value justification for property rights, for instance, *see, e.g.*, J. Locke, The Second Treatise of Civil Government 15–26 (E. Gough, ed. 1947), Monsanto [in *Ruckelshaus v. Monsanto*] would have a superior claim, for the chemical formulae which constitute its property only came into being by virtue of Monsanto's efforts."). In *Carpenter*, Justice Thomas discusses "Lockean labor theory," which is "[t]he philosopher John Locke's justification of private property, based on the natural right of one's ownership of one's own labor, and the right to nature's common property to the extent that one's labor can make use of it." Lockean Labor Theory, Black's Law Dictionary (11th ed. 2019). Locke states 1 percent of the value of "every thing" "is purely owing to nature" whereas 99 percent of the value is "wholly to be put on the account of labour." *Second Treatise of Government* § 40.

After ascribing 99 percent of the value of property to labor, Locke explains property is "very unsecure" in the state of nature, *Second Treatise of Government* § 123, so individuals form governments to "secure enjoyment of their properties," *id.* at § 95. "Once a government is formed, however, it cannot be given 'a power to destroy that which every one designs to secure'; it cannot legitimately 'endeavour to take away, and destroy the property of the people,' or exercise 'an absolute power over [their] lives, liberties, and estates.'" *Carpenter*, 138 S. Ct. at 2239 (citing *Second Treatise of Government* § 222). In a 1792 essay on property, James Madison, the drafter of the Fifth Amendment, expressed views consistent with Locke's:

> [A] Government is instituted to protect property of every sort; as well that which lies in the various rights of individuals, as that which the term particularly expresses. This being the end of government, that alone is a *just* government, which *impartially* secures to every man, whatever is his *own*.

Jeffrey M. Gaba, *John Locke and the Meaning of the Takings Clause*, 72 Mo. L. Rev. 526, 527 n.4 (2007) (citation omitted); *see also Fla. Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21, 24 n.2 (1999) (citing The Federalist, No. 54, at 339 (J. Madison) (C. Rossiter ed. 1961)) ("Government is instituted no less for protection of the property than of the persons of individuals."). Indeed, Madison "was deeply influenced by Locke." Gaba, *supra*, at 526–27; *see also* Gaba, *supra*, at 527 n.4 ("Madison's writings reflected his deep indebtedness to Locke."); Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 16 (1985) ("The Lockean System was dominant at the time when the Constitution was adopted."); Gaba, *supra*, at 579 ("If not the sole voice that is echoed in the American revolution and the Constitutional Convention, [Locke] clearly influenced the founders, particularly James Madison, and he thus represents an intellectual force that is a legitimate part of the current debate over the relationship between government power and individual property rights.").

Madison "realized the significance of national ratification of a compensation requirement[] and included it among the amendments he proposed to Congress."  William Michael Treanor, 94 Yale L.J. 694, 709 (1985).  "By giving constitutional status to the common law requirement of compensation Madison rejected outright confiscation as an acceptable policy for the federal government."  James W. Ely, Jr., *The Guardian of Every Other Right* 55 (2d ed. 1998). The states ratified Madison's understanding of property rights and a compensation requirement in the Fifth Amendment which reads "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  In his 1792 essay on property, James Madison suggests a broad reading of the Takings Clause stating, just as property cannot be "directly" taken without compensation, neither can the government take property "indirectly" by diminishing the value of property without payment of just compensation.  *See* James Madison, *Property* (1792).  "The rationale behind the takings clause is that the financial burden of public policy should not be unfairly placed on individual property owners but should be shared by the public as a whole."  Ely, *supra*, at 55.  Justice Black similarly explains the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  The requirement of just compensation "also secures property ownership by imposing a practical cost limitation on the amount of private property that the federal government can seize for public purpose."  Ely, *supra*, at 55.

