# In the United States Court of Federal Claims

Nos. 20-44; 20-47; 20-55 (consolidated)
(Filed:  9 February 2024)

*****************************************

| | |
|---|---|
| ROBERT L. CAMPO, *et al.*, | * |
| | *    Motion to Dismiss; RCFC 12(b)(6); |
| | *    Motion for Summary Judgment; RCFC 56; |
| Plaintiffs, | *    Fifth Amendment; Takings; Oysters; |
| v. | *    28 U.S.C. § 1497; Louisiana |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

*****************************************

     *Camilo K. Salas III*, Salas & Co., L.C., with whom were *Michael G. Stag*, *Ashley M. Liuzza*, and *Matthew D. Rogenes*, Stag Liuzza, L.L.C., all of New Orleans, LA, for plaintiffs.

     *William J. Shapiro*, Senior Trial Attorney, of Sacramento, CA, with whom was Todd Kim, Assistant Attorney General, Environment and Natural Resources Division, Department of Justice, of Washington, DC, for the government.

## OPINION AND ORDER

**HOLTE, Judge.**

     Plaintiff oyster farmers allege the federal government spillway operations destroyed their oyster stock and deprived them of use of their real property (leased oyster beds and reefs).  The farmers allege the government's actions resulted in a permanent taking of their property for a public use without payment of just compensation.  In 2020, the government filed a motion to dismiss plaintiffs' Complaint in part arguing plaintiffs lack compensable property rights in the oysters.  On 23 December 2021, the Court denied the government's Motion and—citing John Locke[1]—held, in some circumstances and as against some parties, plaintiffs do have compensable property rights in the oysters.  *Campo v. United States*, 157 Fed. Cl. 584 (2021).

     The Court is now asked to determine whether Louisiana state law prevents plaintiffs from maintaining the instant Fifth Amendment takings claim against the government.  The Court again heeds the wisdom of Locke's 1690 Second Treatise of Government, which recognizes:

---

[1] *Campo v. United States*, 157 Fed. Cl. 584 (2021) ("In his 1690 Second Treatise of Government, John Locke famously noted 'the labour of his body, and the work of his hands, we may say, are properly his.  Whatsoever then he removes out of the state that nature hath provided, and left it in, he hath mixed his labour with, and joined to it something that is his own, and thereby makes it his property.'") (quoting JOHN LOCKE, TWO TREATISE OF GOVERNMENT 204–05 (George Rutledge and Sons 1884) (1690)).

> [T]he society or legislative [body] constituted by them . . . is obliged to secure
> every one's property . . . .  And so, whoever has the legislative or supreme power
> of any commonwealth, is bound to govern by established standing laws,
> promulgated and known to the people . . . [which are to be enforced by]
> indifferent and upright judges who are to decide controversies by those laws . . . .

In this Opinion and Order, the Court undertakes to "decide [this] controvers[y] by th[e] laws" of the State of Louisiana.

The government's pending Motion to Dismiss or, in the Alternative, for Summary Judgment argues plaintiffs' claims are precluded by state law.  Plaintiffs contend the Louisiana laws at issue are inapplicable and, in the alternative, allege the laws unconstitutionally prevent them from maintaining a Fifth Amendment takings claim.  On 27 September 2023, the Court held oral argument on the government's Motion at Tulane University School of Law.  Plaintiffs agreed at oral argument, if the statutes proffered by the government apply to this case, their claims must be dismissed.  The Court finds these Louisiana laws do apply to plaintiffs and unambiguously bar them from maintaining the instant action.

While plaintiffs may wish to expeditiously resolve these state law questions before Louisiana's courts, it is not clear this court can certify questions to the Louisiana Supreme Court. *See infra* note 9.  The Court agrees, however, the parties' arguments in this case necessitate the Court address the meaning and constitutionality of sections 49:214.2(11), 56:423(A)(1)(a), and 56:423(B) of the Louisiana Revised Statutes, a task perhaps better suited for the Louisiana Supreme Court.  *See infra* Sections III, V, VII.  This is particularly true because this court does not have the power to grant plaintiffs the declaratory relief they request.  *See infra* Section VII. Further, while the State of Louisiana, rather than the United States government, is likely the party best suited for defending Louisiana's state laws, there is no provision in the Rules of the United States Court of Federal Claims ("RCFC") permitting states to intervene.  *See infra* Section VII. *Compare* Fed. R. Civ. P. 5.1, *with* RCFC 5.1.  The Court's limited jurisdiction is therefore not well suited for adjudicating contracted-for property rights limited by state law, particularly where, as noted by this court in its 2021 Order, the property rights at issue have already been uniquely addressed by the Louisiana Supreme Court.  Thus, although plaintiffs' claims are against the United States, the jurisdiction of Louisiana state courts appears more appropriate for considering the parties' state law arguments.

Pursuant to this court's interpretation of Louisiana state law, in light of the above considerations, and for the reasons discussed below, the Court grants the government's Motion to Dismiss and dismisses this case.

I.      **History of the Bonnet Carré Spillway and Louisiana's Coastal Protection Statutes[2]**

"[I]n response to the Great Mississippi flood of 1927," Compl. at 23, ECF No. 1, "the [United States Army Corps of Engineers (the "Corps")] authorized the construction of the Bonnet Carré Spillway in 1928," 9 July 2021 Mot. to Dismiss Oral Arg. Tr. ("MTD Tr.") at 30:5–8, ECF No. 26.  The spillway was completed in 1931 as "a flood control structure in . . . St. Charles Parish, Louisiana about 32.8 miles west of New Orleans."  Compl. at 20.  The spillway "allows floodwaters from the Mississippi River to flow into Lake Pontchartrain and thence into the Lake Pontchartrain Basin, including Lake Pontchartrain, Lake Borgne, the Biloxi Marshes, Chandeleur Sound, Breton Sound, the Mississippi Sound and ultimately the Gulf of Mexico."  *Id.* It is key to the "comprehensive flood control program tasked with averting the worst Mississippi River flood conceivable—the so-called 'project design flood.'"  *Harrison Cnty. v. U.S. Army Corps of Eng'rs*, 63 F.4th 458, 460 (5th Cir. 2023).

"The decision to operate or 'open' the Bonnet Carré Spillway is the responsibility of the Mississippi River Commission ('MRC') president."  Compl. at 22.  "The MRC president relies heavily on the recommendations of the Corps' New Orleans District Engineer, who is responsible for the actual operation of the control structure and the floodway of the Bonnet Carré Spillway."  *Id.*  The spillway is opened when "existing conditions, combined with predicted river stages and discharges, indicate that the mainline levees in New Orleans and other downstream communities will be subjected to unacceptable stress from highwater."  *Id.*; Tr. at 72:17–19 ("[THE GOVERNMENT:]  [It] is opened when the Mississippi River reaches a particular [predetermined] stage and is expected to increase or stay at that stage.").  While the MRC and Corps control the operation of the spillway, the Louisiana Coastal Protection and Restoration Authority (CPRA) is "the state entity charged with implementing" Louisiana's integrated coastal protection plan.  *See* United States' Mot. to Dismiss or Mot for Summ. J. ("Def.'s MTD/MSJ") at 10, ECF No. 43.  Relevant here, the CPRA administers those portions of Louisiana law related to "integrated coastal protection," a term defined by Louisiana state law and encompassing an expansive array of programs and plans related to protecting coastal Louisiana from natural disaster.  *See* LA. REV. STAT. § 49:214.2(11) (2024).  The MRC, the Corps, the CPRA, and myriad other local, state, and federal agencies and authorities all play a role in protecting Louisiana from storms, floods, and similar natural disasters.  Tr. at 74:1–6 ("THE COURT:  . . . [Plaintiffs], any response on how CPRA, MRC, and the Army Corps, and the [other state] flood protection authorities relate to each other?  [PLAINTIFFS]:  . . . [T]hey are always fighting with each other . . . [b]ecause they are taking over their little turfs . . . .").

In 2019, the Corps opened the Bonnet Carré Spillway for a total of 123 days, first from 27 February until 11 April and then from 10 May until 27 July.  Compl. at 3, 32–33.  These two openings released "nearly ten trillion gallons of freshwater from the Mississippi River into [oyster estuaries] . . . , lowering the natural and essential salinity levels of the waters and marshes

---

[2] On 23 December 2021, the Court issued an opinion denying the government's Motion to Dismiss in Part.  *See Campo v. United States*, 157 Fed. Cl. 584 (2021) [hereinafter 23 December Order].  A full recitation of the factual and procedural histories in this case can be found in the 23 December Order.  *See id.* at 587–93.  The factual history in this Opinion and Order relies on uncontested facts expressed in the Court's 23 December Order and contains only those facts pertinent to the government's Motion to Dismiss or, in the alternative, for Summary Judgment, ECF No. 43.

where plaintiffs' . . . oyster leases are located." *Id.* at 32–33.  On 13 June 2019, the Governor of Louisiana, "John Bell Edwards, sent a letter to the United States Secretary of Commerce" admitting "[t]he extreme influx of freshwater [from the Bonnet Carré Spillway opening] has greatly reduced salinity levels in our coastal waters and disrupted estuarine productivity." *Id.* at 29 (quoting the Governor's Letter).  The Governor further stated:  "The most recent sampling of oyster reefs indicated a mortality range of 14% up to 100%.  Private oyster leaseholders in nearby areas have indicated to [the Louisiana Department of Wildlife and Fisheries] they have suffered between 50% and 100% mortality on their oyster reefs, with additional mortalities still ongoing in multiple areas." *Id.* (quoting the Governor's Letter).  On 3 July 2019, "the Louisiana Department of Health announced the closing of several oyster-harvesting areas due to the low salinity levels caused by the influx of fresh water from the Mississippi River resulting from the opening of the Bonnet Carré Spillway."  Compl. at 29.

## II.    **Procedural History**

On 14 January 2020, plaintiffs, Robert L. Campo, Michael Campo, Lepetich Aquaculture, L.L.C., and M.J. Lepetich Oysters, L.L.C., along with several consolidated plaintiffs (collectively, "plaintiffs"), filed a complaint alleging:

> As a direct, natural or probable consequence of the opening of the Bonnet Carré Spillway during the year 2019, plaintiffs and the putative Class members have been deprived of the use, occupancy and enjoyment of their personal (oyster stock) and real (oyster beds and reefs) property, resulting in a permanent taking of their property for a public use, without payment of just compensation.

*See* Compl. at 33.  The Court granted the parties' Motion to Consolidate Case Nos. 20-47 & 20-55 with this case on 1 May 2020.  *See* Order, ECF No. 10.  The government then moved to dismiss in part plaintiffs' Complaint pursuant to RCFC 12(b)(6), arguing plaintiffs lack a compensable property right in the oysters.  *See* Defendant's Mot. to Dismiss in Part ("Def.'s MTD"), ECF No. 11.  Plaintiffs responded to the government's Motion to Dismiss by stating the Fifth Amendment Takings Clause applies to all forms of property rights and not only ownership.  Pls.' Resp./Opp'n to the United States' Mot. to Dismiss in Part ("Pls.' MTD Resp.") at 7, ECF No. 14.  On 27 July 2020, the government filed a reply averring none of plaintiffs' arguments contradict its argument the State of Louisiana owns the oysters, not plaintiffs.  Def.'s Reply in Supp. of Mot. to Dismiss in Part ("Def.'s MTD Reply") at 2–3, ECF No. 15.  On 9 July 2021, the Court held oral argument on the government's Motion to Dismiss in New Orleans, Louisiana.  *See* Order, ECF No. 23.

The Court issued a 39-page opinion (the "23 December Order") on 23 December 2021 denying the government's Motion to Dismiss in Part.  *See Campo v. United States*, 157 Fed. Cl. 584 (2021).  The Court noted, "the government concedes when plaintiffs sell oysters they are 'paid for the fruits of [their] effort,' and plaintiffs demonstrate rights to exclude, destroy, use, possess, sue third parties for damages, recover for larceny, alienate, and enjoy the fruits of selling oysters." *Id.* at 618.  The Court therefore concluded, "[u]nder Louisiana precedent, federal common law, and Lockean labor theory, plaintiffs have shown compensable property

rights in oysters" as "against third parties, such as the [government], in certain circumstances." *Id.*

In the final footnote of the 23 December Order, the Court called the parties' attention to an important section of Louisiana law:

> Neither party . . . includes a year for their [Louisiana Revised Statutes section] 56:423 citations . . . [so t]he Court is thus unable to determine whether the parties are referring to the correct version of section 56:423[3] and observes in full review of the most recent version of the statute, there may be non-property right reasons to address a motion to dismiss under Louisiana [law].

*Id.* at 618 n.27. "Given the potential importance of these statutes to this case," the Court ordered the parties to "include a discussion of the applicability of the . . . statutes in the[ir] 20 January 2022 joint status report [(JSR)]." *Id.* at 619 n.27. Addressing its holding, the Court noted, "[t]hese statutes are likely applicable *regardless* of compensable property rights in oysters." *Id.* (emphasis added). In the parties' 20 January 2022 JSR, the government noted, "these statutes, and specifically La. Rev. Stat. § 56:423 (2016), apply to this case and are one of several reasons why [p]laintiffs' claims will ultimately fail." 20 Jan. 2022 JSR at 2, ECF No. 33. On 22 April 2022, the Court adopted the parties' proposed schedule for discovery "limited to the dispositive issue in the Court's [23 December Order], note 27." 22 April Sched. Order at 2, ECF No. 40.