Nineteenth century court decisions also confirm the government may not take private property without just compensation.  *See e.g.*, *Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166, 177 (1871) (describing the government's requirement to pay just compensation upon flooding plaintiff's property as "so essentially a part of American constitutional law."); *Gardner v. Village of Newburgh*, 2 Johns. Ch. 162, 167–68 (N.Y. Ch. 1816) ("[I]t is made a part of the constitution of the *United States,* 'that private property shall not be taken for public use, without just compensation.'  I feel myself, therefore, not only authorized, but bound to conclude, that a provision for compensation is an indispensable attendant on the due and constitutional exercise of the power of depriving an individual of his property.").

The government's suggestion plaintiffs are compensated for "the fruits of [their oyster-growing] effort[s]" in the marketplace, yet plaintiffs lack property rights in the oysters, runs counter to the Lockean foundation of the Fifth Amendment Takings Clause.  Plaintiffs fix the water bottoms with cultch, acquire seed oysters, place these seed oysters within their leases, cultivate the oysters, and then harvest the oysters.  In the government's own words, plaintiffs' "blood, sweat and toil" are mixed with the oysters and this mixture is why plaintiffs are paid when they sell oysters.  *See* Tr. at 132:17–24.  These "backbreaking" efforts when "mixed" with the water bottoms, cultch, and seed oysters confirms plaintiffs have quintessential Lockean property rights in the oysters—this mixture is what the Fifth Amendment assumed to be compensable property if taken for public purpose.

**IX.  Whether 28 U.S.C. § 1497 Gives Plaintiffs an Independent Claim**

The government states, "Plaintiffs' complaint does not mention Section 1497" and urges the Court not to consider whether plaintiffs have a viable claim under this provision.  Def.'s Surreply Resp. at 8.  The government alternatively argues the Court should reject plaintiffs' section 1497 argument for the following three reasons:  (1) plaintiffs have not alleged damage arising from "dredging operations," *id.* at 8–9; (2) plaintiffs have not alleged damage arising from "use of machinery and equipment in making river and harbor improvements authorized by Act of Congress," *id.* at 9–11; and (3) section 1497 does not apply retroactively to the Bonnet Carré Spillway, *id.* at 11–13.  The government further asserts the statutory language, "making river and harbor improvements," 28 U.S.C. § 1497, "is contemplating an actual improvement, an actual structure that's going to be built and that's authorized by Congress," Tr. at 157:13–16.

Plaintiffs contend, their complaint meets the requirements for jurisdiction under section 1497 because "they allege that the damage to their oysters *arose from use of other machinery and equipment in making river . . . improvements authorized by Act of Congress*."  Pls.' Surreply Suppl. at 13.  Plaintiffs assert the spillway "control structure is a mechanically-controlled concrete weir" and "[w]hen opened, the control structure allows overflow volume to flow into Lake Pontchartrain."  *Id.* at 14.  Plaintiffs also aver they are not seeking a retroactive application of section 1497 as the operation of the spillway was not when it was constructed, but rather when it was opened in 2019.  *See* Tr. at 155:4–9 ("[PLAINTIFFS]:  . . . [W]e are applying [section 1497] to the actual process that took place two years ago, in 2019 . . . ."); *see also* Tr. at 155:11–15 ("[PLAINTIFFS]:  The operation that took place in 2019 twice during the year . . . for the purpose of lowering the river, which is an improvement on the river . . . .").

In relevant part, section 1497 provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim for damages to oyster growers on private or leased lands or bottoms arising from dredging operations or use of other machinery and equipment in making river and harbor improvements authorized by Act of Congress.

28 U.S.C. § 1497.  "When interpreting a statute, we look first to the language of the statute." *Fisherman's Harvest, Inc. v. PBS & J*, 490 F.3d 1371, 1376–78 (Fed. Cir. 2007) (citation omitted) (interpreting 28 U.S.C. § 1497 and holding "section 1497 does not create exclusive jurisdiction in the Court of Federal Claims over the oyster growers' claims against private contractors for damage to oyster beds as a result of dredging operations.").  "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  *Mulder v. McDonald*, 805 F.3d 1342, 1345 (Fed. Cir. 2015) (quoting *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002)).  "The inquiry 'ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent.'"  *Id.* (quoting *Barnhart*, 534 U.S. at 450)).