On 24 October 2022, following limited discovery on the issue raised in note 27, the government moved to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(6) or, in the alternative, for summary judgment pursuant to RCFC 56, arguing Louisiana Revised Statutes section 56:423 precludes plaintiffs from suing "the United States for claims allegedly arising out of the spillway's 2019 operation." *See* Def.'s MTD/MSJ at 21. Plaintiffs responded to the government's Motion by stating section 56:423 does not apply to the Bonnet Carré Spillway and, even if it did, it could not prevent plaintiffs from vindicating their constitutional rights under the Fifth Amendment Takings Clause. Pls.' Resp./Opp'n to the United States' Mot. for Summ. J. ("Pls.' MTD/MSJ Resp."), ECF No. 47. On 1 February 2023, the government filed a reply averring section 56:423 applies to the Bonnet Carré Spillway and defines plaintiffs' property rights as "subordinate to the United States' right to take any action in furtherance of integrated coastal protection." Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s MTD/MSJ Reply") at 4, ECF No. 52. After reviewing the parties' initial briefing, on 8 September 2023, the Court ordered supplemental briefing on questions related to the history and constitutionality of Louisiana's oyster regulatory scheme. Suppl. Br. Order, ECF No. 59.[4] Plaintiffs and the

---

[3] As discussed in detail *infra* Section IV.C, Louisiana Revised Statutes sections 56:423(A)(1) and (B)(1)(a) subordinate oyster lessees' rights in leased water bottoms to those of the state and federal governments to take action in furtherance of "integrated coastal protection," a defined term construed by the Court *infra* Section V, and prohibit lessees from suing the state and federal governments for harm caused by such activity.

[4] The Court requested the parties provide arguments related to: (1) the applicability of the unconstitutional conditions doctrine to this case; (2) the legislative history of Louisiana Revised Statutes sections 56:423 and 49:214.2(11); (3) the most appropriate defendant and forum for plaintiffs' constitutional challenges to Louisiana law; (4) caselaw regarding states' ability to restrict Fifth Amendment takings claims against the federal government; (5) the applicability of *Tyler v. Hennepin County*, 598 U.S. 631 (2023) and related Supreme Court precedent to this case; and (6) caselaw related to governmental power to contract for the forfeiture of constitutional rights.

government filed supplemental briefing on 14 September 2023.  Pl's Suppl. Br., ECF No. 60; Def.'s Suppl. Br., ECF No. 61.  The government filed a response supplemental brief on 21 September 2023.  Def.'s Resp. Suppl. Br., ECF No. 62.  On 27 September 2023, the Court held oral argument on the government's Motion to Dismiss and Alternative Motion for Summary Judgment in New Orleans, Louisiana.  *See* Order, ECF No. 58.

### III.   Parties' Arguments Regarding the Government's Motion to Dismiss Under RCFC 12(b)(6) and Alternative Motion for Summary Judgment Under RCFC 56

The government moves to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(6) or, in the alternative, for summary judgment pursuant to RCFC 56 arguing, "[p]laintiffs' claim fails because oyster leases in Louisiana are subordinate to actions taken in furtherance of integrated coastal protection, including actions taken for the purpose of . . . flood control, like the 2019 operation of the Bonnet Carré Spillway."  Def.'s MTD/MSJ at ii.  In its Motion, the government "assumes [p]laintiffs own oyster leases within Louisiana and Louisiana law," and argues, "Louisiana's comprehensive statutory scheme [regulating the oyster industry] limits the property rights oyster lessees enjoy by preventing lessees from raising certain claims against the United States."  *Id.* at 5.  The government continues:  "[While] current Louisiana law allows owners of oyster leases to bring a tort-like claim for 'damages against any . . . entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee' . . . [,] 'lessee[s] [do not] have any right to maintain any action against . . . [the government] for any claim arising from . . . integrated coastal protection . . . .'"  *Id.* at 7 (emphasis omitted) (quoting LA. REV. STAT. § 56:423(B)(1)(a) (2021)).  Concluding the Bonnet Carré Spillway is an integrated coastal protection project within the meaning of Louisiana Revised Statutes section 49:214.2(11), the government contends plaintiffs "have no ability to sue the United States for claims" arising out of its operation, meaning the Court should dismiss plaintiffs' complaint pursuant to RCFC 12(b)(6) or grant summary judgment to the government pursuant to RCFC 56.  *See id.* at 21.

Plaintiffs respond to the government's Motion stating:  "This Court has already determined that [p]laintiffs have protectable property interests in their oyster leases and in the oysters they grow.  Louisiana law cannot prevent [p]laintiffs from pursuing their claims against the government for the taking of their oyster[s] and . . . leases in violation of the Fifth Amendment."  Pls.' MTD/MSJ Resp. at 5.  Plaintiffs acknowledge "state law defines the scope of property rights" but argue the Supremacy Clause of the United States Constitution prevents state law from "determin[ing] whether individuals can enforce their rights when property is taken by the government in violation of the Fifth Amendment."  *Id.* at 9.  Plaintiffs therefore contend the government is incorrect in arguing section 56:423 precludes their Fifth Amendment claims.  *Id.* at 9–10.  In their response, plaintiffs also refute the government's characterization of the Bonnet Carré Spillway as an integrated coastal protection project.  *See id.* at 11.  Plaintiffs acknowledge the Bonnet Carré Spillway is a flood control structure but note it "was never 'intended to provide hurricane protection or coastal conservation or restoration' within the meaning of 'integrated coastal protection.'"  *Id.* (emphasis omitted).  Plaintiffs also argue Louisiana Revised Statutes section 49:214.5.6 "allows [p]laintiffs to maintain an action for the taking of their property in violation of the Fifth Amendment."  Pls.' Suppl. Mem. at 2, ECF No. 51.  The government refutes the applicability of section 49:214.5.6 to plaintiffs and, with respect to plaintiffs' interpretation of the definition of "integrated coastal protection," notes the coast is

- 6 -

"not [just] a small strip of land . . . where the land meets the water."  *See* Tr. at 58:23–24; Def.'s MTD/MSJ Reply at 8–9.  Plaintiffs ultimately request the Court "deny the government's [M]otion to [D]ismiss and the [M]otion for [S]ummary [J]udgment" because, even if the Court does not agree with plaintiffs' argument sections 56:423(A)(1) and (B)(1)(a) conflict with the Constitution, the provisions are inapplicable to the Bonnet Carré Spillway.  Pls.' MTD/MSJ Resp. at 13–14.

## IV.    Applicable Law

### A.    The Government's Motion to Dismiss Pursuant to RCFC 12(b)(6)

The Court must dismiss a complaint that fails to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).  *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  To defeat a RCFC 12(b)(6) motion to dismiss, plaintiffs must show the complaint contains facts sufficient to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013).  This showing "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citation omitted).  When the factual allegations of a complaint, even if true, do not support a claim for relief, "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 558 (ellipsis in original) (citation omitted); *see also Abbott Lab'ys. v. Brennan*, 952 F.2d 1346, 1354 (Fed. Cir. 1991) (stating dismissal "is appropriate 'if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" (citation omitted)).

When evaluating a RCFC 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint . . . [and] indulge all reasonable inferences in favor of the non-movant."  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).  The Court should not, however, "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations."  *Kowal v. MCI Commc'ns. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### B.    The Fifth Amendment and the Application of State Law

The Takings Clause of the Fifth Amendment provides "private property" may not "be taken for public use, without just compensation."  U.S. CONST. amend. V.  Thus, to prevail on a takings claim, a plaintiff first must demonstrate that he has a protectable property interest.  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984).  "Generally speaking, state law defines property interests . . . ."  *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 707 (2010) (citation omitted).  This is because "[p]roperty interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

- 7 -

**C.**     **Integrated Coastal Protection in Louisiana**

"Louisiana has enacted an extensive statutory scheme, which heavily regulates oyster leasing activities on state-owned waterbottoms." *Campo v. United States*, 157 Fed. Cl. 584, 603 (2021) (citation omitted).  Pursuant to Louisiana Revised Statutes section 56:423(A), an oyster "lessee shall enjoy the exclusive use of the water bottoms leased and of all oysters . . . grown or placed thereon, subject to the restrictions and regulations of this Subpart [(i.e., section 56:423(A))] and Part II of Chapter 2 of Title 49 of the Louisiana Revised Statutes of 1950."  LA. REV. STAT. § 56:423(A) (2024).  Section 56:423(A)(1) imposes one such relevant restriction: "*This exclusive use of water bottoms is subordinate to the rights or responsibilities of* the state, any political subdivision of the state, *the United States, or any agency or agent thereof, to take any action in furtherance of integrated coastal protection* as defined in [section] 49:214.2."  *Id.* § 56:423(A)(1) (2024) (emphasis added).  Louisiana law further provides:

> "*Integrated coastal protection*" *means plans, projects, policies, and programs intended to provide hurricane protection or coastal conservation or restoration*, *and shall include but not be limited to* coastal restoration; coastal protection; infrastructure; *storm damage reduction; flood control*; water resources development; erosion control measures; marsh management; *diversions*; saltwater intrusion prevention; wetlands and central wetlands conservation, enhancement, and restoration; barrier island and shoreline stabilization and preservation; coastal passes stabilization and restoration; mitigation; storm surge reduction; or beneficial use projects.

*Id.* § 49:214.2(11) (emphasis added).

Section 56:423 also creates a limited cause of action for oyster lessees when third parties damage their oyster beds and grounds.  *See id.* § 56:423(B).  Section 56:423(B)(1) authorizes lessees to "maintain an action for damages against any person . . . or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee." *Id.* § 56:423(B)(1).  *Oyster lessees do not, however, "have any right to maintain any action against the* state, any political subdivision of the state, *the United States, or any agency, agent, contractor, or employee thereof for any claim arising from any project, plan, act, or activity in relation to integrated coastal protection*, except as provided in [section] 56:427.1." *Id.* § 56:423(B)(1)(a) (emphasis added).  Section 56:427.1(A) reiterates:

> [T]he state of Louisiana, political subdivisions of the state, *the United States*, and any agency, agent, contractor, or employee thereof *shall be held free and harmless from any claims arising under any oyster lease*, renewal, or extension granted to any individual or other entity for any purpose *from diversions of fresh water* or sediment, dredging or direct placement of dredged or other materials, *or any other actions taken for the purpose of coastal protection, conservation, or restoration*.

*Id.* § 56:427.1(A) (emphasis added).  Subsection 56:427.1(C) then carves out limited exceptions to this hold-harmless provision for certain lessees whose leases are or may be acquired by the

CPRA, "the agency charged with oversight of Louisiana's coastal restoration projects," Def.'s MTD/MSJ at 14.  *See id.* § 56:427.1(C).

Recognizing coastal protection may create a need "for the [S]tate [of Louisiana] or its political subdivisions" to compensate Louisiana residents for "property taken for public purposes related to coastal wetlands conservation, management, preservation, enhancement, creation, or restoration" through "the full police power of the state," section 49:214.5.6 states compensation for such takings "shall be governed by . . . the Fifth Amendment of the Constitution of the United States."  *Id.* § 49:214.5.6(A), (B).  Section 49:214.5.6 further specifies such claims against the "[S]tate [of Louisiana] or its political subdivisions" should be filed in the "Nineteenth Judicial District Court for the Parish of East Baton Rouge."  *Id.* § 49:214.5.6(A), (C).