This court's predecessor court previously found the government is not liable under section 1497 for operation of the Bonnet Carré Spillway.  *Lapeyrouse v. United States*, 215 Ct.

Cl. 988, 989 (1977) (sitting in appellate review) (unpublished opinion).  Plaintiffs in *Lapeyrouse* brought a section 1497 claim for damage to their oyster beds over a thirty-month period caused by the United States' government's dredging activity.  *Id.* at 988.  The *Lapeyrouse* court held plaintiffs could only recover under section 1497 for damages to their oyster beds for an 18-month period, the portion of the damages caused directly by dredging operations.[24]  *Id.* at 989.  Plaintiffs were not entitled to damages for the remaining 12-month period because "a superceding [sic] event, namely the opening of the Bonnet Carré Spillway in April 1973 extinguishes the Government's liability for any damages thereafter occurring."  *Id.*  The court noted the "injurious effects of the Spillway opening upon plaintiffs' oyster lease are not factually connected with the damage caused by the dredging operation" and "are, in and of themselves, not compensable by statute."  *Id.*  *Lapeyrouse* is merely persuasive as an unpublished opinion, however, the facts are directly applicable to this case.  *Id.*; *see W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court."); *see also* Fed. Cir. R. 32.1(d) ("The court . . . may look to a[n] . . . unpublished disposition for guidance or persuasive reasoning but will not give one of its own nonprecedential dispositions the effect of binding precedent.").

In this case, as in the non-recoverable 12-month period in *Lapeyrouse*, "Plaintiffs do not allege . . . the United States damaged oyster leases by dredging or some other activity related to dredging operations; they instead allege . . . the United States indirectly damaged oyster leases by opening a flood control spillway in 2019."  Def.'s Surreply Resp. at 9.  As in *Lapeyrouse*, therefore "the injurious effects of the Spillway opening upon plaintiffs' oyster lease are not factually connected with damage caused by [a] dredging operation . . . ."  *Lapeyrouse*, 215 Ct. Cl. at 989.  In *Lapeyrouse*, the court implied the plain meaning of section 1497, "claim for damages to oyster growers on private or leased lands or bottoms arising from dredging operations or use of other machinery and equipment in making river and harbor improvements authorized by Act of Congress," does not include claims for damages arising from operation of the Bonnet Carré Spillway.  28 U.S.C. § 1497; *Lapeyrouse*, 215 Ct. Cl. at 989.

The language of the statute is as follows:  "claim for damages to oyster growers . . . arising from dredging operations or use of other machinery and equipment in making river and harbor improvements authorized by Act of Congress."  28 U.S.C. § 1497.  In this case, while the spillway was opened by use of machinery, plaintiffs admit the public purpose of the spillway is preventing New Orleans from flooding, not "making river and harbor improvements," § 1497.  *See* Compl. at 20 ("The Bonnet Carré Spillway is a flood control structure."); Compl. at 2 (stating, the spillway "avert[s] the flooding of the City of New Orleans.").  Averting flooding of areas surrounding the Mississippi river is not "making a river or harbor improvement," § 1497, rather the MRC president decides to open the spillway to prevent the river from harming others.  *Id.*  This finding affirms the *Lapeyrouse* court's holding regarding the plain meaning of section 1497.

This action is founded upon the Fifth Amendment to the United States Constitution, so this Court has jurisdiction over this action pursuant to the Tucker Act.  *See* 28 U.S.C. § 1491(a)(1) (2018) ("The United States Court of Federal Claims shall have jurisdiction to render

---

[24] This finding is also reinforced by the dearth of non-dredging section 1497 cases.

judgment upon any claim against the United States founded upon . . . the Constitution."). The Court therefore does not need to reach the issue of jurisdiction under section 1497; however, the Court requested supplemental briefing on section 1497 so it could fully consider all issues at one time. *See* Order, ECF No. 20. As the parties fully briefed section 1497's applicability to plaintiffs' claim, the Court concludes plaintiffs do not have an independent cause of action under the plain meaning of section 1497.[25] *See Lapeyrouse*, 215 Ct. Cl. at 989 (finding the government is not liable under section 1497 for operation of the Bonnet Carré Spillway).