## V.    Statutory Interpretation of Louisiana Revised Statutes Section 49:214.2(11)

"The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012).  "When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."  *Stenberg v. Carhart*, 530 U.S. 914 (2000); *see also Fox v. Standard Oil Co. of N.J.*, 294 U.S. 87, 96 (1935) ("[D]efinition by the average man or even by the ordinary dictionary . . . is not a substitute for the definition set before us by the lawmakers with instructions to apply it to the exclusion of all others.  There would be little use in such a glossary if we were free in despite of it to choose a meaning for ourselves.").  The government argues the Bonnet Carré Spillway fits within the plain language of "integrated coastal protection," LA. REV. STAT. § 49:214.2(11) (2024), because it provides flood control and "create[s] much-needed new wetlands" by "bringing sediment from the Mississippi River into the ecologically important wetland area between the spillway structure and Lake Pontchartrain."  Def.'s MTD/MSJ at 18, 20.  The government contends "[t]he terms in these [Louisiana s]tate laws are unambiguous . . . the Bonnet Carré Spillway . . . is one of the 'plans, projects, policies, and programs' intended 'to provide' 'flood control' . . . within the meaning of 'integrated coastal protection.'"  *Id.* at 9 (quoting LA. REV. STAT. § 49:214.2(11) (2020)); Def.'s Resp. Suppl. Br. at 7 ("Plaintiffs' argument ignores the statutory language of 'integrated coastal protection,' which includes 'storm damage reduction; flood control; water resources; . . . [and] diversions." (quoting LA. REV. STAT. § 49:214.2(11)).  Thus, the government urges the Court grant its Motion without considering legislative history or agency action, which the government asserts are only relevant in the event of statutory ambiguity.  *See* Def.'s MTD/MSJ at 8–10 ("The statutes relevant to this [M]otion are unambiguous."); *see also* Tr. at 7:8–12 ("THE COURT:  . . . [I]f the Court agrees with the government [plaintiffs are not stating a claim upon which relief can be granted because Louisiana law subordinates plaintiffs' oyster leases to the government's right to undertake integrated coastal protection, including the operation of the Bonnet Carré Spillway], then there is no reason to discuss or analyze [the government's Summary Judgement Motion?]  [THE GOVERNMENT:]  Yes.").  Plaintiffs disagree, alleging "[t]he evidence clearly shows that although the Bonnet Carré Spillway is a flood control structure, it was never 'intended to provide hurricane protection or coastal conservation or restoration' within the meaning of 'integrated coastal protection.'"  Pls.' MTD/MSJ Resp. at 11; Tr. at 43:5–14 ("[PLAINTIFFS:]  [I]ntegrated coastal protection means plans . . . intended to provide hurricane protection or coastal conservation or restoration.  So . . .

they have to show that those plans . . . were intended to provide either hurricane protection or coastal conservation or restoration.  And the Bonnet Carré Spillway was not intended for any of that."); Tr. at 50:4–8 ("[PLAINTIFFS:]  I would agree that it . . . is a flood control project because it was designed and built to control flooding in the city of New Orleans . . . .  THE COURT:  But not coastal?  [PLAINTIFFS:]  Not coastal.").  Plaintiffs ask for a strict application of the definition of "integrated coastal protection," limiting the term exclusively to those measures intended to provide "hurricane protection or coastal conservation or restoration."  Pls.' MTD/MSJ Resp. at 10 ("[T]he Bonnet Carre Spillway was not intended to provide coastal conservation or restoration." (citing 23 Dec. Order at 601)).  Plaintiffs concede, however, if these provisions apply to the 2019 operation of the Bonnet Carré Spillway, they are barred from bringing suit.  Tr. at 37:1–8 ("THE COURT:  . . . [I]f [sections 56:423(A)(1) and (B)(1)(a)] apply, then plaintiffs do not have the ability to sue the [government?]  [PLAINTIFFS:]  Yes.").  The parties therefore agree:  (1) these provisions, if applicable, prohibit the instant case; and (2) the Bonnet Carré Spillway is a flood control structure.  They differ, however, as to whether the spillway is the *type* of flood control structure within the meaning of "integrated coastal protection."  To determine whether the Bonnet Carré Spillway is an integrated coastal protection project, plan, or program, the Court accordingly must interpret the statute and begins with the statutory language.  *See BASR P'ship v. United States*, 795 F.3d 1338, 1342 (Fed. Cir. 2015) ("Statutory interpretation begins with the words of the statute." (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002))); Scalia & Garner, *supra*, at 56.

As noted *supra* Section IV.C, section 56:423(A)(1) provides in relevant part, the "exclusive use of water bottoms [by oyster lessees] is subordinate to the rights or responsibilities of the state, any political subdivision of the state, the United States, or any agency or agent thereof, to take any action *in furtherance of integrated coastal protection* as defined in [section] 49:214.2."  La. Rev. Stat. § 56:423(A)(1) (2024) (emphasis added).  Section 56:423(B)(1)(a) likewise provides, "[n]o lessee shall have any right to maintain any action against [the government] . . . for any claim arising from any project, plan, act, or activity *in relation to integrated coastal protection*."  La. Rev. Stat. § 56:423(B)(1)(a) (2024) (emphasis added).  Section 49:214.2(11), in turn, states:

> *"Integrated coastal protection"* means plans, projects, policies, and programs intended to provide hurricane protection or coastal conservation or restoration, and *shall include but not be limited to . . . storm damage reduction; flood control [and] . . . diversions . . . .*

La. Rev. Stat. § 49:214.2(11) (2024) (emphasis added).  This statutory definition has the potential to be dispositive with respect to the government's Motion, so the Court must consider its meaning at the outset.  *See* Tr. at 37:1–8.  The Court therefore first addresses the plain meaning of section 49:214.2(11).

### A.    Plain Meaning of Subsection 49:214.2(11)

A federal court "has a duty to determine state law as it believes the State's highest court would."  *Hulin v. Fireboard Corp.*, 178 F.3d 316, 328 (5th Cir. 1999).  "To determine Louisiana law . . . this Court should first look to final decisions of the Louisiana Supreme Court."  *Howe ex*

*rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000).  Absent a decision from the Louisiana Supreme Court, the Court "must determine, in [its] best judgment, how [it] believe[s] that court would resolve the issue."  *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 607 (5th Cir. 2014).  This requires the Court to "employ Louisiana's civilian methodology [of statutory interpretation]" by looking to the "authoritative 'sources of law [in Louisiana:]  legislation and custom.'"  *Id.* (quoting *Am. Int'l Specialty Lines Ins. Co. v. Canal Indemnity Co.*, 352 F.3d 254, 260–61 (5th Cir. 2003))*; see also Campo*, 157 Fed. Cl. at 595 ("In Louisiana, a civil code jurisdiction, '[t]he sources of law are legislation and custom.'" (citing LA. CIV. CODE. ANN. art 1 (2021))).  The Court "must [therefore] look first to Louisiana's Constitution, its codes, and statutes."  *Boyette*, 741 F.3d at 607.

"As in all statutory construction cases, we begin with the language of the statute."  *Barnhart*, 534 U.S. at 450.  "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'"  *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (alteration in original) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).  "When the wording of a Section [of the Louisiana Revised Statutes] is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit."  LA. REV. STAT. § 1:4 (2024).  The introduction of the government's proffered provision—"'[i]ntegrated coastal protection' means plans, projects, policies, and programs intended to provide hurricane protection or coastal conservation or restoration, *and shall include but not be limited to*"—introduces a broad, non-exhaustive list of examples of "integrated coastal protection."  LA. REV. STAT. § 49:214.2(11) (2024) (emphasis added).  Each item on the list is set off in semicolons and stands alone from the others as an independent example of "integrated coastal protection."  *See United States Nat'l Bank of Or. v. Indep. Ins. Agents of America, Inc.*, 508 U.S. 439, 454 (1993) ("[T]he meaning of a statute will typically heed the commands of its punctuation."); SCALIA & GARNER, *supra*, at 161 ("[S]emicolons insulate words from grammatical implications that would otherwise be created by the words that precede or follow them.").  If, as plaintiffs suggest, the definition was narrow and limited only to projects "intended to provide coastal conservation or restoration," the text could have ceased earlier (e.g., "'Integrated coastal protection' means plans, projects, policies, and programs intended to provide hurricane protection or coastal conservation or restoration.") or been structured to clearly state such (e.g., "'Integrated coastal protection' shall include but not be limited to the following, but only to the extent each is intended to provide hurricane protection or coastal conservation or restoration: . . . .").[5]  *See* Pls. MTD/MSJ Resp. at 10.  The statute instead uses the unqualified phrase "shall include but not be limited to" to clarify

---

[5] The definition of "coastal protection" originally appeared in section 56:423 of the 2006 Louisiana Revised Statutes, which was subsequently amended in 2009 and 2016 to become the definition at issue here.  The 2006 definition stated:  "'[C]oastal protection, conservation, or restoration' means any project, plan, act, or activity for the protection, conservation, restoration, enhancement, creation, preservation, nourishment, maintenance, or management of the coast, coastal resources, coastal wetlands, and barrier shorelines or islands, including but not limited to projects authorized under any comprehensive coastal protection master plan or annual coastal protection plan . . . ."  LA. STAT. ANN. § 56:423 (2006).  The 2009 and 2016 amendments may, however, have been "merely intended for clarity" as the "absence of discussion" regarding these amendments among the Louisiana House and Senate Natural Resources Committees suggests they were inconsequential.  Def.'s Reps. Suppl. Br. at 10.  In other words, as the government suggests, dating as far back as 2006 it may have been a "well-understood fact that flood control and other integrated coastal protection efforts in the State of Louisiana require[d] state and federal responses."  *Id.*

the definition's broad scope; there is no indication the first clause (i.e., "intended to provide hurricane protection or coastal conservation or restoration") imposes a limitation on the subsequent list.  LA. REV. STAT. § 49:214.2(11) (2024); *see* SCALIA & GARNER, *supra*, at 132 ("The verb *to include* introduces examples.").  "[A]nd shall include" begins a dependent clause referring to integrated coastal protection, and the non-exhaustive list within the clause provides examples of the defined term.  When this dependent clause continues and enumerates "storm damage reduction; flood control; water resources development; . . . [and] diversions," LA. REV. STAT. § 49:214.2(11) (2024), the plain meaning of "shall include" shows integrated coastal protection encompasses a broad range of "efforts . . . to address the myriad, interrelated problems of coastal protection," LA. REV. STAT. § 214.1(B) (2024), beyond the "small strip of land . . . where the land meets the water," Tr. at 58:23–24.  *See* SCALIA & GARNER, *supra*, at 174 ("[E]very word and every provision is to be given effect.").  One such effort, pursuant to the list in section 49:214.2(11), is flood control, which, as noted, the parties agree is the primary purpose of the Bonnet Carré Spillway.  *See* Pls.' MTD/MSJ Resp. at 12; Def.'s MTD/MSJ at 9.  The Bonnet Carré Spillway is therefore unambiguously an integrated coastal protection project as defined by section 49:214.2(11) and used by sections 56:423(A)(1) and (B)(1)(a).[6]  *BedRoc*, 541 U.S. at 176.  The structure of these provisions, to which the Court now turns, further confirms this interpretation.

## B.    Statutory Structure

The Court next considers the structure of the statutory scheme.  When interpreting the plain language of a statute, a court must also take into consideration the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)); *see also West Virginia v. EPA*, 142 S.Ct. 2587, 2607–08 (2022); SCALIA & GARNER, *supra*, at 56 ("The subject matter of the document (its purpose, broadly speaking) is the context that helps to give words meaning . . . . [T]he purpose must be derived from the text . . . .").

The definition of integrated coastal protection, section 49:214.2(11), is within "Subpart B. Hurricane Protection, Flood Control, and Coastal Restoration" of title 49 of the Louisiana Revised Statutes.  *See* LA. REV. STAT. § 49:214.1 (2024).  Subsection 214.1 of this subpart explicates the Louisiana legislature's goal with respect to integrated coastal protection:

---

[6] To the extent plaintiffs contend the Bonnet Carré Spillway is not an integrated coastal protection structure because it, in some cases, "negatively impacts the coastal areas," at oral argument the parties acknowledged its operation necessarily impacts Louisiana's coastal environment, including the oysters farmed there, and is therefore part of a broader system of *integrated* coastal protection requiring a careful balance of inputs and outputs.  Pls.' Suppl. Br. at 6; Tr. at 76:4–11 ("THE COURT:  [T]he operation of [the spillway] and the controlling of flooding needs to be done in conjunction with an analysis of what the negative effects might be on the coastal protection processes . . . not everything that is coastal protection oriented needs to be [exclusively] positive for coastal protection orientation, it could be reducing the negative issues[, correct?]  [PLAINTIFFS:]  Well, that's right."); Tr. at 45:3–17 ("THE COURT:  So what is your response to [plaintiffs'] conclusion that integrated coastal protection must always be intended to provide for hurricane protection, coastal protection or restoration?  [THE GOVERNMENT:]  It misreads the statute, because the statutes goes on to explain the . . . types of actions that will be included, and those include . . . . flood control . . . .  [Plaintiffs] also ignore[] the fact that the Bonnet Carré is part of a larger whole.").