## X. Whether Plaintiffs' Claim Should be Dismissed Pursuant to 12(b)(6) for Failure to State a Claim

The government argues, "[b]ecause Plaintiffs have no compensable property right to the oysters themselves, any claim related to a taking of the oysters must be dismissed for failure to state a claim upon which relief can be granted." Def.'s MTD at 8.

The Takings Clause of the Fifth Amendment provides "private property" may not "be taken for public use, without just compensation." U.S. Const. amend. V. To prevail on a takings claim a plaintiff must demonstrate a protectable property interest. *Ruckelshaus*, 467 U.S. at 1000; U.S. Const. amend. V.

In 2019 the Corps opened the Bonnet Carré Spillway on 27 February and again on 10 May in anticipation of flood water conditions in New Orleans. Compl. at 24–25; *see also id.* at 22 (noting the Spillway was constructed to protect New Orleans' and other downstream communities' levees from "unacceptable stress from high water."). Part of plaintiffs' prayer for relief requests a "[f]inding that plaintiffs' . . . properties have been taken for a public purpose." *Id.* at 34. For purposes of this motion, the government does not contest the openings occurred for a public purpose, affirmatively asserting "the United States operated the Bonnet Carré Spillway . . . in order to minimize flood damages along the lower river reaches and the City of New Orleans." Def.'s MTD at 1. During oral argument, the government agreed, for the purpose of the motion to dismiss, the opening of the Bonnet Carré Spillway was for a public purpose. Tr. at 30:18–21 ("THE COURT: "Well, so the operation of the Bonnet Carré Spillway, the Government agrees that it is a measure of flood prevention for a public purpose. [GOVERNMENT]: Yes."). Additionally, the government concedes, "[f]or purposes of this motion, the United States assumes Plaintiffs own oyster leases on state-owned waterbottoms." Def.'s MTD at 7.

The government concedes the above elements of plaintiffs' takings claims for the purposes of this motion and instead bases its RCFC 12(b)(6) motion to dismiss solely on the argument plaintiffs "have no compensable property right to the oysters themselves." *Id.* at 8; Tr.

---

[25] The Court concludes plaintiffs do not have an independent cause of action under section 1497, thus the Court does not need to reach the issue of whether finding jurisdiction would violate the party presentation rule. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) (reversing the Ninth Circuit for failing to follow the party presentation rule by finding the statute in question was overbroad, even though the defendant did not make such an argument); *Greenlaw v. United States*, 554 U.S. 237 (2008) (reversing the Eighth Circuit for violating the party presentation rule by *sua sponte* imposing a prison sentence not advocated by the government); *Stearn v. Dep't of Navy*, 280 F.3d 1376, 1381 (Fed. Cir. 2002) (reversing the trial court for failing to follow the party presentation rule).

at 33:17–20 ("THE COURT: . . . The only issue [is] whether Plaintiffs have a compensable property right in the oysters. [THE GOVERNMENT]: Yes."). This is the government's only argument, and as the Court found *supra* Sections VII & VIII, plaintiffs have compensable property rights in the oysters as against third parties, such as the United States, in certain circumstances. Therefore, the Court must deny the government's motion to dismiss in part pursuant to RCFC 12(b)(6).

## XI. Conclusion

The government concedes when plaintiffs sell oysters they are "paid for the fruits of [their] effort," and plaintiffs demonstrate rights to exclude, destroy, use, possess, sue third parties for damages, recover for larceny, alienate, and enjoy the fruits of selling oysters. Under Louisiana precedent, federal common law, and Lockean labor theory, plaintiffs have shown compensable property rights in oysters as against the United States. For the foregoing reasons, the Court **DENIES** the government's motion to dismiss in part pursuant to RCFC 12(b)(6).[26] The parties shall meet and confer, and **SHALL FILE** a joint status report detailing the next steps in the case and further proceedings on or before **20 January 2022**.[27]

---

[26] The Court also **GRANTS** plaintiffs' motion to file a surreply in opposition to the government's motion to dismiss in part. *See supra* Section V.