> *It is the intention of the [Louisiana] legislature that comprehensive integrated coastal protection be elevated to a position within state government of high visibility and* action and *that* hurricane protection, *storm damage reduction*, *flood control*, and conservation and restoration of the coastal area[7] *be of high priority within that structure.*

*See* LA. REV. STAT. § 49:214.1(E) (2024) (emphasis added); *see also* SCALIA & GARNER, *supra*, at 217 ("It is well settled . . . that the preamble to a regulation . . . should be considered in construing [a] regulation and determining [its] meaning . . . In the construction of . . . statutes . . . the federal rule permits and requires consideration of preambles in appropriate cases.") (quoting *Wiggins Bros., Inc. v. Dep't of Energy*, 667 F.2d 77, 88 (Temp. Emer. Ct. App. 1981)). In the wake of "disasters such as Hurricanes Katrina and Rita," the Louisiana legislature recognized the need for a "comprehensive integrated coastal protection plan" to ensure the proper prioritization of storm damage reduction, flood control, and similar coastal conservation and restoration-related goals. LA. REV. STAT. § 49:214.1(A), (C) (2024). The state therefore created its integrated coastal protection scheme, *see* LA. REV. STAT. § 49:214.1 (2024), and empowered the CPRA Board "to carry out any and all functions necessary to serve as the single entity responsible [for] . . . storm damage reduction and flood control projects in areas under its jurisdiction, *including the greater New Orleans and southeast Louisiana area*." LA. REV. STAT. § 49:214.1(F) (2024) (emphasis added); *see also* Def.'s Suppl. Br. at 10 ("[T]he Louisiana legislature understood even in 2006 that flood control projects were included within the types of projects contemplated in [title 56, section 423] . . . ."). By defining "integrated coastal protection" in a subpart expressly intended to provide for the mitigation and prevention of damage from hurricanes, storms, and flooding in the Louisiana coastal area, section 49:214's structure illustrates the important part coastal area flood control, like the Bonnet Carré Spillway, plays in the integrated coastal protection of "the greater New Orleans and southeast Louisiana area," LA. REV. STAT. § 49:214.1(F) (2024), which includes land well beyond the "small strip . . . where the land meets the water," Tr. at 58:23–24. This structure, together with the plain language of the statute, provides an unambiguous interpretation of subsection 49:214.2(11): integrated coastal protection includes projects, plans, and programs intended to provide, among other things, flood control within the Louisiana coastal area. The parties do not dispute the Bonnet Carré Spillway is a flood control structure in the New Orleans and southeast Louisiana coastal area. *See* Pls.' MTD/MSJ Resp. at 13 ("The decision . . . to operate the Bonnet Carré Spillway is made when existing conditions . . . indicate that the mainline levees in New Orleans and other downstream communities will be subjected to unacceptable stress from high water."); Def.'s MTD/MSJ at 2 ("Plaintiffs [agree] the Bonnet Carré Spillway is a 'flood control structure.'"); *see also* Tr. at 44:4–23. The structure of these statutory sections therefore supports

---

[7] Section 49:214.2(4) (2024) defines "coastal area" as "the Louisiana Coastal Zone and contiguous areas subject to storm or tidal surge and the area comprising the Louisiana Coastal Ecosystem as defined in Section 7001 of P.L. 110–114." At oral argument, the parties agreed the Bonnet Carré Spillway is within the Louisiana Coastal Zone. Tr. at 55:19–25 ("THE COURT: . . . [I]s the spillway in the Louisiana coastal area? [PLAINTIFFS:] It is . . . it is in the area that is designated as Louisiana Coastal Zone for various purposes."); Tr. at 58:2–5 ("THE COURT: . . . [T]his is a map [of] the . . . Louisiana Coastal Zone. [THE GOVERNMENT:] . . . I think that's consistent with the mandate [of the] CPRA . . . ."). Plaintiffs, however, argue the "Louisiana Coastal Zone . . . has nothing to do with integrated coastal protection" and dispute the significance of the defined term "coastal area" being used in setting out the goals of Louisiana's integrated coastal protection scheme. Tr. at 56:11–13; *see* LA. REV. STAT. § 49:214.1(E) (2024).

the Court's interpretation the Bonnet Carré Spillway falls within the plain language of subsection 49:214.2(11).  *Util. Air Regul. Grp.*, 573 U.S. at 320; *see also West Virginia v. EPA*, 142 S.Ct. at 2607–08.

### C.    Plaintiffs' Arguments Regarding Statutory Ambiguity

Section 49:214.2(11) is not ambiguous, *supra* Sections V.A–B.  It states, "'[i]ntegrated coastal protection' means . . . flood control."  LA. REV. STAT. § 49:214.2(11) (2024).  Plaintiffs dispute this interpretation, however.  *See supra* Section V.  In addition to maintaining section 49:214.2(11) does not apply to the spillway, plaintiffs argue Louisiana's oyster and takings statutes are ambiguous.  *See* Tr. at 150:21–151:11.  Specifically, plaintiffs contend there are other sections of the Louisiana Revised Statutes in conflict with and potentially "trumping" Sections 56:423(A)(1) and (B)(1)(a).  Tr. at 151:5 ("[PLAINTIFFS:]  [Section 427.1(A)] takes precedence [over 56:423].")).  Plaintiffs further argue the legislative history of section 56:423 indicates it is not related to Mississippi River flooding but instead is concerned with: (1) "[future] coastal protection or restoration" projects; and (2) ensuring the government continues to fund Louisiana's coastal protection regime.  Pls.' Suppl. Br. at 5; Tr. at 35:25–36:4 ("[PLAINTIFFS:]  [The] history of the amendments, and all of these laws and the changes that have been written into them have to do with . . . attempt[s] by the [Louisiana] government to try to get the United States [g]overnment to pay for or join them in doing coastal restoration projects into the future."); Tr. at 86:10–14.

In response, the government puts forth its own interpretation of relevant legislative history, emphasizing sections 56:423(A)(1) and (B)(1)(a) were passed as a "compromise between limiting [takings] litigation [arising out of oyster leases]" and "the [oyster] industry's desire to lift the existing oyster lease moratorium."  Def.'s MTD/MSJ at 13 (citing *La. House Nat. Res. Env't Comm. Hearing*, LA. HOUSE OF REPRESENTATIVES, at 19:40–43:04 (May 4, 2016), https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2016/may /0504_16_NR).  The government likewise maintains the statutes at issue do not conflict with one another.  Tr. at 151:19–25.

The government further argues the definition of "integrated coastal protection" "includes flood control" projects like the Bonnet Carré Spillway.  Tr. at 45:2.  If the Court finds section 49:214.2(11) ambiguous, however, the government states the actions of the CPRA have, "for a long time," "support[ed] the [government's] position" with respect to whether the Bonnet Carré Spillway is a flood control project within the meaning of "integrated coastal protection."  Def.'s MTD/MSJ at 16–17.  The government points to contemporaneous construction, a doctrine of Louisiana law allowing "courts[, in the event of statutory ambiguity,] to consider 'long settled contemporaneous construction by those charged with administering the statute' and to 'give[] substantial and often decisive weight . . . [to such] interpretation,'" in support of its argument.  *Id.* at 14–15 (second alteration in original) (quoting *Traigle v. PPG Indus., Inc.*, 332 So. 2d 777, 782 (La. 1976)).  This doctrine gives weight to long-standing administrative interpretations otherwise consistent with the statute being interpreted.  *See City of Baton Rouge v. 200 Gov't St., LLC*, 995 So. 2d 32, 38 (La. Ct. App. 2008) ("[W]hile the administrative construction given to a statute by the agency responsible for its implementation may be a persuasive indication of its true meaning . . . an administrative interpretation cannot be given weight where it is contrary to

or inconsistent with the statute."). In its Motion, the government states, "[b]y statute, CPRA produces an 'annual plan,' which is statutorily defined as 'the state integrated coastal protection plan'" and is required to "include a description and status of all projects and programs pertaining to integrated coastal protection." Def.'s MTD/MSJ at 16 (first quoting LA. REV. STAT. § 49:214.2(1)(2020); and then quoting LA. REV. STAT. § 49:214.5.2 (2018)). CPRA "has consistently . . . included several maps showing the federal levee system and the Bonnet Carré Spillway" in its annual plans' "Inventory of Non-State Projects." *Id.* (citing Def.'s MTD/MSJ Ex. 7 at 143, ECF No. 43-1). The government therefore argues, pursuant to the doctrine of contemporaneous construction, CPRA's actions "support[] the [government's] position." *Id.* Plaintiffs assert there is "no basis for such argument" because "the idea that the Bonnet Carré Spillway has at any time provided conservation or restoration to the coast is just . . . not true." Pls.' MTD/MSJ Resp. at 13; Tr. at 66:21–23.

### 1. There Is No Evidence Section 56:423 Conflicts with, or Is Subordinate to, Other Provisions of the Louisiana Revised Statutes

At oral argument, plaintiffs argued other provisions of the Louisiana Revised Statutes render section 56:423 ambiguous as to whether and how it applies to flood control measures like the Bonnet Carré Spillway. Specifically, plaintiffs suggested sections 56:427.1(A) and 49:214.5.6 make unclear the extent to which the definition of "integrated coastal protection" and its use in section 56:423 apply to the Bonnet Carré Spillway. *See* Tr. at 150:21–151:11. Section 56:427.1(A), as noted *supra* Section IV.C, holds the government "free and harmless from any claims arising under any oyster lease . . . from diversions of fresh water . . . or any other actions taken for the purpose of *coastal protection, conservation, or restoration*." *See* LA. REV. STAT. § 56:427.1(A) (emphasis added) (2024). Section 49:214.5.6 states compensation for certain takings by Louisiana or its subdivisions "shall be governed by . . . the Fifth Amendment of the Constitution of the United States." *Id.* § 49:214.5.6(B). Plaintiffs contend section 49:214.5.6 "allow[s] plaintiffs to maintain an action for the taking of their property in violation of the Fifth Amendment [to the United States Constitution]." Pls.' Suppl. Mem. Authorities at 2; Tr. at 145:11–15 ("[PLAINTIFFS:] [W]hat this statute [49:214.5.6] really tells me is that the Fifth Amendment is the floor, so that basically anybody who suffers any kind of damage is entitled to no less . . . than what the Fifth Amendment provides for."). Plaintiffs then argue section 56:427.1(A)'s discussion of "coastal protection, conservation, or restoration," as opposed to "integrated coastal protection," supports their proposition section 56:423 applies only to a narrow subset of coastal protection projects as opposed to the myriad schemes enumerated in the definition of "integrated coastal protection." *See* Tr. at 151:5. In other words, plaintiffs argue the allegedly narrower language in section 56:427.1(A) "takes precedence" over, and limits the kinds of claims barred by, section 56:423. *Id.* At oral argument plaintiffs went so far as to suggest Sections 56:427.1(A) and 49:214.5.6 may "trump" Sections 49:214.2(11) and 56:423 and render the latter two without effect. Tr. 150:23–24 ("[THE COURT:] [F]or some reason, this [statutory] language invalidates the flood control language [in section 49:214.2(11)]? [PLAINTIFFS:] Yes, sir."). In response, the government emphasizes "there is no support for the idea that [section 56:427.1(A)] somehow trumps the language of [Sections 56:423(A)(1) and (B)(1)(a)]." Tr. at 151:19–21. The government continues, "[these sections] make perfect sense when read together that the [government] cannot be liable in this situation because of integrated coastal protection." Tr. at 151:22–25.

"The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."  SCALIA & GARNER, *supra*, at 180; *see also Johnston v. United States*, 37 Ct. Cl. 309, 318 (1902) ("[I]f there is any possible construction [of two statutes covering the same subject] which the court can place upon the[m] . . . so as to make [them] harmonize . . . it is the duty of the courts to adopt such construction.") (citing *United States v. Healey*, 160 U.S. 136, 147 (1895) ("[W]here two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, the duty of the court . . . is, if possible, to give effect to both.")); THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 58 (Boston, Little, Brown & Co. 1868) ("[O]ne part is not allowed to defeat another, if by any reasonable construction the two can be made to stand together.").  Plaintiffs ask the Court to read a series of statutory provisions in conflict with one another when, as the government pointed out at oral argument, they may easily be read in harmony.  *See* Tr. at 151:22–152:3.  Indeed, sections 56:423(A)(1) and (B)(1)(a) subordinate oyster lessees' rights to those of the government when the latter undertakes integrated coastal protection, and section 56:427.1(A) reiterates this arrangement before enumerating two minor exceptions.  Section 56:423(B)(1)(a) reads:

> *No [oyster] lessee shall have any right to maintain any action against* the state, any political subdivision of the state, *the United States*, or any agency, agent, contractor, or employee thereof *for any claim arising from any project, plan, act, or activity in relation to integrated coastal protection*, *except as provided in [section] 56:427.1.*

LA. REV. STAT. § 56:423(B)(1)(a) (2024) (emphasis added).  Section 56:427.1(A) similarly states:

> Except [for the limited exceptions[8]] provided in Subsection C of this Section, the state of Louisiana, political subdivisions of the state, *the United States*, and any agency, agent, contractor, or employee thereof *shall be held free and harmless from any claims arising under any oyster lease*, renewal, or extension granted to any individual or other entity for any purpose *from diversions of fresh water or* sediment, dredging or direct placement of dredged or other materials, or *any other actions taken for the purpose of coastal protection, conservation, or restoration*.

*Id.* § 56:427.1(A) (2024) (emphasis added).  Plaintiffs do not provide evidence these two statutory provisions, which reference one another and both block plaintiffs from recovering damages for claims arising out of coastal-protection related injuries, materially conflict so as to alter the Court's interpretation of sections 49:214 and 56:423.  *See* Tr. 150:4–10.  Rather, these provisions appear exceedingly similar—they prevent Louisiana and the government from facing liability in narrow circumstances arising out of (integrated) coastal protection, including fresh water diversions and similar flood control measures.  *Supra* Sections IV–V.  Plaintiffs likewise fail to proffer evidence indicating section 56:427.1(A) "trumps" section 56:423.

---

[8] The exceptions apply in situations where CPRA acquires, or a leaseholder wishes CPRA to acquire, a lessee's lease and are inapplicable to this case.  *See* LA. REV. STAT. § 427.1(C) (2024).