[27] As mentioned in a handful of notes *supra*, the parties do not fully cite or discuss section 56:423 in their briefing. A proper Bluebook citation to a state statute includes "the year of the cited code edition." The Bluebook: A Uniform System of Citation R. 12.1.2, at 19 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020). Neither party, however, includes a year for their section 56:423 citations and plaintiffs presented the Court with a 1981 copy of section 56:423 at argument. The Louisiana legislature has amended section 56:423 several times since 1981, but the government did not object to plaintiffs' 1981 edition of the statute. The Court is thus unable to determine whether the parties are referring to the correct version of section 56:423 and observes in full review of the most recent version of the statute, there may be non-property right reasons to address a motion to dismiss under Louisiana Statute Annotated Section 56:423 (2016).

The parties cite sections 56:423(A), (B), (B)(1), and (C) in their briefs but other sections of this statute are notably absent. A few subsections which may be relevant to this case were amended as recently as 2016. For example, where section 56:423(A)(1) currently reads "integrated coastal protection as defined in R.S. 49:214.2," La. Stat. Ann. § 56:423(A)(1) (2016), from 2006 to 2016, the statute read, "coastal protection, conservation, or restoration," La. Stat. Ann. § 56:423(A)(1) (2006). The full current subsection 423(A)(1) provides:

> This exclusive use of water bottoms is subordinate to the rights or responsibilities of the state, any political subdivision of the state, the United States, or any agency or agent thereof, to take any action in furtherance of integrated coastal protection as defined in R.S. 49:214.2.

La. Stat. Ann. § 56:423(A)(1) (2016). The Louisiana legislature defines "integrated coastal protection," first incorporated into section 56:423(A)(1) in 2016, in section 214.2(11) as follows:

> [P]lans, projects, policies, and programs intended to provide hurricane protection or coastal conservation or restoration, and shall include but not be limited to coastal restoration; coastal protection; infrastructure; storm damage reduction; flood control; water resources development; erosion control measures; marsh management; diversions; saltwater intrusion prevention; wetlands and central wetlands conservation, enhancement, and restoration; barrier island and shoreline stabilization and preservation; coastal passes stabilization and restoration; mitigation; storm surge reduction; or beneficial use projects.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

La. Stat. Ann. § 214.2(11).  This language specifically refers to "plans, projects, policies, and programs intended to provide hurricane protection or coastal conservation or restoration" including, but not limited to, "flood control." La. Stat. Ann. § 214.2(11).  The parties' briefing also lacks section 423(B)(1)(a) which provides:

> No lessee shall have any right to maintain any action against the state, any political subdivision of the state, the United States, or any agency, agent, contractor, or employee thereof for any claim arising from any project, plan, act, or activity in relation to integrated coastal protection, except as provided in R.S. 56:427.1.

La. Stat. Ann. § 56:423(B)(1)(a).  Section 56:423(B)(1)(a) provides no lessee shall have a right to maintain an action against the United States "for any claim arising from any project, plan, act, or activity in relation to *integrated coastal protection*, except as provided in R.S. 56:427.1."  La. Stat. Ann. § 56:423(B)(1)(a) (emphasis added).  This section applies the definition of "integrated coastal protection" which might include actions relating to "flood protection" under certain circumstances.  La. Stat. Ann. § 214.2(11).

If applicable to plaintiffs in this case, these statutes may raise the following issues:  whether operation of the Spillway to control non-hurricane upstream river water constitutes a "plan[], project[], polic[y], [or] program[] intended to provide hurricane protection or coastal conservation or restoration . . . includ[ing] but not limited to . . . flood control" under section 214.2(11) and section 56:423(B)(1)(a);  and  whether under section 56:423(A)(1) plaintiffs' "exclusive use of water bottoms" might be "subordinate to the rights or responsibilities of . . . the United States, or any agency or agent thereof."  These statutes are likely applicable regardless of compensable property rights in oysters.

Given the potential importance of these statutes to this case, the parties shall include a discussion of the applicability of the full version of the statutes in the 20 January 2022 joint status report.