Plaintiffs also do not present evidence in favor of their preferred construction of section 49:214.5.6, which plaintiffs argue enables them "to maintain an action for the taking of their property in violation of the Fifth Amendment." Pls.' Suppl. Mem. Authorities at 2. Read in full, section 49:214.5.6 applies to compensation paid "*by the state [of Louisiana] or its political subdivisions*" in the event of a taking of property "for public purposes related to coastal wetlands conservation, management, preservation, enhancement, creation, or restoration" through Louisiana's exercise of the "*full police power of the state*." LA. REV. STAT. § 49:214.5.6(A) (2024) (emphasis added). Contrary to plaintiffs' argument, there is no indication section 49:214.5.6(B)'s discussion of paying such compensation as "required by the Fifth Amendment of the Constitution of the United States of America" negates section 56:423's limitations on suits against the government. LA. REV. STAT. § 49:214.5.6(B) (2024). The relevant provisions of the Louisiana Revised Statutes therefore need not be read in such a manner as to "defeat [one] another," rather all can be read in harmony as a coherent statutory scheme meant to establish Louisiana's rules for takings litigation arising out of coastal protection, restoration, and preservation activities, including those activities categorized as "integrated coastal protection." *Johnston*, 37 Ct. Cl. at 318; COOLEY, *supra*, at 58.

## 2. The Legislative History is Unpersuasive

Plaintiffs next argue legislative history renders the statutes at issue ambiguous. In particular, plaintiffs assert the government's construction of "integrated coastal protection" as including flood control of the sort provided by the Bonnet Carré Spillway is inconsistent with legislative history, which makes "clear [the purpose of Sections 56:423(A)(1) and (B)(1)(a)] . . . [is] to allow the [s]tate's *future* coastal restoration projects to continue while also protecting the oyster farmers' abilities to make investment decisions and protect those investments." Pls.' Suppl. Br. at 5 (emphasis added); Tr. at 35:25–36:4. Plaintiffs allege the Bonnet Carré Spillway falls outside the statutory purpose set forth in this legislative history because it is a near-century old Mississippi River spillway, not a future project "created for coastal protection or restoration." Pls.' Suppl. Br. at 5. The government's Motion takes a different view of the legislative history of Louisiana's oyster regulatory regime and argues the enactment of section 56:423 was a compromise—Louisiana would offer new oyster leases to lessees for, as plaintiffs admit, "a [good] deal . . . they were willing to accept," Tr. at 32:16–17, and oyster farmers would assume the risk their oysters might be damaged by freshwater diversions. *See* Def.'s MTD/MSJ at 11– 14. The government notes, in March 2002, Louisiana imposed a "moratorium on new oyster leases" borne out of fear of oyster-related takings litigation because Louisiana state trial courts held the state liable for oyster takings effectuated through operation of a freshwater diversion structure. *Id.* at 11; Tr. 80:13–21 ("[THE GOVERNMENT:] [I]t was the result of the lower court's decisions in the *Avenal* case, which eventually were overturned by the Louisiana Supreme Court. . . . The lower court's decisions . . . had found for plaintiffs and awarded some significant dollar figures."); *see, e.g.*, *Avenal v. State*, 858 So. 2d 697 (La. Ct. App. 2003), *rev'd*, 886 So. 2d 1085 (La. 2004). The government points out, during the 2006 Louisiana legislative hearings on what is now section 56:423, a "limitation on future lawsuits was discussed explicitly," and one speaker noted, "the salinity changes [and freshwater issues] will now be in the risk of the oyster lease holder if this bill goes through." Def.'s MTD/MSJ at 11 (quoting *La. House Nat. Res. Env't Comm. Hearing*, LA. HOUSE OF REPRESENTATIVES, at 30:15–29 (May 10, 2006), https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2006/may

/0510_06_NR).  In contrast to plaintiffs, who assert the legislative history of section 56:423 illustrates the Bonnet Carré Spillway is not part of the scheme created by this provision, the government contends the spillway is the exact kind of project the Louisiana legislature contemplated when opening oyster leases in exchange for limiting liability against the state and federal governments.  *See id.* 13–14.

In a recent statutory interpretation case, the Court stated it "considers the [statutory] text paramount and does not find legislative history persuasive, especially . . . in [a] case . . . [where] the legislative history is not particularly persuasive for either party."  *ITServe All., Inc. v. United States*, 161 Fed. Cl. 276, 284 n.5 (2022), *appeal docketed*, No. 23-1052 (Fed. Cir. Oct. 19, 2022). Understanding the purpose of a statute is important to understanding the text, but purpose should—except in rare instances—be derived from the text.  SCALIA & GARNER, *supra*, at 56 ("[P]urpose must be derived from the text, not from extrinsic sources such as legislative history."); *see also Conroy v. Aniskoff*, 507 U.S. 511, 519 (Scalia, J., concurring) ("The greatest defect of legislative history is its illegitimacy.  We are governed by laws, not by the intentions of legislators.").  The Court has already endeavored to understand the purpose of sections 56:423 and 49:214.2(11) through statutory context in its review of section 49:214.1, which sets forth the Louisiana legislature's intent in creating an integrated coastal protection regime.  *See supra* Section V.B; LA. REV. STAT. § 49:214.1 (2024).  The parties' disparate interpretations of the history of Louisiana's oyster regime in this case are illustrative of why the Court remains wary of affording substantial weight to legislative history.  The statutory history here is ambiguous and therefore does not convince the Court its interpretation of sections 49:214.2(11) and 56:423(A)(1) and (B)(1)(a), *supra* Section V.A–B, is misguided.  *See ITServe All., Inc.*, 161 Fed. Cl. at 284 n.5.

### 3.    CPRA's Actions Supports the Court's Interpretation of Section 49:214.2(11)

Plaintiffs, as noted *supra* Section V.C, argue Louisiana Revised Statutes section 49:214.2(11) is ambiguous.  The government disagrees, contending at oral argument "the plain language of the statute . . . clarifies that it includes flood control," Tr. at 45:1–2, but notes—in the event the Court believes the statute is ambiguous—the Court should employ the doctrine of contemporaneous construction, which permits courts to credit "the administrative construction given to a statute by the agency responsible for its implementation" as "a persuasive indication of its true meaning."  Def.'s MTD/MSJ at 14–15 (quoting *City of Baton Rouge*, 995 So. 2d at 38); *City of Baton* Rouge, 995 So. 2d at 38.  The parties agree Louisiana courts employ this interpretive method.  *See City of Baton Rouge*, 995 So. 2d at 38; *see* Tr. at 64:11–20.  The Court therefore assumes for further analysis section 49:214.2(11) is ambiguous and applies the doctrine of contemporaneous construction as would a Louisiana state court.

In Louisiana, when a statute is ambiguous, "the contemporaneous construction principle . . . gives 'substantial and often decisive weight' to an agency's long-standing interpretation."  *Coastal Drilling Co., LLC v. Dugrene*, 198 So. 3d 108, 116 (La. 2016) (quoting *Traigle*, 332 So. 2d at 782) ("[A] time-endured construction by an agency 'may reasonably be presumed to be in accord with the legislative intent.'" (quoting *Traigle*, 332 So. 3d at 782)); *see also Roberts v. City of Baton Rouge*, 108 So. 2d 111, 124–25 (La. 1958) (asserting the

"contemporaneous . . . construction accorded by the executive departments of" Louisiana reinforces the Louisiana Supreme Court's statutory construction). In *Traigle*, for instance, the Louisiana Supreme Court acknowledged "the best guide [to the statute at issue's] meaning in the present case is the accepted contemporaneous administrative construction given to the statute . . . by the agency charged with administering it." *Traigle*, 332 So. 2d at 782. The parties agree this doctrine permits courts to credit an administering agency's statutory interpretation when consistent with, and not contrary to, the statutory text. *See City of Baton Rouge*, 995 So. 2d at 38; *see* Tr. at 64:11–20. CPRA, the Louisiana agency statutorily responsible for integrated coastal protection, LA. REV. STAT. § 49:214.1(F) (2024), has "included several maps showing . . . the Bonnet Carré Spillway" in its "annual plan['s] . . . description . . . of all projects and programs pertaining to integrated coastal protection." *See* Def.'s MTD/MSJ at 16 (first citing Def.'s MTD/MSJ Exs. 7–11; and then quoting LA. REV. STAT. § 49:214.5.2(A)(2) (2018)); *see also* Tr. at 90:12–13 ("[PLAINTIFFS:] [CPRA] is an agency that was created to deal with [coastal] conservation and restoration."). Through the inclusion of the Bonnet Carré Spillway in its annual plan appendices enumerating integrated coastal protection projects, CPRA has consistently interpreted the definition of "integrated coastal protection" as including the spillway. *See* Def.'s MTD/MSJ Exs. 7–11; *see also Traigle*, 332 So. 3d at 782 ("[T]he administrative construction may reasonably be presumed to be in accord with the legislative intent; it also being a reasonable meaning of the legislative language in the light of the legislative purpose evidenced by the statute as a whole."). CPRA's interpretation thus supports the Court's own reading of section 49:214.2(11). *See* supra Sections V.A–B. The Court therefore finds, according to the plain meaning of subsection 49:214.2(11), its statutory structure and context, and the doctrine of contemporaneous construction, the Bonnet Carré Spillway is a flood control project within the meaning of "integrated coastal protection." *See* Def.'s MTD/MSJ, at ii; *BedRoc Ltd.*, 541 U.S. at 176; *Coastal Drilling Co.*, 198 So. 3d at 108. Sections 56:423(A)(1) and (B)(1)(a), which are likewise unambiguous, *supra* Sections V.C.1–2, thus apply to plaintiffs and the 2019 operation of the Bonnet Carré Spillway and bar plaintiffs from maintaining the instant lawsuit.[9]

## VI.   The Scope of Plaintiffs' Property Rights in the Oysters Granted by their Lease Contracts

In addition to arguing Louisiana law precludes plaintiffs from bringing this case, at oral argument the government stated plaintiffs' lease contracts likewise bar them from bringing suit against the government for harm caused by integrated coastal protection activities. Specifically, the government first argues plaintiffs had no rights in the oysters until after the lease contracts were signed. Tr. at 22:1–15 ("THE COURT: . . . [S]o before [plaintiffs] entered into the leases, they did not have any right to oyster farm in the water bottoms? [THE GOVERNMENT:] That's correct."). The government then points to plaintiffs' "prohibitive" lease contracts and

---

[9] Louisiana Supreme Court Rule XII, section 1 permits "the Supreme Court of the United States, . . . any circuit court of appeal of the United States, . . . [or] any district court of the United States" to certify to the Louisiana Supreme Court "questions or propositions of [Louisiana] law . . . which are determinative of [a] cause independently of any other questions involved in [the] case" when there are "no clear controlling precedents in the decisions of" the Louisiana Supreme Court. The Court will not attempt to discern whether this Rule authorizes non-district Article I federal courts to certify questions of Louisiana law to the Louisiana Supreme Court. The Court leaves open the possibility of certification—of the question on meaning of Louisiana Revised Statutes sections 49:214.2(11) and 56:423(A)(1) and (B)(1)(a)—to the Louisiana Supreme Court by the Federal Circuit on any appeal of this Opinion and Order.

notes Louisiana "issued all of the relevant oyster leases . . . after the 2006-era amendments to [section] 56:423," Def.'s Suppl. Br. at 2, which introduced the states' prohibition on lessees "maintain[ing] any action[s] against . . . the [government] . . . for any claim arising from . . . activity in relation to coastal protection, conservation, or restoration." Def.'s MTD/MSJ at 5–6 (quoting H.R. 1249, 2006 Leg., Reg. Sess. (La. 2006)); Tr. at 40:25. All but five of the leases provided by plaintiffs to the government "were [also] issued after the 2009 amendment[s]" to sections 56:423—and the addition of 49:214.2—at which time "coastal protection" was replaced with the defined term "integrated coastal protection" at issue in this Opinion and Order. Def.'s Suppl. Br. at 2. The lease contracts, as agreed by the parties at oral argument, require lessees abide by myriad "restrictions in[, among other things,] the harvesting of oysters[,] . . . the seeding of oysters," and the filing of lawsuits for harm to the oysters. Tr. at 28:13–29:16; Tr. at 17:13–17 ("[THE GOVERNMENT:] Louisiana has a statute . . . Section 56:424, which clarifies, or underscores, the fact that Louisiana may enter into [oyster] leases and those leases will be prescribed by Louisiana's statutory scheme."); Tr. at 25:11–15. The government, pointing to these restrictions and plaintiffs' lack of rights in the oysters before signing these leases, contends plaintiffs "never had the right to sue the United States for actions taken for 'integrated coastal protection' because that limitation [predated, and was incorporated into, plaintiffs' lease contracts]." Def.'s Suppl. Br. at 18; Tr. at 22:1–6; Tr. at 24:4–6 ("[THE GOVERNMENT:] . . . [Plaintiffs] did not obtain the right to sue the [government] in this particular circumstance."). In other words, the government argues plaintiffs "do not have th[e] right [to sue for a taking]" and "never had the right to sue the [government] when the damage allegedly results from actions taken for integrated coastal protection." Tr. at 22:1–6; Tr. at 24:15–18; Tr. at 126:8–14 ("[THE GOVERNMENT:] [M]y concern is they never had that right. THE COURT: The plaintiffs never had the right to effectuate a takings claim against the state or federal government when the property interest arose, it never existed? [THE GOVERNMENT:] Exactly.").

Plaintiffs do not refute Louisiana law at the time of contracting, nor do they dispute they "voluntarily decided to become oyster farmers" on public land and "agree[d] as a matter of contract . . . [to] operate under [Louisiana] laws,"[10] *Campo v. United States*, 157 Fed. Cl. 584, 604 (2021) (quoting *Avenal v. State*, 886 So. 2d 1085, 1095 (La. 2004)). *See* Tr. at 26:18–19; Tr. at 32:24–33:2 ("THE COURT: Just to confirm, plaintiffs' oyster leases do obligate them to comply with Louisiana law in their oyster farming? [PLAINTIFFS:] Yes, sir."); Tr. at 26:11–13 ("THE COURT: So [plaintiffs' leases were signed] long after the [statutory] amendments at issue in 2006 or 2009? [PLAINTIFFS:] Yes . . . ."). Plaintiffs likewise agree they did not have rights in the oysters until "the moment the lease[s] [were] signed," at which time they accepted the "high-risk situation" involved in oyster farming.[11] *See* Tr. at 136:10–14; Tr. at 29:24–30:1.

---

[10] Louisiana Revised Statutes section 56:427.1(B) states, "[a]ll oyster leases . . . granted to any individual or other entity shall include language which shall hold harmless from all claims [related to coastal protection, conservation, or restoration] . . . the United States, and any agency, agent, contractor, or employee thereof."

[11] To the extent plaintiffs argue in their Response the "Court . . . already determined that [p]laintiffs have protectable property interests in their oyster leases and in the oysters they grow," Pls.' MTD/MSJ Resp. at 5, plaintiffs acknowledged at oral argument the Court never determined whether, under Louisiana law and plaintiffs' oyster leases, plaintiffs have a preexisting right to maintain a takings claim against the government. Tr. at 102:9–21 ("THE COURT: . . . [I]n December of 2021 . . . [the Court said plaintiffs have] a property right that is compensable against some[, but that] is different than having a compensable property right against specifically the federal government[, correct?] . . . [PLAINTIFFS:] Yes, I agree with that."). Indeed, the Court's 23 December Order noted, "[t]hese

Plaintiffs contend, however, while "state law defines the scope of [p]laintiffs['] property interests . . . [it cannot] prevent [p]laintiffs from pursuing their federal claims for the taking of their property . . . [because this] conflicts with the Constitution and federal takings law." Pls.' MTD/MSJ Resp. at 9–10. Contrary to the government's assertion plaintiffs "never had the right to sue," plaintiffs argue the right to do so stems directly from the Fifth Amendment and cannot be restricted by states when creating property rights. Tr. at 136:3–4 ("[PLAINTIFFS:] [Plaintiffs have always had] all their constitutional rights, they have those."); Tr. at 108:9–17 ("[PLAINTIFFS:] There is no justification for it. . . . They have to [have] a justification for taking these oysters and saying, these oysters do not have the same rights as any other property that a person can own in the State of Louisiana."). In response, the government cites three Federal Circuit cases it asserts are a handful of the "numerous . . . cases rejecting Fifth Amendment claims due to a 'background principle' that limits a plaintiff's property right." *See* Def.'s MTD/MSJ Reply at 4 (first citing *Acceptance Ins. Cos. v. United States,* 583 F.3d 849, 859 (Fed Cir. 2009) ("Acceptance did not have a cognizable property interest for Fifth Amendment purposes."); then citing *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1219 (Fed. Cir. 2005) ("Air Pegasus failed to assert a cognizable property interest sufficient to support a takings claim under the Fifth Amendment."); and then citing *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1383 (Fed Cir. 2004) ("American Pelagic did not have . . . the property right that it asserts formed the basis for its takings claim.")); Tr. at 104:16–18 ("[THE GOVERNMENT:] [N]ot every property interest is one that is compensable under the Fifth Amendment, and we cite several cases that discuss that."); Tr. at 115:17–22. The Court must therefore determine the scope of the property rights granted by plaintiffs' oyster lease contracts and whether they include the right to bring a takings claim against the government.

"[G]enerally speaking, state law defines property interests . . . ." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 707 (2010) (citation omitted); *see also Moore v. Harper*, 143 S.Ct. 2065, 2088 (2023) ("State law . . . 'is one important source' for defining property rights." (citing *Tyler v. Hennepin Cnty.*, 143 S. Ct. 1369, 1375 (2023))). This is because "the Constitution protects rather than creates property interests[, so] the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)); *see also Campo*, 157 Fed. Cl. at 594. While states do not have exclusive or unlimited power to define property interests, "[o]therwise . . . a state could 'sidestep the Takings Clause by disavowing traditional property interests' in assets it wishes to appropriate," they have substantial latitude when doing so. *Tyler*, 143 S. Ct. at 1377 (quoting *Phillips*, 524 U.S. at 167). In this case, Louisiana has "an extensive statutory scheme, which heavily regulates oyster leasing activities on state-owned waterbottoms." *Campo*, 157 Fed. Cl. at 603 (citation omitted). Among the restrictions imposed on oyster lessees through lease contracts obligating adherence to Louisiana law are those on "the harvesting of oysters" and the "seeding of oysters," Tr. at 28:13–15; Tr. at 32:24–33:2, and the prohibition on "maintain[ing] any action against the [government] . . . for any claim arising from any project, plan, act, or activity in relation to integrated coastal protection." LA. REV. STAT. § 56:423(B)(1)(a) (2024). At oral argument, plaintiffs agreed before "plaintiffs entered into the[ir] contract[s] and agreed to abide by the Louisiana state

---

statutes are likely applicable *regardless* of compensable property rights in oysters." *Campo*, 157 Fed. Cl. at 619 n.27.

provisions on oysters," they did not "have any property rights in oysters." Tr. at 135:21–136:7. The restrictions imposed by the leases, including the requirement lessees "operate under Louisiana law[]," therefore set forth the bounds of plaintiffs' rights in the oysters. *See Campo*, 157 Fed. Cl. at 604 (quoting *Avenal*, 886 So. 2d at 1095). Just as, by virtue of the lease restrictions, plaintiffs never had the right to freely harvest oysters, plaintiffs never had the right to sue for harm caused by integrated coastal protection. Tr. at 28:13–14 ("[PLAINTIFFS:] So there are restrictions in harvesting oysters."); Tr. at 136:10–14 ("THE COURT: So at what point do the oyster property rights grow? [PLAINTIFFS:] The moment when the lease is signed. . . ."). Louisiana therefore did not—as plaintiffs allege—require plaintiffs forfeit their preexisting right to bring a lawsuit for harm to the oysters arising out of integrated coastal protection because plaintiffs never had such a right, and signing their lease contracts did not change this. *See Stop the Beach Renourishment, Inc.*, 560 U.S. at 707; Tr. at 135:21–136:7 ("THE COURT: . . . [D]o plaintiffs have a preexisting right [in the oysters]? . . . [It seems] they don't have any property rights in oysters [before signing the lease contracts]. . . . [PLAINTIFFS:] That's right."). Similar schemes have been approved by the Federal Circuit. The Court turns to two such cases cited by the government in its Motion. *See* Def.'s MTD/MSJ Reply at 4.

In *Acceptance Insurance*, in which the Federal Circuit held a plaintiff "voluntarily entering into the federally regulated crop insurance business" lacked a "cognizable property interest for Fifth Amendment purposes in the ability to freely transfer . . . insurance policies," the Federal Circuit found, under the "background principles and rules existing when [the plaintiff] entered into the crop insurance business, [the plaintiff] could not freely transfer the policies at issue." *Acceptance Ins.*, 583 F.3d at 857–59. The Federal Circuit therefore affirmed this court's dismissal of the case. *Id.* In a similar case, *American Pelagic Fishing Co.*, the plaintiff's takings claim failed because the plaintiff "did not have, as one of the sticks in the bundle of property rights that it acquired with title to [its fishing vessel], the right to fish." *Am. Pelagic Fishing Co.*, 379 F.3d at 1383. The Federal Circuit therefore held the plaintiff "did not possess the property right" being asserted for its takings claim. *Id.* While the instant case is distinguishable from the two cases enumerated above because plaintiffs here allege the *state* of Louisiana improperly required plaintiffs to forfeit the right to sue for a takings claim through lease contracts otherwise granting myriad rights in the oysters, the principles acknowledged in *Acceptance Insurance* and *American Pelagic Fishing Co.* apply. Namely, when a government "defines [a] property interest[]," *Stop the Beach Renourishment, Inc.*, 560 U.S. at 707, "'existing rules or understandings' and 'background principles' derived from independent sources such as state . . . law" impact the "sticks in the bundle of property rights" granted, *Am. Pelagic Fishing Co.*, 379 F.3d at 1376, 1384 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029–30 (1992)). When plaintiffs "voluntarily enter[ed] into" the oyster industry, they assented to Louisiana defining their property interests through their lease contracts and the existing background principles of state law directly or indirectly incorporated therein. *Am. Pelagic Fishing Co.*, 379 F.3d at 1376; Tr. at 13:5–23 ("[THE GOVERNMENT:] [T]he actual language [in the lease] is . . . 'Lessee further acknowledges that Lessee has no intent to pursue any claims arising under this oyster lease . . . [against the government] arising out of, or resulting from . . . [any] actions taken for the purpose of coastal protection, conservation, or restoration, as defined in Louisiana Revised Statute 56:423.' THE COURT: . . . So . . . that is language that is essentially mirror[ing] . . . the statutory language[.]"). One such background principle, enshrined in section 56:423 and the lease contracts themselves, is the restriction on plaintiffs' ability to maintain

- 22 -

takings claims against the government.  *See* La. Rev. Stat. § 56:423(A)(1), (B)(1)(a) (2024); Tr. at 13:5–23.  By virtue of these laws and plaintiffs' lease contracts, plaintiffs thus never had the right to sue the government for injuries "arising from any project, plan, act, or activity in relation to integrated coastal protection."  La. Rev. Stat. § 56:423(B)(1)(a) (2024); *see Am. Pelagic Fishing Co.*, 379 F.3d at 1376.  Plaintiffs therefore cannot bring this case.[12]

## VII.    The Constitutionality of Louisiana's Oyster Regime

Plaintiffs further oppose the government's Motion by asserting state law cannot constitutionally prevent plaintiffs from maintaining Fifth Amendment takings claims.  *See* Pls.' MTD/MSJ Resp. at 9–10 ("It is true that state law defines the scope of [p]laintiffs property interests . . . [but] this statute attempts to prevent Plaintiffs from pursuing their federal claims for the taking of their property . . . [this] conflicts with the Constitution and federal takings law." (emphasis omitted).  In support of their constitutional argument, plaintiffs cite myriad cases and doctrines.  First, plaintiffs contend "the Supremacy Clause of the [United States] Constitution" prohibits sections 56:423(A)(1) and (B)(1)(a) from "preventing lessees from raising certain [takings] claims against the [government]."  *Id.* (emphasis omitted) (quoting Def.'s MTD/MSJ at 11).  In a closely related argument,[13] plaintiffs allege the unconstitutional conditions doctrine, which according to plaintiffs "holds that even if a state has absolute discretion to grant or deny any individual a privilege or benefit, it cannot grant the privilege subject to conditions that . . . induce the waiver of that person's constitutional rights," bars Louisiana from indirectly "limiting [p]laintiffs' exercise of their constitutional right[ to bring a takings claim] . . . by offering [p]laintiffs oyster leases subject to the condition that they waive their constitutional rights to compensation for the taking of their property."  Pls.' Suppl. Br. at 1–4 (citing *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013)).  Plaintiffs next argue restricting their ability to sue renders the Takings Clause "a dead letter" and violates the Supreme Court's pronouncement "a [s]tate, by *ipse dixit*, may not transform private property into public property without compensation."  *Id.* at 9 (first quoting *Hall v. Meisner*, 51 F.4th 185, 189–90 (6th Cir 2022); and then quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980)).  Specifically, plaintiffs argue "Louisiana . . . banning the ability of these property owners to exercise their constitutional rights under the Fifth Amendment is an improper attempt to sidestep the Takings Clause" to the benefit of the State of Louisiana.  *Id.* at 10.  Finally, plaintiffs conclude Louisiana's regulatory scheme "places an unjustifiable burden on [t]akings plaintiffs" in violation of *Knick v. Township of Scott*, in which the Supreme Court stated "[t]he

---

[12] The government also cites *Air Pegasus* as support for its argument.  In *Air Pegasus*, the plaintiff operated a heliport business in Washington, DC.  *See Air Pegasus*, 424 F.3d at 1209.  Following the "terrorist attacks of September 11, 2001 . . . the Federal Aviation Administration ('FAA') . . . shut down virtually all commercial air traffic throughout the United States . . . [including via enduring] limits to commercial aircrafts [in Washington, DC.]"  *Id.* at 1209–10.  Although the Federal Circuit affirmed this court's finding of no liability in *Air Pegasus*, it did so "in a slightly different manner" than this court.  *Id.* at 1215.  Specifically, the Federal Circuit determined the plaintiff did not properly allege a taking because "Air Pegasus . . . did not itself own or operate any helicopters, does not allege that the FAA's restrictions regulated *its* operations under the lease [and] [i]nstead . . . alleges that the FAA, by regulating helicopters owned by third parties, frustrated its business expectations at the South Capitol Street heliport."  *Id.* at 1216.  To the extent the case provides an example of the Federal Circuit finding no takings liability, the Federal Circuit's reasoning based on third-party harms is inapplicable here.

[13] At oral argument, plaintiffs acknowledged their Supremacy Clause and unconstitutional conditions doctrine arguments are "basically the same thing."  Tr. at 128:6–7.  The Court accordingly addresses them as one argument, *see infra* Section VII.A.

- 23 -

Fifth Amendment right to [bring a federal lawsuit for] full compensation arises at the time of the taking." *Id.* at 13–14; *Knick v. Township of Scott*, 139 S. Ct 2162, 2170 (2019). Plaintiffs therefore request the Court strike down sections 56:423(A)(1) and (B)(1)(a) as unconstitutional. *See* Tr. at 91:24–92:1 ("[PLAINTIFFS:] The federal government is following state law . . . but no court can enforce an unconstitutional law."); Tr. at 110:23–25 ("THE COURT: So, again, is [your request] that [56:423(A)(1)] should be completely stricken? [PLAINTIFFS:] I believe so . . . .").

The government's primary objection to plaintiffs' constitutional arguments is plaintiffs' constitutional "claim[s] . . . would have to be brought against the state." Tr. 129:24–25. The government argues it is the incorrect party to defend Louisiana's statutory scheme because it is "just following state law," not creating or enforcing it. Tr. at 91:22–23. Specifically, at oral argument, the government stated, plaintiffs' "claim is against the state [of Louisiana]. If plaintiffs really think that they had some pre-existing right to sue the United States and that was taken from them, that claim is only viable against the State of Louisiana in a court that has jurisdiction . . . ." Tr. at 93:17–21. The government therefore believes plaintiffs "should have sued [Louisiana] at the moment that they were contemplating entering into [these] lease[s]" because "[t]hat's the point when they lost their property right [to sue] . . . if they had such a property right to begin with." Tr. at 138:8–14. Addressing each of plaintiffs' arguments, however, the government argues "[p]laintiffs' position . . . assumes every property right includes some sort of pre-existing right to pursue a Fifth Amendment claim . . . [even though] '[i]t is well settled that "existing rules and understandings" and "background principles" derived from . . . state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking.'" Def.'s MTD/MSJ Reply at 3 (quoting *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 857 (Fed. Cir. 2009)). The government argues the parties agree Louisiana "state law defines the scope of [p]laintiffs' property interest[s,]" and Louisiana law, according to the government, "defines [p]laintiffs' property right[s] as" without "the right to sue the United States for actions taken for 'integrated coastal protection.'" Def.'s MTD/MSJ Reply at 3–4 (citing LA. REV. STAT. § 56:423(A)(1) (2016)); Def.'s Suppl. Br. at 18; *see also* Pls.' MTD/MSJ Resp. at 5 (noting "independent source[s] such as state law" define the scope of property rights (quoting *Murr v. Wisconsin*, 137 S. Ct. 1933, 1951 (2017) (Roberts, C.J., dissenting))). The government distinguishes the instant case from the unconstitutional conditions doctrine cases cited by plaintiffs on the grounds plaintiffs "were never granted" the right to sue in the first place. Tr. at 138:22. The government therefore argues there was no conditioning of a benefit on the forfeiture of a right because the right never existed. *See id.* The government likewise distinguishes those cases in which states were prevented from turning, "by *ipse dixit*[,] . . . private property into public property without compensation" on factual grounds, arguing no such transformation occurred here because plaintiffs never had a property interest in the right to sue for a taking. *Webb's Fabulous Pharmacies, Inc.*, 449 U.S. at 164; *see* Tr. at 120:3–14. Finally, the government contends *Knick* is inapposite here, where "the state owns the water bottoms [so] . . . can define the property interest the way [it] want[s]." Tr. at 126:2–4.

The Court next turns briefly to each of plaintiffs' constitutional arguments. At the outset, however, the Court notes "[p]ursuant to express grants by Congress, the jurisdiction of the Court of Federal Claims is primarily over monetary claims against the federal government." *Giesecke & Devrient GmbH v. United States*, 150 Fed. Cl. 330, 342 (2020). This court is largely without

power to grant declaratory relief. *See United States v. Sherwood*, 312 U.S. 584, 588 (1941) ("[I]t has been uniformly held . . . that [the Court of Federal Claims'] jurisdiction is confined to the rendition of money judgments in suits brought for that relief against the United States."); 28 U.S.C. § 1491(a)(1) (defining the jurisdiction of the United States Court of Federal Claims as, primarily, "jurisdiction to render judgment upon any claim against the United States"). Indeed, the Supreme Court has expressly stated, "the Court of [Federal] Claims has no power to grant equitable relief." *Bowen v. Massachusetts*, 487 U.S. 879 (1988) (quoting *Richardson v. Morris*, 409 U.S. 464 (1973) (per curiam)). Further, in contrast to the Federal Rules of Civil Procedure, the RCFC do not permit a "[state] attorney general [to] intervene" in this court when a state law is challenged on constitutional grounds. *Compare* FED. R. CIV. P. 5.1, *with* RCFC 5.1. This court, in which Louisiana cannot defend its laws and the Court is without jurisdiction to declare a state law unconstitutional, is therefore, unlike the Louisiana Supreme Court, not the most appropriate forum for considering plaintiffs' request to "completely stri[ke]" down Louisiana's statutory scheme. *See* Tr. 110:23–25; *see also* Tr. at 91:22–23; Def.'s Suppl. Br. at 8 ("If plaintiffs intend to challenge the constitutionality of a statute, they must do so in a forum with jurisdiction to hear such a claim . . . ."); Pls.' Suppl. Br. at 7 ("[T]o the extent that the Court sees a need to declare the state law unconstitutional, it may be appropriate to notify the State of Louisiana."). The Court, in addressing plaintiffs' constitutional arguments, therefore cautions its analysis is not necessary to holding plaintiffs' claim must be dismissed, which relies not only on Louisiana's statutory scheme, but on plaintiffs voluntarily assenting to lease contracts imposing the relevant restrictions on their rights in the oysters.

## A.     Whether Louisiana Law Violates the Unconstitutional Conditions Doctrine

Plaintiffs contend "Louisiana . . . is prohibited by the [United States] Constitution from . . . indirectly" limiting plaintiffs' "exercise of their constitutional rights" by conditioning oyster leases on the waiver of their "right[] to compensation for the taking of their property." Pls.' Suppl. Br. at 3–4. Plaintiffs argue the unconstitutional conditions doctrine makes clear "[t]he power of the state . . . is not unlimited[;] and one of the limitations is that [states] may not impose conditions which require [the] relinquishment of constitutional rights." *Id.* at 2 (quoting *Frost v. R.R. Comm'n*, 271 U.S. 583, 594 (1926)). Plaintiffs, citing *Koontz v. St. Johns River Water Management District*, emphasize the Supreme Court's pronouncement, "[t]he government may not [condition] a benefit . . . on a basis that infringes . . . constitutionally protected . . . freedom[s]." 570 U.S. at 608 (quoting *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 210 (2003)). Thus, plaintiffs conclude it is unconstitutional for Louisiana to "offer[] plaintiffs oyster leases subject to the condition that they waive their constitutional rights to compensation for the taking of their property by the [government]." Pls.' Suppl. Br. at 3–4.

In response, the government first argues the unconstitutional conditions doctrine is "not a viable argument against the . . . government" because Louisiana, not the government, "took the action which [allegedly] took" plaintiffs right to maintain a takings claim. Tr. 135:13–17. Addressing the doctrine itself, the government primarily argues it is inapplicable because plaintiffs do not have a "preexisting compensable property right" in the ability to sue, meaning Louisiana could not have "coerce[d] plaintiff[s] into giving up that right." Def.'s Suppl. Br. at 1–2; Tr. at 22:1–6 ("[THE GOVERNMENT:]  [T]hey do not have that right [to sue for a taking],

but I would not say it's a forfeiture, because that suggests that they had that right to begin with.").

The unconstitutional conditions doctrine applies when a "condition is . . . imposed" requiring a person "surrender . . . [a] constitutional right as a condition of [a government's] favor" such that something "has been taken."[14]  *Koontz*, 570 U.S. at 608; *Frost* 271 U.S. at 594.  "Where . . . [a] condition is never imposed, nothing has been taken[,]" so the "remedy—just compensation—[mandated by the Fifth Amendment] for takings" is inapplicable.  *Koontz*, 570 U.S. at 608–9 (emphasis omitted).  In *Frost*, for example, which plaintiffs refer to as "the seminal unconstitutional conditions case[,]" Pls.' Suppl. Br. at 1–2, California required the plaintiff, a contract carrier, to submit to regulation as a common carrier and obtain a certificate of public convenience before continuing to operate its business on public highways, *Frost*, 271 U.S. at 590.  The plaintiff, who operated its business on public highways freely until the enactment of the law at issue, was suddenly "compel[led] to surrender . . . [a] constitutional right as a condition of [the state's] favor."  *Id.* at 594.  The Supreme Court therefore struck down California's statute as applied.  *Id.* at 599.  Likewise, in *Koontz*, the plaintiff challenged a local government's "demand for [real] property [in exchange for approving] a land-use permit" application.  570 U.S. at 619.  The Supreme Court, rather than addressing the merits of the case, held such a requirement must satisfy its unconstitutional conditions doctrine precedent in the land permitting context.  *Id.* (citing *Nollan v. California Coastal Comm'n*, 483, U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994)).  In both *Frost* and *Koontz*, the government imposed "excessive conditions" on preexisting rights.  *Koontz*, 570 U.S. at 609.  In *Frost*, the plaintiff's preexisting right to operate privately on public highways was conditioned on the plaintiff submitting to the "regulative control of the" California Railroad Commission and obtaining "a certificate of public convenience and necessity."  *Frost*, 271 U.S. at 590.  In *Koontz*, the plaintiff's right to use and "develop . . . [the] northern section of his property" was conditioned on him making "one of two concessions" involving granting the local government a "conservation easement on" much of his "remaining 13.9 acres."  570 U.S. at 601.  In contrast, here, plaintiffs had no rights in the oysters until they executed their lease contracts, in which they agreed to be bound by Louisiana law.  *See supra* Section VI; Tr. at 135:21–136:7 ("THE COURT:  . . . [D]o plaintiffs have a preexisting right [in the oysters]? . . . [It seems] they don't have any property rights in oysters [before signing the lease contracts]. . . .  [PLAINTIFFS:] That's right."); Tr. at 32:24–33:2 ("THE COURT:  Just to confirm, plaintiffs' oyster leases do obligate them to comply with Louisiana law in their oyster farming?  [PLAINTIFFS:]  Yes, sir.").  Plaintiffs were not subject to "conditions which require[d] relinquishment of constitutional rights," rather they agreed via lease contract to acquire property rights in oysters subject to certain restrictions.  *Frost*, 271 U.S. at 594; Tr. at 26:19–21, 32:24–33:2.  One such restriction, imposed by most—if not all—of the leases directly and by all indirectly through the obligation plaintiffs "comply with Louisiana law in their oyster farming," is plaintiffs may not "maintain any action against . . . [the government] for any claim arising from . . . integrated

---

[14] The unconstitutional conditions doctrine "represents a rejection of the logic that the government's greater power to withhold a benefit all together authorizes the government to condition a benefit on the relinquishing of a constitutional right."  Michael A. Helfand, *There Are No Unconstitutional Conditions on Free Exercise*, 98 NOTRE DAME L. REV. REFLECTION (SPECIAL ISSUE) S50, S54 (2023).  According to one scholar, "the Court has sorted various government-imposed conditions into constitutional and unconstitutional buckets, but critics contend that there isn't much method to the the madness."  *Id.* at S55.

coastal protection.'" La. Rev. Stat. § 56:423(B)(1) (2024); *see supra* Section VI.  Louisiana did not, and could not, impose a condition resulting in the taking of this right because plaintiffs "never had the right to sue."[15]  Def.'s Suppl. Br. at 18; *Koontz*, 570 U.S. at 606; *see* La. Rev. Stat. § 49:214.2(11) (2024); *Id.* § 56:423(A)(1), (B)(1)(a).[16]

### B.   Whether *Tyler v. Hennepin County* and Related Supreme Court Precedent Are Applicable

Plaintiffs next cite *Tyler v. Hennepin County* and related Supreme Court precedent in support of their argument, "[s]tates do not have the unfettered authority to 'shape and define property rights.'"  Pls.' Suppl. Br. at 9–10 (first quoting *Murr*, 137 S. Ct. at 1951; then citing *Tyler v. Hennepin Cnty.*, 143 S. Ct. 1369 (2023); then citing *Webb's Fabulous Pharmacies*, 449 U.S. 155; and then citing *Phillips v. Wash. Legal Found.*, 524 U.S. 156 (1998)).  Specifically, plaintiffs contend, "[t]hough fundamental principles of [s]tate property law may define property rights, the Takings Clause limits a state's authority to . . . circumvent federal constitutional provisions."  *Id.* (citing *Moore v. Harper*, 143 S. Ct. 2065, 2069 (2023)).  In *Tyler*, the plaintiff's home was seized by the state after "the [c]ounty obtain[ed] a judgment against the property" due to outstanding property tax liabilities.  *Tyler*, 143 S. Ct. at 1373.  The state then sold the home for $40,000 and retained the total proceeds, even though the tax liability was merely $15,000.  *Id.* at 1374.  In *Tyler*, the Supreme Court took issue with Minnesota creating "an exception [in defining property interests] only for itself" by retaining the surplus from the sale of the plaintiff's home when, in "collecting all other taxes, Minnesota protects the taxpayer's right to surplus."  *Tyler*, 143 S. Ct. at 1379.  Plaintiffs allege this is similar to the instant case, in which plaintiffs argue Louisiana made "an exception only for itself" because Louisiana has always afforded oyster lessees the right "to maintain an action for damages against any . . . entity causing wrongful . . . damage" to their beds and oysters "EXCEPT the state or federal government in relation to integrated coastal protection."  *Id.*  at 11 (quoting La. Rev. Stat. § 56:423(B)(1)(a)).

The government disputes plaintiffs' characterization of *Tyler* and related cases and argues the key distinction is, "[in those cases], state laws deemed [private property] . . . to be state property," prompting the Supreme Court to hold, "notwithstanding the state laws'

---

[15] At oral argument, plaintiffs attempted to liken the instant case to *Horne v. Department of Agriculture*, in which the Supreme Court held a federal regulation requiring "a percentage of a grower's [raisin] crop [to] . . . be physically set aside in certain years for the account of the [g]overnment, free of charge" amounted to a taking without just compensation.  *Horne*, 576 U.S. 350, 354, 367 (2015); Tr. at 139:7–140:4.  Plaintiffs argue, in the lease contracts, Louisiana could not "have required oyster farmers . . . give up half of their crop to the state if they farm on state land" because "[t]hat is the . . . raisins case[,]" and the government cannot "take away constitutional rights to begin with."  Tr. 139:8–25.  *Horne*, like *Frost* and *Koontz*, however, involved plaintiffs with preexisting property rights.  In contrast, plaintiffs here had no rights in the oysters until they executed their lease contracts, which required they abide by Louisiana law and imposed myriad restrictions, including on their ability to sue for injuries arising out of integrated coastal protection.  *See supra* Section VI.  The Court is therefore wary of plaintiffs' argument *Horne* would prevent Louisiana from hypothetically requiring plaintiffs turn over half of their oyster crop in exchange for the ability to oyster farm on public land.  *See* Tr. at 139:7–140:4.

[16] The government contends, if the unconstitutional conditions doctrine applies to plaintiffs, "there is a nexus and rough proportionality here" as required by *Nollan* and *Dolan* such that the condition is permissible.  *See* Tr. 143:18–19 (first citing *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); and then citing *Dolan v. City of Tigard*, 512 U.S. 374 (1994)).  The Court finds the unconstitutional conditions doctrine is inapplicable here and accordingly does not reach the question of whether there is a nexus or rough proportionality as required by those cases.

recharacterization of formerly private property as public property, the claimants had property rights sufficient to bring takings claims." Def.'s Suppl. Br. at 13 (first citing *Tyler*, 143 S. Ct. 1373–74; then citing *Phillips*, 524 U.S. at 156–67, 172 (invalidating a state law deeming interest earned on monies held in attorney trust accounts as part of a state program to be state property ); and then citing *Webb's Fabulous Pharmacies*, 449 U.S. at 162–65 (invalidating a state law deeming interest earned on a fee held by a court to be state property)). The government states Louisiana's oyster regime is unlike the laws invalidated in plaintiffs' proffered cases because "[section] 56:423 does not purport to transfer any rights held under the oyster leases to the state," meaning "Louisiana did not appropriate any interest in the oyster leases [or oysters]." *Id.* at 14. Specifically, the government clarifies "the difference" is no "property interest [in the ability to sue] . . . exists" here, so the government cannot and did not "recharacterize [that non-existent right] in such a way" as to render it public property. Tr. at 120:8–12.

In *Webb's Fabulous Pharmacies*, the Supreme Court held a Florida statute authorizing a county to "take as its own . . . the interest accruing on . . . [certain] fund[s] deposited in the registry of the county court" violated the Fifth Amendment Takings Clause. 449 U.S. at 155–56. In doing so, the Supreme Court stated, "a [s]tate, by *ipse dixit*, may not transform private property into public property without compensation, even for the limited duration of the deposit in court." *Id.* at 164. The Supreme Court applied this same principal in *Phillips*, in which it recognized "interest earned on client funds held in [Interest on Lawyers Trust Accounts] . . . is the property of the client," including for purposes of state statutes requiring such interest be paid to "foundations that finance legal services for low-income individuals." 524 U.S. at 160, 167 ("'[A] [s]tate, by *ipse dixit*, may not transform private property into public property without compensation' simply by legislatively abrogating the traditional rule[s] [of property]." (quoting *Webb's Fabulous Pharmacies*, 449 U.S. at 164)). The Supreme Court likewise applied this rule in *Tyler*, stating "[t]he Takings Clause 'was designed to bar [g]overnment from forcing some people alone to bear public burdens which . . . should be borne by the public as a whole.'" 143 S. Ct. at 1380 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). The Court therefore found the plaintiff "plausibly alleged a taking under the Fifth Amendment" because Minnesota took "her $40,000 house to . . . fulfill a $15,000 tax debt." *Id.* at 1380–81. In other words, the state, "by *ipse dixit* . . . transform[ed the plaintiff's] private property [($25,000)] into public property without compensation." *See Webb's Fabulous Pharmacies, Inc.*, 449 U.S. at 164.

Louisiana's regulatory scheme grants plaintiffs myriad rights in the oysters and oyster beds. *See Campo v. United States*, 157 Fed. Cl. 584, 618 (2021) ("[P]laintiffs demonstrate rights to exclude, destroy, use, possess, sue third parties for damages, recover for larceny, alienate, and enjoy the fruits of selling oysters."). It does not, however, afford plaintiffs the right to "maintain an[] action against . . . [the government] for [a] claim arising from . . . integrated coastal protection." LA. REV. STAT. § 56:423(B)(1)(a) (2024). Plaintiffs, whose rights in the oysters stem *exclusively* from their lease contracts, which obligate plaintiffs to follow Louisiana law, therefore never had the right to sue the government for a taking arising out of integrated coastal protection, meaning this right could not be "transform[ed] . . . into public property." *Webb's Fabulous Pharmacies, Inc.*, 449 U.S. at 164; *supra* Section VI; *see also* Tr. at 26:18–20, 32:24–33:2 ("THE COURT: Just to confirm, plaintiffs' oyster leases do obligate them to comply with Louisiana law in their oyster farming? [PLAINTIFFS:] Yes, sir."). Further, assuming *arguendo* plaintiffs had such a right, plaintiffs fail to explain how this case is similar to those discussed

*supra*. There is no indication the government appropriated plaintiffs' right to sue in a manner similar to the improper statutes at issue in *Webb's Fabulous Pharmacies*, *Phillips*, or *Tyler*. Overall, it appears to the Court Louisiana did not—and indeed could not—"transform [plaintiffs'] private property" right to sue the government for a taking arising out of integrated coastal protection "into public property" because plaintiffs never had the right to sue. *Webb's Fabulous Pharmacies, Inc.*, 449 U.S. at 164.

## C.   Whether *Knick v. Township of Scott* Applies to Louisiana's Oyster Regime

Plaintiffs finally argue *Knick* prevents Louisiana from allegedly "effectuat[ing] a ban of Takings claims." Pls.' Suppl. Br. at 13. In *Knick*, the Supreme Court overruled *Williamson County*, in which the Supreme Court had held, "if a [s]tate provides an adequate procedure for seeking just compensation [for an alleged taking], [a] property owner cannot claim a violation of the [Takings] Clause until it has used the procedure and been denied just compensation." *Knick*, 139 S. Ct. at 2169 (final alteration in original) (quoting *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985)). The *Knick* court recognized "property owners may bring Fifth Amendment claims against the . . . [g]overnment as soon as their property has been taken" because "if there is a taking, 'the claim is founded upon the Constitution' and within the jurisdiction of the Court of [Federal] Claims to hear and determine." *Id.* at 2170 (first citing Tucker Act, 28 U.S.C. § 1491(a)(1); and then quoting *United States v. Causby*, 328 U.S. 256, 267 (1946)). The government distinguishes *Knick* on the grounds it dealt with "a [Supreme] Court-related exhaustion requirement *in Section 1983 litigation*," not any issue relevant to this case. Def.'s Resp. Suppl. Br. at 11 (emphasis added). The government likewise alleges sections 56:423(A)(1) and (B)(1)(a) are not "blocking a right to sue the [government]" in any manner prohibited by *Knick* because plaintiffs "never had that right." Tr. at 126:6–9.

In *Knick*, the Supreme Court, without clearly limiting its holding to suits filed under 42 U.S.C. § 1983, stated, "[t]he Fifth Amendment right to full compensation arises at the time of the taking." 139 S. Ct. at 2170. In the instant case, Louisiana's regulatory scheme grants plaintiffs myriad rights in the oysters and oyster beds. *See Campo*, 157 Fed. Cl. at 618 ("[P]laintiffs demonstrate rights to exclude, destroy, use, possess, sue third parties for damages, recover for larceny, alienate, and enjoy the fruits of selling oysters."). It does not, however, afford plaintiffs the right to "maintain an[] action against . . . [the government] for [a] claim arising from . . . integrated coastal protection.'" LA. REV. STAT. § 56:423(B)(1)(a) (2024). Plaintiffs assented to this restriction when voluntarily signing their oyster leases. *See* Tr. at 26:18–20, 32:24–33:2 ("THE COURT: Just to confirm, plaintiffs' oyster leases do obligate them to comply with Louisiana law in their oyster farming? [PLAINTIFFS:] Yes, sir."). Louisiana therefore is not blocking plaintiffs from exercising a preexisting right to sue, rather plaintiffs never had the right to sue by virtue of "voluntarily entering into the . . . regulated" oyster industry via their restrictive lease contracts. *Acceptance Ins.*, 583 F.3d at 857–59; *see Am. Pelagic Fishing Co.*, 379 F.3d at 1376.[17]

---

[17] The Court is wary, however, of the government's assertions at oral argument states may freely: (1) "define property rights to block . . . takings claim[s]"; and potentially (2) "bargain with individuals to forfeit their constitutional rights." Tr. at 125:20–23, 138:16–139:2.

## VIII.  Whether Plaintiffs' Claim Should be Dismissed Pursuant to RCFC 12(b)(6) for Failure to State a Claim

The government argues, "[p]laintiffs[] . . . fail[] [to state a claim upon which relief can be granted] because oyster leases in Louisiana are subordinate to actions taken in furtherance of integrated coastal protection, including actions taken for the purpose of providing flood control, like the 2019 operation of the Bonnet Carré Spillway." Def.'s MTD/MSJ at ii.  Plaintiffs disagree and argue the Louisiana statutes cited by the government do not apply to this case. *See* Pls.' MTD/MSJ Resp. at 9–13.  In the alternative, plaintiffs argue the statutes are "not enforceable, because they are unconstitutional." Tr. at 25:9–10.  As the Court found *supra*:  (1) sections 49:214.2(11) and 56:423(A)(1) and (B)(1)(a) apply to plaintiffs and the 2019 operation of the Bonnet Carré Spillway, *supra* Section V; (2) plaintiffs, when executing their oyster lease contracts, voluntarily agreed to obtain rights in the oysters subject to the restrictions imposed by their contracts and Louisiana law, *supra* Section VI; and (3) the Court need not—and is not the best forum to—rule on plaintiffs' constitutional arguments, *supra* Section VII, the Court must grant the government's Motion to Dismiss pursuant to RCFC 12(b)(6).  Even "accept[ing] as true all the factual allegations in [plaintiffs'] complaint and . . . indulg[ing] all reasonable inferences" in their favor, Louisiana law unambiguously blocks plaintiffs' claims. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001); *BedRoc Ltd., v. United States*, 541 U.S. 176, 183 (2004).

## IX.  Conclusion

For the foregoing reasons, the Court **GRANTS** the government's Motion to Dismiss, ECF No. 43, **FINDS as MOOT** the government's alternative Motion for Summary Judgment, ECF No. 43, **FINDS as MOOT** the government's Joint Motion for Discovery Protocol, ECF No. 35, and **DISMISSES** plaintiffs' Complaint, ECF No. 1.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge
